United States District Court
Southern District of Texas
FILED

OCT 1 5 2010

David J. Bradley, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**10 CV 3856**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* Elizabeth W. Kennedy | § | CIVIL ACTION NO. _____ |
| | § | |
| | § | |
| STATE OF ILLINOIS, *ex rel.* | § | |
| Elizabeth W. Kennedy; | § | FILED UNDER SEAL |
| STATE OF CALIFORNIA, *ex rel.* | § | |
| Elizabeth W. Kennedy; | § | |
| STATE OF FLORIDA, *ex rel.* | § | PLAINTIFF'S ORIGINAL |
| Elizabeth W. Kennedy; | § | COMPLAINT PURSUANT TO 31 |
| STATE OF TENNESSEE, *ex rel.* | § | U.S.C. §§ 3729–3732, FEDERAL |
| Elizabeth W. Kennedy; | § | FALSE CLAIMS ACT AND VARIOUS |
| STATE OF TEXAS, *ex rel.* | § | STATE FALSE CLAIMS ACTS, AND |
| Elizabeth W. Kennedy; | § | PENDENT STATE CLAIMS |
| COMMONWEALTH OF | § | |
| MASSACHUSETTS, *ex rel.* | § | |
| Elizabeth W. Kennedy; | § | |
| STATE OF DELAWARE, *ex rel.* | § | |
| Elizabeth W. Kennedy; | § | |
| STATE OF NEVADA, *ex rel.* | § | JURY TRIAL DEMANDED |
| Elizabeth W. Kennedy; | § | |
| STATE OF LOUISIANA, *ex rel.* | § | |
| Elizabeth W. Kennedy; | § | |
| STATE OF HAWAII, *ex rel.* | § | |
| Elizabeth W. Kennedy; | § | |
| DISTRICT OF COLUMBIA, *ex rel.* | § | |
| Elizabeth W. Kennedy; | § | |
| COMMONWEALTH OF | § | |
| VIRGINIA, *ex rel.* | § | |
| Elizabeth W. Kennedy; | § | |
| STATE OF GEORGIA, *ex rel.* | § | |
| Elizabeth W. Kennedy; | § | |
| STATE OF INDIANA, *ex rel.* | § | |
| Elizabeth W. Kennedy; | § | |
| STATE OF MICHIGAN, *ex rel.* | § | |
| Elizabeth W. Kennedy; | § | |
| STATE OF MONTANA, *ex rel.* | § | |
| Elizabeth W. Kennedy; | § | |
| STATE OF NEW HAMPSHIRE, *ex rel.* | § | |
| Elizabeth W. Kennedy; | § | |
| STATE OF NEW JERSEY, *ex rel.* | § | |

Elizabeth W. Kennedy;                              §
STATE OF NEW MEXICO, *ex rel.*                     §
Elizabeth W. Kennedy;                              §
STATE OF NEW YORK, *ex rel.*                       §
Elizabeth W. Kennedy;                              §
STATE OF OKLAHOMA, *ex rel.*                       §
Elizabeth W. Kennedy;                              §
STATE OF RHODE ISLAND, *ex rel.*                   §
Elizabeth W. Kennedy;                              §
STATE OF WISCONSIN, *ex rel.*                      §
Elizabeth W. Kennedy;                              §
STATE OF CONNECTICUT, *ex rel.*                    §
Elizabeth W. Kennedy;                              §
STATE OF NORTH CAROLINA, *ex rel.*                 §
Elizabeth W. Kennedy;                              §
STATE OF COLORADO, *ex rel.*                       §
Elizabeth W. Kennedy;                              §
STATE OF MARYLAND, *ex rel.*                       §
Elizabeth W. Kennedy;                              §
CITY OF CHICAGO *ex rel.*                          §
Elizabeth W. Kennedy;                              §
STATE OF MINNESOTA *ex rel.*                       §
Elizabeth W. Kennedy;                              §
                                                   §
     Plaintiffs,          §
                                                   §
v.                                                 §
                                                   §
NOVO A/S;                                          §
NOVO NORDISK, A/S;                                 §
NOVO NORDISK FOUNDATION                            §
NOVO NORDISK, INC.;                                §
                                                   §
     Defendants.           §

## **<u>RELATOR ELIZABETH W. KENNEDY'S ORIGINAL COMPLAINT</u>**

TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II. PARTIES ......................................................................................................... 3

   A.  RELATOR'S BACKGROUND................................................................. 3

   B.  BACKGROUND ON DEFENDANTS ....................................................... 4

III. JURISDICTION AND VENUE ......................................................................... 6

IV. RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY ......................... 6

V.  REGULATORY BACKGROUND .................................................................... 8

   A.  THE FDA'S ROLE IN THE REGULATION OF PRESCRIPTION DRUGS ........... 8

       i.   FDA Approval of Prescription Drugs ...................................... 8

       ii.  FDA Regulation of Manufacturers' Marketing of Prescription Drugs ....... 9

   B.  REIMBURSEMENT OF PRESCRIPTION DRUGS UNDER MEDICAID, MEDICARE PART D, CHAMPUS/TRICARE, CHAMPVA, FEDERAL EMPLOYEE HEALTH BENEFIT PLAN, AND OTHER FEDERAL HEALTHCARE PROGRAMS ..................................... 11

       i.   Medicaid ................................................................................ 11

       ii.  Medicare Part D .................................................................... 14

       iii. CHAMPUS/TRICARE, CHAMPVA, and Federal Employee Health Benefit Plan ................................................................. 17

   C.  PROHIBITION OF KICKBACKS ASSOCIATED WITH MEDICAID, MEDICARE, CHAMPUS/TRICARE, CHAMPVA, AND FEDERAL EMPLOYEE HEALTH BENEFIT PLAN PRESCRIPTIONS     18

       i.   Federal Anti-Kickback Statute................................................ 18

       ii.  OIG, PhRMA, AMA and ACCME's Guidelines on the Manufacturer-Doctor Relationship and Behaviors that Violate the Anti-Kickback Statute ........................................ 20

VI. NOVO NORDISK'S SCHEME TO SELL VICTOZA THROUGH OFF-LABEL MARKETING AND ILLEGAL KICKBACKS.............................................. 21

   A.  DIABETES & VICTOZA OVERVIEW ...................................................... 21

iii

i.      Type 2 Diabetes ....................................................................... 21

ii.     Victoza .................................................................................... 26

        a.      Indication ....................................................................... 26

        b.      Means of administration and dosage.............................................26

        c.      Efficacy .......................................................................... 27

        d.      Claims not supported by Victoza label ......................................... 29

        e.      Safety concerns ................................................................. 29

B.      NOVO NORDISK'S OFF-LABELING MARKETING STRATEGIES AND FALSE CLAIMS. 31

i.      Victoza Pre-Launch ................................................................ 33

ii.     Victoza Launch ..................................................................... 34

iii.    Victoza Post-Launch Off-Label Marketing Campaign ............................ 37

        a.      Novo Nordisk's Sales Force and Medical Liaison Group
             Are Structured to Allow Off-Label Marketing ............................37

        b.      Compensation for off-label marketing...........................................40

        c.      Promotion of off-label uses in physician details.......................... 40

        d.      Off-label competitive statements in physician details ................. 44

        e.      Role of speakers and presentation in delivering Victoza's Off-label
             message ...................................................................... 46

        f.      Downplaying safety issues and side effects and promoting as first
             line therapy................................................................... 47

C.      NOVO NORDISK'S USE OF MEDICAL LIAISONS AND KICKBACKS ...................... 48

D.      NOVO NORDISK'S MARKETING SCHEMES FOR VICTOZA TARGETED GOVERNMENT
        HEALTH PROGRAMS, GAINED FORMULARY ACCESS BY DECEIT AND OTHER MEANS,
        AND CAUSED CLAIMS ARISING FROM SUCH SCHEMES TO BE SUBMITTED FOR
        PAYMENT      ................................................................. 50

i.      Targeting Government Health Care Enrollees.................................... 50

ii.     Assisting with Coverage and Prior Authorization Forms ........................ 51

iii.    Evidence that Sales Force Delivered Off-Label Messages and Influenced Physicians: Impact RX Reports on Doctors' Description of Victoza Detailing.................................................................................... 53

VII.    RETALIATION AGAINST KENNEDY ............................................................ 57

VIII.   ACTIONABLE CONDUCT BY NOVO NORDISK UNDER THE FALSE CLAIMS ACT ............................................................................................ 60

    A.      APPLICABLE LAW .................................................................................... 60

        i.      FALSE CLAIMS ACT ......................................................................... 60

    B.      NOVO NORDISK'S VIOLATIONS OF THE FCA ........................................... 62

        i.      Novo Nordisk's Illegal Kickback and Off-Label Marketing Schemes Violated the FCA .................................................................. 62

        ii.     Novo Nordisk Conspired with Physicians to Defraud Medicaid in Violation of the FCA ......................................................................... 65

        iii.    Damages ........................................................................................... 66

IX.     CAUSES OF ACTION ................................................................................... 66

    A.      COUNT I - FALSE CLAIMS (31 U.S.C. § 3729(A)) ..................................... 66

    B.      COUNT II - FALSE RECORDS OR STATEMENTS (31 U.S.C. § 3729(A)) ...... 67

    C.      COUNT III - CONSPIRACY (31 U.S.C. § 3729(A)) ...................................... 68

    D.      COUNT IV - RETALIATION (31 U.S.C. § 3730(H)) ..................................... 68

RELIEF .................................................................................................................. 69

PRAYER ................................................................................................................ 69

    E.      COUNT V - ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT (740 ILCS ET SEQ.) ..................................................................................... 70

F.    COUNT VI - CALIFORNIA FALSE CLAIMS ACT
      (CAL. GOV'T. CODE § 12650 ET SEQ.) ................................................................ 73

G.    COUNT VII - FLORIDA FALSE CLAIMS ACT (FLA. STAT. § 68.081 ET SEQ.)............ 75

H.    COUNT VIII – MASSACHUSETTS FALSE CLAIMS ACT (MASS. GEN. LAWS ANN. 12 §
      5A ET SEQ.)    ................................................................................................ 78

I.    COUNT IX -  TENNESSEE MEDICAID FALSE CLAIMS ACT (TENN. CODE  ANN. § 71-
      5-181 ET SEQ.) ............................................................................................... 81

J.    Count X - Delaware False Claims and Reporting Act (6 Del. C. § 1201 et seq.)..83

K.    COUNT XI – NEVADA FALSE CLAIMS ACT (N.R.S. § 357.010 ET SEQ.).................. 86

L.    COUNT XII - LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW (LA.
      REV. STAT. ANN. § 46:437.1 ET SEQ.).................................................................. 88

M.    COUNT XIII - HAWAII FALSE CLAIMS ACT (HAW. REV. STAT. § 661-21 ET SEQ.) . 91

N.    COUNT XIV - DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT
      (D.C. CODE § 2-308.13 ET SEQ.).......................................................................... 94

O.    COUNT XV - VIRGINIA FRAUD AGAINST TAXPAYER ACT (VA. CODE ANN. § 8.01-
      216.1 ET SEQ.) ................................................................................................. 96

P.    COUNT XVI -GEORGIA STATE FALSE MEDICAID CLAIMS ACT (GA. CODE. ANN. §
      49-4-168 ET SEQ.)............................................................................................. 99

Q.    COUNT XVII - INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT
      (IND. CODE § 5-11-5.5-1 ET SEQ.) ...................................................................... 102

R.    COUNT XVIII - MICHIGAN MEDICAID FALSE CLAIMS ACT (MICH. COMP. LAWS §
      400.601 ET SEQ.).............................................................................................. 104

S.    COUNT XIX - MONTANA FALSE CLAIMS ACT (MONT. CODE ANN. § 17-8-401 ET
      SEQ.)          ...................................................................................................... 107

T.    COUNT XX - NEW HAMPSHIRE FALSE CLAIMS ACT (N.H. REV. STAT. ANN. §
      167:61 ET SEQ.)................................................................................................. 109

U.    COUNT XXI –NEW JERSEY FALSE CLAIMS ACT (N.J. STAT. ANN. §§ 2A:32-C1–
      2A:32-C18)    112

V.    COUNT XXII - NEW MEXICO MEDICAID FALSE CLAIMS ACT (N.M. STAT. ANN. §
      27-14-1 ET SEQ.) .............................................................................................. 114

W.    COUNT XXIII - NEW YORK FALSE CLAIMS ACT (N.Y. STATE FIN. LAW § 187 ET SEQ.) .................................................................................. 117

X.    COUNT XXIV– OKLAHOMA MEDICAID FALSE CLAIMS ACT (OKLA. STAT. ANN. § 5053.1 ET SEQ.) ................................................................................ 120

Y.    COUNT XXV- RHODE ISLAND STATE FALSE CLAIMS ACT (R.I. GEN. LAWS § 9-1.1-1 ET SEQ.)      122

Z.    COUNT XXVI - TEXAS FALSE CLAIMS ACT (V.T.C.A. HUM. RES. CODE § 36.001 ET SEQ.) .................................................................................. 125

AA.   COUNT XXVII - WISCONSIN FALSE CLAIMS ACT ............................... 127

BB.   COUNT XXVIII- COLORADO FALSE CLAIMS ACT ............................... 130

CC.   COUNT XXIX - CONNECTICUT ACT IMPLEMENTING THE PROVISIONS OF THE BUDGET CONCERNING HUMAN SERVICES AND MAKING CHANGES TO VARIOUS SOCIAL SERVICES STATUTES ............................................................... 132

DD.   COUNT XXX - MARYLAND FALSE CLAIMS ACT................................. 135

EE.   COUNT XXXI- MINNESOTA FALSE CLAIMS ACT ............................... 137

FF.   COUNT XXXII - NORTH CAROLINA FALSE CLAIMS ACT ..................... 140

GG.   COUNT XXXIII- CITY OF CHICAGO FALSE CLAIMS ACT .................... 142

HH.   COUNT XXXIV - COMMON RELIEF FUND ......................................... 145

X.    DEMAND FOR JURY TRIAL ................................................................... 146

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

The United States of America, the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and the City of Chicago, by and through *qui tam* Relator Elizabeth W. Kennedy, brings this action under 31 U.S.C. §§ 3729–3732 ("False Claims Act") to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States and themselves and would show the following:

## I. INTRODUCTION

**"Victoza was discussed ... I don't think it was the ideal drug for diabetics 2 for several reasons. One of them they're talking about watching for thyroid cancer, talking about for watching for pancreatitis and an injection in a patient that, you know, for the first time heard about being, not even a diabetic, but maybe metabolic syndrome or pre-diabetic go with an injection. I don't think they're gonna take, they're gonna start flying right away, needs a lot of convincing to do, alright?"**

- Primary care doctor, commenting on Victoza detail, Week 6 after launch (pg.58)

**"I discussed how I like Victoza more than Byetta, the once a day product, but I was hoping for more samples. She was going to leave 2, but she left 4 instead. And also mentioned they have the coupon copay cards because it's on formulary but it's 3rd tier and they want to bring it down to 2nd tier. And so we discussed that and I called 2 of my patients that I was hoping to get on Victoza while she was still there just so I can show them how to use the shot themselves in the office. And she was very excited I had already had 3 patients on the product."**

- Presumably different primary care doctor, commenting on Victoza detail, Week 7 after launch (pg. 58)

**"Novo Nordisk A/S, the world's biggest diabetes-drug maker, raised its 2010 forecast for the second time this year after first-quarter profit beat analyst estimates on higher-than-expected sales of a new medicine. First-quarter net income rose 23 percent to 3.32 billion kroner ($596 million), beating a 2.96 million-**

**kroner average estimate by nine analysts.  Analysts expect Victoza sales to reach 1.14 billion kroner [about $145 million] this year, according to Bloomberg data. Half of patients receiving GLP-1 treatments in the 10th week after the introduction of Victoza are receiving the Novo drug [rather than Byetta], [Jesper Brandgaard, Novo's chief financial officer] said.  Sixty percent of patients being prescribed Victoza have failed to control their blood sugar using conventional oral treatments such as metformin, and between 10 percent and 15 percent are being treated for the first time, Brandgaard said.  Another 10 percent are switching from insulin, while the remaining 15 percent to 20 percent switch from Byetta, he said.  'It looks like we are able to grow the market and that is what is crucial to the success of GLP-1s,' he said."**

> "Novo Nordisk Lifts 2010 Revenue, Profit Forecasts," *Bloomberg Businessweek* website, available at http://www.businessweek.com/news/2010-04-27/novo-nordisk-lifts-2010-revenue-profit-forecasts-update1-.html.

1.     In January of 2010, the FDA approved Novo Nordisk's[1] diabetes drug, Victoza, as an adjunct therapy, but not a first-line treatment, for the treatment of type 2 diabetes.  Novo Nordisk wasted no time in illegally marketing the drug to American diabetics and their physicians for a host of off-label uses.  Novo Nordisk began marketing Victoza as a first-line therapy and a weight loss drug.  Further, without scientific support or the FDA's approval, Novo Nordisk promised the diabetic community that Victoza can reverse diabetes and restore kidney function.  Perhaps even more irresponsibly, Novo Nordisk began claiming that Victoza could prevent diabetes in pre-diabetics suffering from metabolic syndrome.  Novo Nordisk also began making competitive statements about Victoza versus Byetta, a competitor drug, and began detailing[2] physicians on that subject using a "Leave-Behind" reprint.  Finally, since the time of launch, Novo Nordisk has marketed Victoza off-label by downplaying its safety issues and side effects.  Novo Nordisk trained its sales force to make all of these assertions, and it continues to market Victoza accordingly today.

---

[1] Unless otherwise noted, reference to "Novo Nordisk" is a reference to Novo Nordisk, Inc., Novo Nordisk A/S, Novo Nordisk Foundation, and Novo A/S, collectively.

[2] When a sales representative "details" a physician, often during a call to the physician's office, the representative makes his or her sales pitch concerning one or more drug for which the representative is responsible.

2.     In fact, while Novo Nordisk no longer allows its sales representatives to document the substance of their calls on physicians with "call notes," market research reports circulated to the sales force, including verbatim notes from interviews with doctors after receiving visits from Novo Nordisk sales representatives, reflect the rampant extent of illegal off-label marketing in the field.  *See* Ex. 1, Impact RX Report Week 6; Ex. 2, Impact RX Report Week 7.

3.     Novo Nordisk's Victoza campaign targeting non-diabetics and diabetics alike constitutes a massive fraud upon Medicaid, Medicare, and other government health programs, which in the last nine months have paid significant funds for Victoza for their enrollees.  Further, kickbacks to doctors have played an important role in disseminating Novo Nordisk's off-label messages.  Novo Nordisk's false and misleading claims about Victoza have already led to misconceptions by patients and physicians about the inappropriate treatment of diabetic and pre-diabetic patients, misconceptions likely to increase commensurately with Victoza's swiftly-growing sales.  As a result of this nationwide scheme, Novo Nordisk has violated and continues to violate the False Claims Act and reap profits far beyond those it could achieve from legitimate promotion.

## II. PARTIES

### A.     Relator's Background

4.     Relator Elizabeth W. Kennedy ("Kennedy" or "Relator")—a citizen of the United States and resident of the State of Alabama—has lived in Mobile, Alabama since childhood.  The daughter of an endocrinologist with a specialty in diabetes, Kennedy grew up attending summer camps with children suffering from diabetes.  It was her longstanding interest in diabetes that drew her to her first pharmaceutical sales position.  In December 2006, Eli Lilly hired Kennedy

as a Diabetes Care Representative promoting diabetes drugs such as Glucagon, Humalog, and Byetta. Two years later, Novo Nordisk convinced her to accept a job promoting rival diabetes drugs. On January 5, 2009, approximately one year before Victoza's launch, Kennedy took the position of Diabetes Care Specialist II with Novo Nordisk. During her tenure with Novo Nordisk, she marketed Victoza and Novo Nordisk's other diabetes drugs. Kennedy was terminated on April 22, 2010 after disclosing to Human Resources details surrounding the company's off-label marketing scheme for Victoza.

**B.      Background on Defendants**

5.      Defendant Novo Nordisk A/S is an unlisted, public limited liability company organized in Denmark. Its principal place of business is Novo Allé, 2880 Bagsværd, Denmark. Novo Nordisk A/S conducts extensive business in the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and the City of Chicago.

6.      Defendant Novo Nordisk, Inc. is a publicly traded corporation organized in Delaware. Its principal place of business is 100 College Road West, Princeton, NJ 08540. Novo Nordisk, Inc. conducts extensive business in the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and the City of Chicago. Novo Nordisk,

Inc. may be served through its registered agent, CT Corporation System, 5615 Corporate Blvd., STE. 400B, Baton Rouge, LA 70808.

7.      Defendant Novo Nordisk Foundation is an independent Danish, for-profit, commercial foundation.  Its principal place of business is Tuborg Havnevej 19, 2900 Hellerup, Denmark.  Novo Nordisk Foundation conducts extensive business in the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and the City of Chicago.

8.      Defendant Novo A/S is a Danish private limited liability company.  Its principal place of business is Tuborg Havnevej 19, 2900 Hellerup, Denmark.  Novo A/S conducts extensive business in the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and the City of Chicago.

9.      Defendants Novo Nordisk, Inc., Novo Nordisk A/S, Novo Nordisk Foundation, and Novo A/S are hereinafter referred to collectively as "Novo Nordisk" or "Defendants."

10.     Defendants trace their origins to two Danish companies, Nordisk Insulin Laboratorium and Novo Terapeutisk Laboratorium, each of which began manufacturing insulin for the treatment of diabetes in the 1920s, soon after Canadian researchers first successfully began treating diabetic patients with insulin extracted from bovine pancreases.  The two

companies maintained their focus on the treatment of diabetes until they merged in 1989, creating Novo Nordisk A/S.  Diabetes remains the focus of Novo Nordisk's research and manufacture; the company also manufactures pharmaceutical products for the treatment of hemophilia and growth hormone deficiency.

11.     Novo Nordisk continues to manufacture insulin products, such as Levemir and NovoLog.  It also manufactures Prandin and Glucagen, two other diabetes-related drugs.  On January 25, 2010, Novo Nordisk launched Victoza, designed to compete against the new wave of diabetes drugs that include Eli Lilly's drug, Byetta.

### III.     JURISDICTION AND VENUE

12.     Jurisdiction and venue are proper in this Court pursuant to the False Claims Act (31 U.S.C. § 3732(a)) because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729 in the United States by all or any one of Defendants, some of which occurred in the Southern District of Texas, and because all or any one of Defendants transact other business within the Southern District of Texas.  All defendants are subject to the general and specific personal jurisdiction of this Court.  As a result of Novo A/S's organizational structure, Novo A/S, Novo Nordisk A/S, and Novo Nordisk Foundation have continuous and systematic contacts with the United States through its contacts with its American subsidiaries.

13.     This Court also has jurisdiction over actions brought under the laws of the various states since this action arises from the same transactions or occurrences.  31 U.S.C. § 3732(b).

### IV.  RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

14.     Any and all acts alleged herein to have been committed by any or all of the Defendants were committed by said Defendants' officers, directors, employees, representatives

or agents who at all times acted on behalf of their respective Defendant(s) and within the course and scope of their employment.

15.     The Defendants are related entities sharing common employees, offices and business names such that they are joint and severally liable under legal theories of respondeat superior.  Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

16.     The Novo Nordisk Foundation—an independent Danish, for-profit, commercial foundation—wholly owns Novo A/S.  Novo A/S, which was established in 1999, is a Danish private limited liability company and is the holding company in the Novo Group, and is the majority shareholder of Novo Nordisk A/S.

17.     Additionally, the Board of Directors for Novo A/S and the Board of Directors for the Novo Nordisk Foundation overlap: Ulf J. Johansson is both the Chairman of the Board of the Novo Nordisk Foundation and the Chairman of Novo A/S's Board of Directors; and Jørgen Boe is both the Vice Chairman of the Board of the Novo Nordisk Foundation and serves on Novo A/S's Board of Directors.

18.     Novo Nordisk A/S, incorporated on November 28, 1931, is a large multinational group of companies that engage or have engaged in a variety of business activities, including developing, marketing, and selling pharmaceutical products, all of which is or was accomplished through Novo Nordisk A/S's operating groups, subsidiaries, officers, directors, employees, and agents.  Novo Nordisk A/S contains both operating groups and regional companies, for the most part generally organized by location, including companies operating throughout the United States.  The functions of these operating groups and regional companies overlap.  Novo Nordisk

A/S was formally established in 1989. Novo Nordisk has production facilities in seven countries and affiliates and offices in seventy-six countries. As of December 2009, Novo Nordisk A/S had over 29,000 employees in multiple countries (Denmark: 13,433; North America: 4,076; Japan & Oceania: 1,010; International operations: 6,557; Europe: 4,253).

19.     Novo Nordisk, Inc. is an American, wholly-owned subsidiary of Novo Nordisk A/S. Novo Nordisk A/S oversees and coordinates the activities of Novo Nordisk, Inc.'s businesses in the United States. For example, at the end of the January 26, 2010 press release issued on Novo Nordisk, Inc's website announcing the FDA's approval of Victoza, it states that the media and investors may contact persons in Denmark and in the United States. And on April 14, 2010, Gulf Coast Regional Sales Manager Christopher Dowdy, sent an e-mail to the Gulf Coast sales force, including Relator and others, with an attachment regarding Victoza Telesessions, which has "©2010 Novo Nordisk A/S." Thus, Novo Nordisk A/S is approving of the marketing activities of Novo Nordisk, Inc.

## V. REGULATORY BACKGROUND

### A.     The FDA's Role in the Regulation of Prescription Drugs

#### i.     FDA Approval of Prescription Drugs

20.     The FDA regulates human use of pharmaceutical drugs such as Victoza. Companies seeking to introduce new drugs for human use into interstate commerce must comply with FDA statutes and regulations, such as the Federal Food, Drug, and Cosmetic Act ("FDCA"). 21 U.S.C. § 301 *et seq*. The FDCA prohibits companies from distributing in interstate commerce any drugs that the FDA has not approved as safe and effective. 21 U.S.C. § 355(a) and (b).

21.     In order for a company to gain approval of a drug by the FDA, the company must first submit and receive approval of a New Drug Application ("NDA") pursuant to 21 U.S.C. §

355. The company is required to include in its NDA all intended uses proposed for a new drug's labeling and to prove that the new drug is safe and effective for those uses. 21 U.S.C. § 355(b). To prove that the drug is safe and effective, the company must provide the FDA with data from scientifically sound clinical trials. The FDA will refuse approval of a new drug unless, on the basis of all information reviewed, it is demonstrated that a drug can safely accomplish its purported effect under the conditions proposed, and that the method of manufacture and distribution will properly preserve the drug for this purpose. 21 U.S.C. § 355(d).

### ii.   FDA Regulation of Manufacturers' Marketing of Prescription Drugs

22.   When the FDA reviews an NDA and approves a drug for interstate distribution, the approval is only effective for the intended uses that were proposed in the NDA and described on the drug's approved label. Any use for a drug that was not proposed in the NDA and approved for the label by the FDA is referred to as "unapproved" or "off-label." 65 Fed. Reg. 14286, 14286 (Mar. 16, 2000). Although physicians may prescribe a drug for an off-label use so long as the drug has been FDA-approved for some use, pharmaceutical companies are strictly prohibited from bypassing the FDA's approval process and marketing a drug for an off-label use.

23.   When a company markets a drug off-label, the drug becomes a new drug for that purpose and is considered "misbranded." *See* 21 U.S.C. § 331, 21 U.S.C. § 352(f), 21 C.F.R. § 310.3 (h)(4) and (5); *see also* 65 Fed. Reg. 14286, 14286 (Mar. 16, 2000) ("[A]n approved new drug that is marketed for a 'new use' is also 'misbranded' under the FDCA, because the labeling of such a drug would not include 'adequate directions for use.'"). Section 352 of title 21 of the United States Code lists situations in which a drug is illegally misbranded, including but not limited to situations where: (1) the drug's labeling is "false or misleading in any particular;" (2) the drug's labeling does not bear adequate direction for use; or (3) the drug's labeling does not bear "adequate warnings against use in those pathological conditions or by children where its use

9

may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users . . . ." *See* 21 U.S.C. § 352(a) and (f).

24.     The term "labeling" encompasses the actual label attached to the drug's immediate container, as well as all "other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 C.F.R. § 321(m). The term has been construed to include a variety of drug company promotional materials, including booklets, pamphlets, and literature that is textually related to the product, even when disseminated without the presence of the drug. *See Kordel v. United States*, 335 U.S. 345, 349 (1948); *V.E. Irons, Inc. v. United States*, 244 F.2d 34, 39 (1st Cir. 1957). In determining if a drug's labeling or advertising is misleading and thus misbranded, one must examine "(among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article" as described by the labeling or advertising or the customary or usual use of the article. 21 U.S.C. § 321(n).

25.     In order for a drug's labeling to include "adequate directions for use," the directions must allow a layman to use the drug safely and for its "intended use." *See* 21 C.F.R. § 201.5. The "intended use" of a drug refers to "the objective intent of the person legally responsible for the labeling of drugs." *See* 21 C.F.R. § 201.128. "The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article," and "may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives." *Id.* Thus, if a manufacturer

promotes a drug for a use for which the label does not provide adequate directions for use or is otherwise false and misleading, misbranding has occurred. This is so regardless of whether the drug is otherwise eligible for reimbursement by a government health program.

26.     Pharmaceutical manufacturers may not use reprints, reference texts or Continuing Medical Education ("CME") programs or any other devices as tools to "promote" off-label uses. Over the years, the FDA has issued regulatory guidances to aid manufacturers in distinguishing between illegal promotional strategies and the legitimate non-promotional dissemination under very specific circumstances of off-label information where it consists of genuinely scientific article reprints unedited by the manufacturer. *See, e.g.,* Guidance for the Industry: Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices, 74 Fed. Reg. 1694-01 (Jan. 13, 2009). These FDA guidances have never altered the FDA's long-standing prohibition against marketing and promoting approved drugs for off-label uses.

**B.     Reimbursement of Prescription Drugs under Medicaid, Medicare Part D, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Plan, and Other Federal Healthcare Programs**

### i.     Medicaid

27.     As a general rule, to be reimbursable under a state's Medicaid program, a drug must be included on the state's formulary. Each state has its own means of deciding coverage, but federal law sets forth requirements states must meet in excluding or restricting coverage. *See* 42 U.S.C. § 1396r-8. A state may exclude or restrict coverage of a drug in four instances:

(1)     the prescribed use is not for a medically accepted indication;
(2)     the drug is on a list of drugs excluded by the state from Medicaid coverage;
(3)     the drug manufacturer agreed to the restrictions on the drug in its rebate agreement with Medicaid; or

(4)     the drug was excluded from the state's drug formulary.

31 U.S.C. § 1396r-8(d)(1).  In addition, states may use prior authorization programs or preferred

drug lists to control potential abuses of drugs, such as prescriptions for an indication that is not a

medically accepted indication.

28.     A "medically accepted indication" is a use that is listed in the labeling approved

by the FDA or "the use of which is *supported by* one or more citations included or approved for

inclusion in" one of the drug compendia identified by the Medicaid statute.  42 U.S.C. § 1396r-

8(k)(6) (emphasis added).  These compendia are the American Hospital Formulary Service Drug

Information, the United States Pharmacopeia-Drug Information (or its successor publications),

and the DRUGDEX Information System.  42 U.S.C. § 1396r-8(g)(1)(B)(i).  The United States

Government and the states interpret "supported by" to require "some form of corroboration or

validation."  United States' Statement of Interest in Response to Defendant's Motion to Dismiss

Plaintiff's First Amended Complaint, *United States ex rel. Rost v. Pfizer, Inc.*, 03-CV-11084, at

p. 5 (D. Mass. May 16, 2008); *see also* Centers for Medicare and Medicaid Release No. 141

(May 4, 2006) ("The statute requires coverage of off-label uses of FDA-approved drugs for

indications that *are supported (as opposed to listed)* in the compendia specified in section

1927(g)(1)(B)(II).") (emphasis added).

29.     States may establish drug formularies if they meet the following requirements.

*See* 42 U.S.C. § 1396r-8(d)(4).  The formulary must be developed by a committee consisting of

pharmacists, physicians and other qualified individuals appointed by the governor or by the

state's Drug Use Review ("DUR") board consisting of healthcare professionals who have

recognized knowledge and expertise in the prescription, dispensing and monitoring of outpatient

drugs, drug use review, and medical quality assurance.   42 U.S.C. § 1396r-8(d)(4)(A) and § 1396r-8(g)(3).

30.     The formulary must include every drug for which a manufacturer has entered into a Medicaid rebate agreement.  42 U.S.C. § 1396r-8(d)(4)(B).  The state may, however, exclude a drug from the formulary if:  (1) the drug is used for an on-label use -- or an off-label use that is a medically accepted indication based on compendia -- but the drug does not have a significant, clinically meaningful therapeutic advantage over other drugs on the formulary; and (2) the state provides a written explanation, which is available to the public, of why the drug is excluded.  42 U.S.C. § 1396r-8(d)(4)(C).  Finally, any drugs excluded from the formulary must nevertheless be available to Medicaid enrollees under a prior authorization program.   42 U.S.C. § 1396r-8(d)(4)(D).

31.     States generally have some method for drug manufacturers to request that its drug be added to the states' "preferred drug lists."  In the majority of states, the Pharmaceutical and Therapeutics committee or the DUR board makes the decision on whether to add drugs to the state Medicaid program's preferred drug list.  Generally, these committees announce that they will conduct a review of a class of drugs.  At that time, a drug manufacturer may submit information to the committees to be considered for the drug list.  A minority of states, such as Indiana, Montana, Nevada and Texas, require drug manufacturers to submit an application to be placed on the drug list.  As part of the Texas application, drug manufacturers are required to expressly certify compliance with all laws, regulations and rules applicable to the Medicaid program, including the federal and state Anti-Kickback statutes.

32.     Pharmaceutical Therapeutics Committees and DUR boards are required to continually "assess data on drug use against predetermined standards," using the compendia as

the source for these standards.  42 U.S.C. § 1396r-8(g)(1) and (2).  These standards include but are not limited to monitoring for therapeutic appropriateness, overutilization and underutilization, appropriate use of generic products, drug-drug interactions.  *Id*.  The States' continual assessment of drug data permits them the flexibility to determine the appropriate scope, duration, and limitations on coverage of drugs on their formularies.

ii.     **Medicare Part D**

33.     Medicare Part D is a federal program meant to subsidize the costs of prescription drugs for Medicare beneficiaries.  It was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and went into effect on January 1, 2006.  Part D only covers prescription drugs and will not assist with any other medical procedure.  Among those individuals eligible for Medicare Part D are individuals with dual-eligibility, i.e., beneficiaries enrolled in both Medicare and Medicaid, who prior to 2006 had received outpatient drug benefits though Medicaid.  Although Medicare Part D is a component of Medicare, each of the fifty states and the District of Columbia are required to make a contribution to the United States government to defray a portion of the cost of Medicare Part D for beneficiaries whose Medicaid drug coverage has been assumed by Medicare Part D.  42 C.F.R. § 423.910(a) (2008).

34.     A Medicare beneficiary enrolled in Medicare Part D chooses a Prescription Drug Plan (PDP), which is administered by a private insurance company, or "sponsor," based upon the beneficiary's specific drug requirements.  Part D sponsors are required by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 to offer, at a minimum, a basic prescription drug benefit that is either the standard prescription drug benefit or is actuarially equivalent to the standard benefit.  The standard costs structure makes beneficiaries responsible for certain costs, which may include a monthly premium, an annual deductible, and coinsurance.

35.     In 2008, for example, the standard drug benefit had a beneficiary deductible of $275.  In the initial phase of the Part D benefit, after beneficiaries paid the deductible, they contributed twenty-five percent coinsurance toward their drug costs and the plan paid the remaining seventy-five percent until combined beneficiary and plan payments reached $2,510. After combined payments reached $2,510, beneficiaries entered the coverage gap phase of the benefit, or "donut-hole," in which they were responsible for 100 percent of their drug costs.  The catastrophic coverage phase began when a beneficiary's out-of-pocket costs reached $4,050. This amount included a beneficiary's deductible and coinsurance payments.  Once beneficiaries reached $4,050 in out-of-pocket costs, they contributed approximately five percent in coinsurance toward their drug costs.  Of the remaining ninety-five percent of drug costs, the Part D sponsors are responsible for approximately fifteen percent while Medicare pays eighty percent.

36.     Before the beginning of the plan year, sponsors are required to submit a bid for each plan that they intend to offer.  The bid is an estimate of the average costs to provide the basic benefit per beneficiary.  Throughout the year, the Centers for Medicare & Medicaid Services ("CMS") makes prospective payments to sponsors for three subsidies based on sponsors' approved bids.  These subsidies are: (1) the direct subsidy, (2) the reinsurance subsidy, and (3) the low-income cost-sharing subsidy.  The direct subsidy, together with beneficiary premiums, is designed to cover the sponsor's cost of providing the benefit to each beneficiary. The reinsurance subsidy covers the Federal Government's share of drug costs for beneficiaries who have reached catastrophic coverage.  The low-income cost-sharing subsidy covers the Federal Government's portion of the cost-sharing payments for certain low-income beneficiaries.

At the end of the plan year, CMS reconciles these prospective payments with the actual costs incurred by the plan sponsors.

37.     All Part D plan sponsors submit data and information necessary for CMS to determine and make payment.  Every time a beneficiary fills a prescription covered under Part D, plan sponsors must submit a summary called the prescription drug event ("PDE") record.  The PDE record contains drug cost and payment data that enable CMS to administer the Part D benefit.  Part D plan sponsors submit one PDE record each time a Part D covered drug is dispensed to its enrollees, even for those events in which enrollees have 100 percent cost sharing (i.e., they are in the coverage gap or deductible phase).

38.     CMS uses the National Council for Prescription Drug Programs industry standard for collecting PDE data.  The PDE data contain information on the beneficiary, plan, pharmacy, and prescribing physician, as well as information about the event, including the date, quantity dispensed, number of days supplied, national drug code, control number, and the amount reimbursed to the pharmacy by the plan.

39.     Part D covered drugs are defined as drugs available only by prescription, which are used and sold in the United States and used for a medically accepted indication, biological products, insulin and vaccines.  *See* 42 C.F.R. § 423.100.  Medicare Part D's definition of a "medically accepted indication" is the same as Medicaid's.  *See* 42 C.F.R. § 423.100, 42 U.S.C. §§ 1396r-8 (g)(1)(B)(i) and (k)(6).  Part D sponsors are responsible for ensuring that covered Part D drugs are prescribed for "medically accepted indications."  Some Part D sponsors use prior authorization programs to ensure such compliance.  Victoza is listed on PDP formularies for Medicare Part D and is reimbursable under Medicare Part D plans across the country.

### iii. CHAMPUS/TRICARE, CHAMPVA, and Federal Employee Health Benefit Plan

40. In addition to Medicaid and Medicare Part D, the federal and state governments reimburse a portion of the cost of prescription drugs under several other federal and state health care programs, including but not limited to CHAMPUS/TRICARE, CHAMPVA, and the Federal Employees Health Benefit Plan.

41. The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") and TRICARE, a continuation of CHAMPUS, are federally funded uniformed services health care programs for active duty and retired service members, members of the National Guard and Reserve, service members' families, survivors of service members, and certain former spouses of service members. The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA"), is a federally funded healthcare program for the families and survivors of veterans who have been rated permanently and totally disabled for a service-connected disability and for the survivors of a military member who died in the line of duty, not due to misconduct. The Federal Employees Health Benefit Plan is administered by the Office of Personnel Management and provides health insurance for federal employees, retirees, and survivors. Coverage of prescription drugs under these programs is similar to coverage under the Medicaid program. *See, e.g.*, 32 C.F.R. §§ 199.2 and 199.4(g)(15)(i); TRICARE Policy Manual 6010.54-M, Chapter 8, Section 9.1(B)(2) (August 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II.

C.   **Prohibition of Kickbacks Associated with Medicaid, Medicare, CHAMPUS/TRICARE, CHAMPVA, and Federal Employee Health Benefit Plan Prescriptions**

      i.   **Federal Anti-Kickback Statute**

42.   The Medicare-Medicaid Anti-Fraud and Abuse Amendments, known as the Medicare Anti-Kickback Statute ("Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), make it illegal for an individual knowingly and willfully to offer or pay remuneration in cash or in kind to induce a physician to order a good or service that is reimbursed by a federal healthcare program. *See* 42 U.S.C. § 1320a-7b(b)(2). "Remuneration" is broadly defined to include anything of value offered or paid in return for purchasing, ordering, or recommending the purchase or order of any item reimbursable by a federal healthcare program. *See* Department of Health and Human Services, Office of Inspector General Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23734, 23737 (May 5, 2003).

43.   Specifically, in pertinent part, the Anti-Kickback Statute provides:

(b) Illegal remuneration

    1. whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

        (A)   in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

        (B)   in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

2.  whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

    (A)  to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

    (B)  to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Those who violate the statute also are subject to exclusion from participation in federal health care programs, and civil monetary penalties of up to $50,000 per violation and up to three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

44. The purpose of the Anti-Kickback Statute is to prohibit such remuneration in order to secure proper medical treatment and referrals and to limit unnecessary treatment, services, or goods that are based not on the needs of the patient but on improper incentives given to others, thereby limiting the patient's right to choose proper medical care and services. *See* Medicare and Medicaid Programs; Fraud and Abuse OIG Anti-Kickback Provisions, 54 Fed. Reg. 3088, 3089 (proposed Jan. 23, 1989) (to be codified 42 C.F.R. pt. 1001) ("[I]t is necessary for the fiscal integrity of the Medicare and Medicaid programs to assure that physicians exercise sound, objective medical judgment when controlling admittance [of new drugs and medical devices] to . . ." the medical marketplace.").

45.    Paying kickbacks taints an entire prescription, regardless of the medical propriety of its use.  The kickback inherently interferes with the doctor-patient relationship and creates a conflict of interest, potentially putting the patient's health at risk.  Any defendant convicted under the statute is automatically barred from participating in federal and federally-funded healthcare programs.

ii.    **OIG, PhRMA, AMA and ACCME's Guidelines on the Manufacturer-Doctor Relationship and Behaviors that Violate the Anti-Kickback Statute**

46.    Recognizing that the Anti-Kickback Statute has been applied broadly, the OIG has acknowledged that liability under the statute will ultimately turn on intent.  *See* Department of Health and Human Services, Office of Inspector General ("OIG") Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731 (May 5, 2003).  In order to assist pharmaceutical manufacturers, the OIG issued a guidance in May 2003 that not only stated its interpretation of the Anti-Kickback statute, but also highlighted activities that may give rise to liability under the statute.  *See id.*  The OIG Guidance also directed drug manufacturers to review the PhRMA Code, the ACCME standards relating to CMEs, and an ethical opinion issued in June 1992 and amended in April 2001 by the AMA stating its guidelines to govern doctors' acceptance of gifts from pharmaceutical manufacturers.  *See* AMA Opinion 8.061 (1992, amended 2001); PhRMA Code (2003); ACCME Standards (2004).  All of these industry guidelines draw plain lines of demarcation for acceptable and unacceptable behavior under the Anti-Kickback statute.

47.    The OIG's Guidance addressed specific practices commonly arising in the relationship between a drug manufacturer and physicians that present problems.  *Id.* at 23738.  Of particular concern to the OIG were "preceptorships," educational and research funding, CMEs, consulting and advisory arrangements, and gifts of more than trivial value to physicians,

20

such as entertainment, recreation, travel, and meals. *Id.* The OIG was also concerned about payments to physicians to:  1) listen to sales representatives market their drugs, 2) access marketing web sites, or 3) perform "research" for drug manufacturers. *Id.*

48.    The AMA, PhRMA and ACCME guidelines have suggested similar limits on pharmaceutical activities.  Where the three guidelines share the same perspectives on improper activities, one can presume these activities are likely to violate the federal Anti-Kickback statute.[3]

49.    The issuance of these guidelines by the OIG, AMA, PhRMA and ACCME, in addition to the enactment of the Anti-Kickback Statute itself, demonstrates that federal and state health care programs consider compliance with the Anti-Kickback Statute a prerequisite to receiving or retaining reimbursement payments from Medicaid, Medicare Part D, and other federal health care programs.

## VI. NOVO NORDISK'S SCHEME TO SELL VICTOZA THROUGH OFF-LABEL MARKETING AND ILLEGAL KICKBACKS

**A.    Diabetes & Victoza Overview**

### i.    Type 2 Diabetes

50.    Victoza, the drug at issue in this case, is indicated for use by patients who have type 2 diabetes and are unable to control their disease with commonly prescribed oral medications.  Type 2 diabetes is a disease characterized by high levels of blood glucose or sugar stemming from insulin resistance, a condition in which overworked beta cells in the pancreas fail to properly release the hormone insulin.  Insulin resistance is a precursor to the development of type 2 diabetes, which is characterized by an insulin deficiency.  During digestion, the body breaks down all of the sugars and starches from food into glucose, which is the basic fuel for the

---

[3] The three guidelines all address several pharmaceutical activities, such as gifts, entertainment, conferences, CMEs, and consultants.  The ACCME standards address only CME activities.

cells in the body. GLP-1 (glucagon-like peptide-1) is a hormone produced in the gut that aids in the release by beta cells in the pancreas of the right amount of insulin. In non-diabetics, GLP-1 stimulates the beta cells to release an appropriate amount of insulin which conveys the glucose from the blood into the cells to be used for energy. In individuals with type 2 diabetes, the beta cells gradually stop releasing enough insulin, and in some cases, the beta cells die. As a result, when these individuals digest food, in the absence of insulin the glucose remains in the blood and is not transported to the cells to be used for energy, which may lead to diabetes complications.[4]

51.     According to the Centers for Disease Control and Prevention, 23.6 million people, or approximately 7.8% of the American population, have diabetes.[5] And, according to the American Diabetes Association, an additional fifty-seven million people in the United States are pre-diabetic, a condition in which individuals have blood glucose levels that are higher than normal but not enough to be considered diabetic.[6] Type 2 diabetes is the most common form of diabetes; it accounts for about ninety to ninety-five percent of all diagnosed cases of diabetes.[7] Type 2 diabetes is more prevalent among African Americans, Latinos, Native Americans, Asian Americans, Native Hawaiians, and other Pacific Islanders, as well as the elderly and the underprivileged.[8]

52.     While genetics appear to play a role in causing type 2 diabetes, the disease is also correlated with abdominal obesity. Individuals with type 2 diabetes may be able to manage the disease or potentially reverse it through a healthy diet and regular exercise. Indeed, by one

---

[4]   *See* Centers for Disease Control and Prevention, Diabetes Public Health Resource, http://www.cdc.gov/diabetes/consumer/learn.htm.
[5]   Centers for Disease Control and Prevention, National Diabetes Fact Sheet, 2007, http://www.cdc.gov/diabetes/pubs/pdf/ndfs_2007.pdf.
[6]   American Diabetes Association, *Prediabetes*, http://www.diabetes.org/diabetes-basics/prevention/pre-diabetes/.
[7]   *Id.*
[8]   American Diabetes Association, *Diabetes Basics: Type 2*, http://www.diabetes.org/diabetes-basics/type-2/.

estimate, eighty percent of type 2 diabetes cases are preventable by changing diet, increasing physical activity and improving the living environment. No medication can claim such curative or preventative powers. Thus, diet and exercise form the bedrock for any public health plan for treating and preventing type 2 diabetes. Without effective prevention and control programs focused on diet and exercise, the incidence of diabetes, already epidemic, is likely to rise further. In fact, in the United States, the incidence of type 2 diabetes rose by twenty-nine percent between 2007 and 2010.

53.     The goal with any diabetes treatment is to maintain a normal blood glucose level, which is 70 to 100 milligrams/deciliter when fasting. Diabetics on medication often have difficulty maintaining their blood glucose levels within that range. When blood glucose levels fall below 70 mg/dl, the condition is called hypoglycemia. When blood glucose levels rise above 130 mg/dl if fasting or above 180 mg/dl if post-meal, the condition is called hyperglycemia. Both conditions can have dangerous consequences for diabetics' health.

54.     In addition to checking their blood glucose level daily, diabetics should also have an A1C test performed every two to three months to determine their average blood glucose control. An A1C test measures the percentage of glycated hemoglobin, or HbA1c, in the blood. Hemoglobin, a protein that binds with sugars such as glucose, is inside red blood cells and carries oxygen from the lungs to all the body's cells. With uncontrolled diabetes, too much glucose is in the bloodstream, and this extra glucose in the red blood cells binds (or glycates) with the hemoglobin. The more excess glucose in the blood, the more hemoglobin gets glycated. Glycation leads to substantial damage to the body's cells. This damage may result in the stiffening of the collagen in the blood that may lead to high blood pressure and possible stroke. By performing the A1C test, the patient gets an overview of his or her average blood glucose

control for the past few months.   Blood glucose levels and thus diabetes are considered controlled when a patient's A1C is less than seven percent.

55.    For those cases in which the condition progresses despite any attempts to improve diet and exercise, diabetes medications or insulin therapy, or a combination of treatment methods, may be necessary depending on the individual's blood sugar level and other health problems.   First, a doctor may begin treatment with monotherapy by prescribing a diabetes medication.   Diabetes medications traditionally used at this juncture include (1) sulfonylureas and meglitinides, which stimulate the pancreas to release more insulin; (2) biguanides such as metformin, which lower blood glucose levels by decreasing the amount of glucose produced by the liver and by making muscle tissue more sensitive to insulin so that glucose can be absorbed; (3) thiazolidinediones, which improve insulin resistance in muscle and fat tissue; (4) alpha-glucosidase inhibitors, which block enzymes that digest starches and slow the rise in blood glucose levels, and (5) dipeptidyl peptidase IV (DPP-4) inhibitors, which lower blood glucose levels by increasing insulin secretion and reducing sugar production.   Of all the diabetes medications, metformin is the most commonly prescribed drug used to treat type 2 diabetes.

56.    The second step in controlling diabetes if one medication alone is insufficient is to add one of several other oral or injected diabetes medications.   Victoza is one of the medications in the class of injected drugs.

57.    These types of diabetes medications are only for patients whose bodies still produce some insulin.   Type 2 diabetics who do not control their diabetes gradually develop "beta-cell failure," which means that the beta cells in the pancreas no longer release insulin in response to high blood glucose levels.   At this stage, these individuals will not be able to manage their diabetes with medications alone and therefore require insulin injections.   Stated differently,

treatment of type 2 diabetes with insulin injections is reserved for relatively advanced diabetes in patients with significantly compromised pancreatic function.

58.     Since the discovery of insulin in 1921, doctors have used many forms of insulin injections as a method of treatment for controlling blood sugar levels.  The types of insulin products that exist today include rapid-acting insulin, long-acting insulin, and intermediate options.  A doctor may instruct a patient to use a different type of insulin during the day and night depending on the patient's needs.  And insulin may be administered through several methods, including injections from a fine needle and syringe, an insulin pen injector, or an insulin pump.  Depending on the nature of the diabetes, doctors may prescribe insulin therapy either in combination with diabetes medications or as a monotherapy.

59.     In addition to insulin and the medications mentioned above, other synthetic drugs have recently developed.  The role of the hormone glucagon-like peptide-1 (GLP-1) in regulating beta cells' release of insulin was not understood until the late 1970s and early 1980s, when Dr. John Eng discovered that the saliva of a lizard, the Gila monster, contained the hormone exenide-4, which is similar to human GLP-1.[9]  The discovery led to the market entry of the first synthetic GLP-1 agonist, exenatide, in April of 2005.  The theory was, and is, that by supplementing the body's supply of GLP-1, one could stimulate malfunctioning beta cells to again produce insulin as needed.  Exenatide, which is marketed as Byetta by Eli Lilly and manufactured by Amylin Pharmaceuticals, Inc., is Victoza's main competitor drug.  The FDA approved Byetta in April of 2005 for use by individuals with type 2 diabetes who are unable to control their blood sugar

---

[9] *See BYETTA (exenatide) Injection The Discovery and Development of the First GLP-1 Receptor Agonist for Treatment of Type 2 Diabetes*, http://www.lilly.com/pdf/BYETTA_History_Backgrounder120209.pdf; *see also* American Diabetes Association, *Other Injectable Medications*, http://www.diabetes.org/living-with-diabetes/treatment-and-care/medication/other-injectable-medication.html.

levels with commonly prescribed oral medications.[10]   Like Victoza, Byetta is a non-insulin, injectable prescription medicine.

### ii.   Victoza

60.   Victoza (scientific name liraglutide), manufactured and marketed by Novo Nordisk, is a non-insulin medication first approved for use in the United States on January 25, 2010.

### a.   Indication

61.   According to the current label, Victoza is a "glucagon-like peptide-1 (GLP-1) receptor agonist indicated as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus."   Immediately below the label's indication is a section entitled "Important Limitations of Use," which warns that the drug has not been studied in conjunction with insulin, and which notes first and foremost, "not recommended as first-line therapy for patients who have inadequate glycemic control on diet and exercise."   In other words, the FDA limited Victoza's approval to use in patients who do not take insulin, and even then, only as an add-on medication when neither diet and exercise alone, nor diet and exercise with a first-line non-insulin drug, have controlled blood-glucose levels.

62.   Diabetes specialists generally consider metformin to be the gold-standard among first-line, non-insulin diabetes drugs.   Victoza's label reflects Victoza's approval for use when the first-line choice, such as metformin, fails, but this failure is not common; most patients tolerate metformin well.

### b.   Means of administration and dosage

63.   Victoza is administered through a disposable, pre-filled, multi-dose pen with injection needles.  Each pen contains a 3 mL clear, colorless solution of Victoza equivalent to 18

---

[10] FDA Approval Letter for Byetta, http://www.accessdata.fda.gov/drugsatfda_docs/appletter/2005/021773ltr.pdf.

mg liraglutide—the active ingredient—and several inactive ingredients. And each individual pen delivers doses of 0.6 mg, 1.2 mg, or 1.8 mg. Although the pen is a multi-dose pen, the injection needle should be changed after each use and the pen should never be shared between patients.

### c.    *Efficacy*

64.     According to its label, Victoza, like naturally-produced GLP-1, activates the GLP-1 receptor in beta cells in the pancreas, leading to insulin release in the presence of elevated glucose concentrations. Insulin secretion then subsides as blood glucose levels decrease.

65.     To support Victoza's NDA, Novo Nordisk submitted five company-sponsored trials entitled "Liraglutide Effect & Action in Diabetes" or "LEAD" 1 through 5. Describing the LEAD trials in logical rather than numerical order, as sales representatives are taught to do, LEAD-3 studied the effect of Victoza as "monotherapy," that is, accompanied by no other antidiabetic drugs, versus the effect of a sulfonylurea ("SU") and versus a placebo. LEAD-2 studied Victoza in combination with metformin, versus metformin alone and versus metformin combined with an SU. LEAD-1 combined Victoza with an SU, versus an SU alone and versus an SU combined with a thiazolidinedione ("TZD"). LEAD-4 and LEAD-5 added third agents to the therapy.[11]

---

[11] LEAD 4 and LEAD 5 studied liraglutide plus two add-on therapies. LEAD 4 studied liraglutide plus metformin and TZD versus metformin and TZD. LEAD 5 studied liraglutide plus SU and metformin versus glargine plus SU and metformin.

66.    All five LEAD trials are outlined in the following table:

| | LEAD-3 | LEAD-2 | LEAD-1 | LEAD-4 | LEAD-5 |
|---|---|---|---|---|---|
| **Test protocol** | | | | | |
| -Principal Agent | Liraglutide | Liraglutide | Liraglutide | Liraglutide | Liraglutide |
| -Combination Agent(s) | (None) | Metformin | SU | Metformin TZD | Metformin SU |
| **Comparator protocol** | | | | | |
| -Regimen 1— Active group | SU | Metformin SU | SU TZD | (None) | Insulin glargine Metformin SU |
| -Regimen 2— Parallel group | (None) | Metformin | SU | Metformin TZD | Metformin SU |

67.    Researchers concluded, as summarized on Victoza's label, that Victoza as monotherapy (LEAD-3), as add-on to metformin (LEAD-2), as add-on to SU (LEAD-1), as add-on to metformin and TZD (LEAD-4), and as add-on to metformin and SU (LEAD-5) lowered the amount of glycated hemoglobin (HbA1C) more than did the placebo or the other add-on agents of each trial..   In combination with metformin, it outperformed metformin administered alone, but not metformin in combination with an SU (LEAD-2).   In combination with an SU, it outperformed use of an SU alone and with TZD (LEAD-1).   Finally, with TZD added to both comparators, the combination that included Victoza outperformed the combination with metformin and TZD alone (LEAD-4).

68.    Victoza's overall effect on glucose levels is statistically significant according to these studies, but modest: a one to one-and-a-half percent drop in hemoglobin A1C.   It was after having measured this effect, and having taken consideration of the countervailing risks that are or may be attributed to Victoza that the FDA approved Victoza solely as "adjunct" therapy and

specifically advised, "Victoza is not recommended as first-line therapy for patients who have inadequate glycemic control on diet and exercise."

69.     A sixth study also exists—LEAD-6, a company-sponsored study directly comparing Victoza to Byetta.  LEAD-6 was not submitted to the FDA as part of the NDA, nor has it been submitted to the FDA since the filing of the NDA.  It therefore is not referenced on Victoza's label.

### d.     *Claims not supported by Victoza label*

70.     Victoza was specifically approved for treating type 2 diabetes.  The FDA has not approved Victoza for first-line therapy, reversal of type 2 diabetes, replacing or restoring beta cells, preventing diabetes in pre-diabetics, or preventing beta cell "burnout" in patients with type 2 diabetes.  Victoza's label makes no mention of any of these possible effects.  Accordingly, promoting Victoza for any of these uses constitutes illegal off-label promotion.

71.     While Victoza's label does note that the drug's mechanism of blood glucose lowering involves a delay in gastric emptying, it does not connect that delay to any potential weight loss effect.  The label reflects that the five LEAD trials found greater weight loss with Victoza than without, but it is essentially a side effect of treatment; the label makes no mention of weight loss as an indication, and the FDA did not find the drug safe and effective as a weight loss treatment in diabetic populations or otherwise.

### e.     *Safety Concerns*

72.     Victoza is not a risk-free medication and may cause several serious health risks. The Victoza label has a black box warning entitled "WARNING: RISK OF THYROID C-CELL

TUMORS."[12]  Studies have shown that Victoza causes thyroid C-cell tumors in mice and rats. The label also warns that "[i]t is unknown whether Victoza causes thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans, as human relevance could not be ruled out by clinical or nonclinical studies." To further explore possible associations between medullary thyroid cancer and liraglutide use, the FDA exercised its authority under the Food and Drug Administration Amendments Act to require additional studies in animals and the establishment of a cancer registry to monitor the annual incidence of medullary thyroid cancer over the fifteen years following Victoza's approval.

73.    In addition to the black box warning, the label further warns that Victoza may cause pancreatitis, which is a potentially deadly inflammation of the pancreas. According to a March 4, 2010 article published in the New England Journal of Medicine, in the phase 2 and phase 3 trials of liraglutide, which include the aforementioned LEAD trials, "there were seven cases of pancreatitis reported among the 4,257 patients treated with liraglutide and only one case in the 2381 patients in the comparator group."

74.    After adjustment for more patient-years of exposure to liraglutide, this finding of pancreatitis represented a 4:1 imbalance between the liraglutide and comparator groups.  The small number of events makes it difficult to draw conclusions about causation, but this imbalance, along with concerns about Byetta and sitagliptin, led the FDA to require Novo Nordisk to perform post-approval mechanistic studies in animals and to conduct an epidemiologic evaluation using a large insurance-claims database.

75.    Additionally, patients who use Victoza "in combination with an insulin secretagogue (e.g., sulfonylurea) may have an increased risk of hypoglycemia." Hypoglycemia,

---

[12]    The "black box" warning on a drug's label is the FDA's sternest warning.  Such a warning, which is named a "black box" warning for the black border that surrounds the text of the warning, indicates that a serious, adverse event is associated with that particular drug.

evidenced by symptoms such as cold sweats, headaches, fatigue, and convulsions, is a serious condition occurring when a person's blood glucose level is too low.

76.     Cardiovascular risks may also accompany the use of anti-diabetic therapies.  In December 2008, the FDA published industry guidelines outlining recommendations for assessing any cardiovascular risk conferred by new antidiabetic drugs.  Drugs meeting this standard could be approved for marketing, with more stringent evaluation of cardiovascular risks required after approval.  While analyses of cardiovascular events from the aforementioned combined phase 2 and phase 3 trials showed that this drug met the standard for ruling out an unacceptable increase in cardiovascular risk, Novo Nordisk did not meet at that time the more stringent criteria outlined for post-approval evaluations, and thus the FDA is requiring a post-approval study of cardiovascular safety.[13]

**B.     Novo Nordisk's Off-Labeling Marketing Strategies and False Claims**

77.     With Victoza's launch, Novo Nordisk committed to a marketing campaign that, as it well knows, diverges from Victoza's FDA-approved label in numerous respects.  First, Novo Nordisk misbrands Victoza for indications not approved by the FDA, including weight loss, use as a first-line therapy, the treatment of pre-diabetics, the regression or reversal of type 2 diabetes, restoration of beta cell function, and the prevention of beta cell "burnout."  Second, Novo Nordisk downplays and thus misrepresents the risks of thyroid cancer and pancreatitis as spelled out on Victoza's label.  Third, Novo Nordisk makes competitive claims about Victoza's supposed superiority to its competitor drug, Byetta, including directing sales representatives to "detail" physicians on LEAD-6, the company-sponsored study that has not been submitted to the

---

[13]   In addition, Victoza also causes many gastrointestinal side effects, including nausea, vomiting, constipation, diarrhea, dyspepsia (upset stomach or indigestion), and a decreased appetite.  Victoza may also cause patients to develop anti-liraglutide antibodies and have immunogenicity-related events, including urticaria.

FDA and is not included on Victoza's label. Further, Novo Nordisk has included kickbacks to physicians in its marketing efforts.

78.    Although Novo Nordisk has policies and procedures in place that prohibited sales representatives from engaging in off-label marketing, Novo Nordisk has not enforced these procedures and in fact has turned a blind eye towards violations of laws, industry guidelines, and company policies. These laws, guidelines, and policies were described in company documents, including an "FDA Regulation of Advertising and Promotion" packet dated 2009 and a 2007 procedure packet from Novo Nordisk's Promotion Review Board ("PRB"), which is the department that reviews and approves promotional materials before use in the field. Both of these documents were disseminated to Novo Nordisk's sales force.

79.    Yet, on the second–to-last slide of the company's "FDA Regulation of Advertising and Promotion packet, Novo Nordisk points out the risk of "FDA/Civil enforcement," and juxtaposes it with the benefit of "market potential." It then advises its employees to weigh for themselves the risks and benefits of complying with the regulations it has just outlined.

80.    Kennedy's territory was the Mobile West territory in Mobile, Alabama. Kennedy personally witnessed that the following members of the Novo Nordisk's management participated in the off-label marketing scheme or knew of it yet did nothing to limit it: (1) Kennedy's direct supervisor, Mobile West District Business Manager, Paul Humenansky; (2) Regional Business Director, Albert Vicario, who terminated Kennedy's position with Novo Nordisk; (3) Regional Sales Manager Gulf Coast Region, Christopher Dowdy; (4) Associate Vice President, Diabetes Sales Southeast Area, Frank Jacobs, who oversaw the actions of Albert

Vicario; (5) Vice President National Diabetes Sales, Andy Ajello; (6) Chief Compliance Officer, Frank Bigley; and (7) Chief Medical Officer, Dr. Alan Moses.

### i.     Victoza Pre-Launch

81.     Novo Nordisk prepared for Victoza's launch with the expectation that the drug would be a blockbuster that would not only compete strongly against Eli Lilly's Byetta, but also significantly expand the patient population it serves to include pre-diabetics.   Kennedy was recruited because of her experience selling Byetta, and her hiring was part of the company's sales force expansion in anticipation of Victoza's launch.   While Kennedy was trained at orientation in early 2009 to sell Novo Nordisk's other diabetes drugs, such as Levemir (Novo Nordisk's long-acting insulin that was first launched four years ago) and NovoLog (Novo Nordisk's top-selling, rapid-acting insulin that was launched ten years ago), she had been employed less than a year when she and the rest of the sales force were directed to market only Victoza for the first three months of 2010.

82.     Victoza was not actually approved until the last week of January 2010; sales representatives were thus promoting Victoza even before Victoza's approval and launch, and before Novo Nordisk had an approved label for the drug.   Kennedy's Mobile West District Business Manager, Paul Humenansky, specifically asked his sales representatives to begin promoting Victoza to their physician targets before launch.   Their specific instructions were to answer questions from doctors regarding the anticipated black box warning on thyroid C-cell tumors, including medullary thyroid carcinoma (MTC) (before receiving the final approved Victoza label).

### ii.    Victoza Launch

83.    The FDA approved Victoza on January 25, 2010.   The following day, Novo Nordisk issued a press release on its Novo Nordisk, Inc. website (http://www.novonordisk-us.com) announcing the approval.   Novo Nordisk declared in the press release that "[i]n clinical studies including use as monotherapy and in combination with standard diabetes treatments, Victoza produced significant reductions in A1C and also was associated with *weight loss*."   Not satisfied to stay within the limits of Victoza's label, Novo Nordisk then quoted and endorsed impermissible off-label competitive statements made by Dr. Alan J. Garber, MD, PhD, FACE, Professor of Medicine, Biochemistry and Molecular Biology, and Cellular Biology Department of Medicine Baylor College of Medicine Houston, Texas in which Dr. Garber stated that Victoza "*unlike many other diabetes therapies*, does not promote weight gain and is associated with *weight loss* in the majority of patients."   He added that Victoza "offers patients an attractive new treatment option that has consistently performed well when compared to other currently available treatments."

84.    In early February 2010, Novo Nordisk assembled its national sales force for a launch meeting whose educational purposes were eclipsed by extravagant partying rivaling events common in the heyday of pharmaceutical marketing in the mid-1990s, before the sobering effect of increased government oversight.   Indeed, even the educational portion of the meeting was extravagantly-produced and presented by entertainers.   Victoza's launch meeting signaled that Novo Nordisk believed it was debuting a blockbuster and was flush with cash ready to be spent on an army of well-paid sales representatives and to be poured into fat marketing budgets.

85.    Novo Nordisk's entire sales force stayed at Las Vegas's Venetian Hotel, and attended a private Victoza launch party at the Tao Night Club—an exclusive night club where

women pose provocatively in bathtubs filled with rose petals positioned throughout the club. Novo Nordisk hired former "American Idol" singer Chris Daughtry to perform live at this private event. Other paid performers included scantily-clad go-go dancers and Chippendales men. The company prohibited Kennedy and other attendees from taking pictures. During the celebration, Novo Nordisk distributed to a select group of VIP sales representatives martini glasses with either a fake or real diamond in the bottom of each glass for the attendees to keep as a gift. Gemologists were stationed at the club to inspect each diamond and determine which individuals received one of the ten genuine, one-carat diamonds in their glasses. It was evident that Novo Nordisk expected extravagant profits from Victoza to match its extravagant launch.[14]

86.     At educational meetings, Novo Nordisk hired celebrities to educate the sales force about the new drug. The two hosts of MythBusters, a television program airing on the Discovery Channel, gave one such presentation, live on closed circuit television, to the entire sales force as they watched from the hotel. While some pharmaceutical companies hire preeminent physicians to give medical lectures at such meetings, television celebrities delivered Novo Nordisk's program on Victoza's clinical attributes, in an effort, for reasons best known to Victoza's brand team, boosting the lectures' entertainment value, but not necessarily its scientific value.

87.     The educational message in those and other sessions, supposedly justifying the fanfare, was that Victoza represented a breakthrough in diabetes medicine. *All* of the LEAD studies, including LEAD-6, the off-label study comparing Victoza with Byetta, were covered. Lecturers surmised that the LEAD trials' results were explained by a mechanism of action in which beta cells in the pancreas exposed to Victoza are actually replenished and restored,

---

[14] Victoza's decadent launch party was far from unprecedented for Novo Nordisk. In March 2009, for example, Novo Nordisk rented the Royal Caribbean's largest cruise ship for an all-expenses-paid, sales representatives' training-at-sea session, which included unlimited alcoholic beverages and ports of call in Caribbean islands such as St. Thomas. On a similar cruise in about 2007, when the liquor ran out before the ship reached Denmark, the crew had to arrange an unscheduled stop in Western Europe.

signaling the drug's potential to prevent or reverse diabetes. Such theories receive no mention in Victoza's label.

88.     At one such session, Novo Nordisk gave sales representatives a "Victoza Launch Roadmap," which instructed sales representatives to leave the LEAD-6 study behind with the physicians and not discuss it on calls to physicians. In the company break room just afterwards, however, Humenansky announced that the prohibition on discussing LEAD-6 was "BS." He distributed reprints of LEAD-6 to his team, and instructed them to distribute it to doctors proactively without prompting during calls and to detail physicians routinely on LEAD-6 and competitive comparisons to Byetta. Novo Nordisk expected and intended district managers like Humenansky to so direct their teams, discreetly and behind closed doors. Evidence of the use of LEAD-6 is clearly demonstrated within Impact RX Report doctor's comments, such as this one: "Discussion about the comparision between Victoza and Byetta. Some of the information from the LEAD 6 trial was discussed" provided following a sales representative's call. *See* Ex. 1 Page 1/78.

89.     Following the Las Vegas launch meeting, on February 16, 2010, Novo Nordisk issued a second press release announcing Victoza's availability in the United States market. In that press release, Jurek Gruhn, president of Novo Nordisk, Inc., emphasized an off-label indication by stating that "Victoza provides a once-a-day treatment that not only lowers blood sugar, but *helps to reduce weight*." Dr. Garber again added his praise for Victoza, exaggerating the clinical support for Victoza and claiming that the drug had been "extensively studied both as monotherapy, as well as in combination with current anti-diabetic medications, and has consistently demonstrated glucose control in both scenarios." Like Gruhn, Dr. Garber plugged Victoza's supposed efficacy for weight loss, and also downplayed the risk of hypoglycemia:

"Victoza will provide patients with an effective therapy for type 2 diabetes that not only lowers blood sugar, but shows weight loss and low risk of hypoglycemia." Novo Nordisk apparently mistakenly believed that its press release could safely meander off-label as long as the company spoke through a mouthpiece.

### iii.   Victoza Post-Launch Off-Label Marketing Campaign

#### a.   Novo Nordisk's Sales Force and Medical Liaison Group Are Structured to Allow Off-Label Marketing

90.     Novo Nordisk structures its sales force and medical liaison group to suit the needs of its off-label marketing scheme for Victoza. As shown in company literature, Novo Nordisk refers to Victoza sales representatives as members of "Club V." The Mobile West territory is one among many "Club V" groups. During Kennedy's tenure, she and her fellow sales representatives in the Mobile West territory, including Matt Jones and Dawn Fredric, marketed to primary care physicians, family practice physicians, and internists, and overlapped with two other sales representatives, endo-diabetes care specialist Greg Wellborn and his partner John Stranzl, who targeted specialists. Institutional diabetes care specialist Jill Purkey, meanwhile made calls on hospitals within the territory.

91.     Novo Nordisk issues to each member of its sales force a physician target list or "call plan," containing the names of doctors to whom the sales representative must promote Victoza. All doctors on Kennedy's call plan participate in Medicare Part D, and certain doctors on her plan were high Medicaid prescribers, including Raymond Broughton, Sheryar Anjum, Hunte Eyston, Benjamin Gayle, Paul Smith, Karen Millender, Prince Uzoije, and Bobby Wright. Novo Nordisk maintains targeted physicians lists in its AdvantEdge database in the form of an exportable spreadsheet that can be printed but not downloaded. Relator's top-target doctors for Victoza in the Gulf Coast Region also included Greg McKelvey, Stephen Davis, Mary

Honkanen, Kathleen Arnold, Edward Carlos, Donald Sanders, H. Ashurst, Lisa Burch, William Hicks, Noah Whetstone, and Jacob Webster.   These doctors' names appear in a spreadsheet customized for the Mobile West territory and disseminated to Kennedy and to Matt Jones, which categorizes doctors based upon his or her Victoza segment (Fast Adopting Experts or Cost Conscious GLP-1 Adopters), Plan of Action rating (Gold versus Silver or Bronze), and percent market share given to competitor drugs Byetta and Januvia.

92.     Sales representatives receive a new call plan with every new Plan of Action ("POA").   Normally, sales representatives receive a new POA once a quarter, but because of Victoza's launch, sales representatives received a new POA in January and in February 2010. Novo Nordisk's Field Force Effectiveness group creates and maintains the POA and physicians list.

93.     Novo Nordisk uses deciles and prescribing habits to tailor its off-label promotion strategy to specific doctors.   For example, physicians are placed in gold, silver, and bronze deciles or within very specific categories such as "Fast Adopting Experts", Safety Conscious Byetta Users" or "Slow Adopter" category. The doctor's placement on the continuum or in a category depends on how likely the doctor is to prescribe Victoza.   Kennedy's top doctor was Dr. McKelvey.   For each of the doctors listed in the Plan of Action, Novo Nordisk prepared individual spreadsheets containing more specific information.

94.     Sales representatives use an electronic call note system to track their calls on target doctors, but that system no longer allows for any free typing; it is essentially multiple choice in form.   The content of sales conversations is therefore, purposefully, not documented. The system does, however, allow the company to track the frequency with which important doctors are visited, and the quantity of samples left with doctors on each visit.

95.     Novo Nordisk employs a separate group of employees in its Drug Information Department called medical liaisons, who collectively possess more scientific education or experience than sales representatives.  They are meant to be seen as independent of the sales division, and able to educate doctors both more fully and neutrally about Novo Nordisk's products.  In reality, however, Novo Nordisk's medical liaisons and sales representatives work closely together to ensure the delivery of Victoza's off-label message.  While Novo Nordisk has a standard Professional Information Request ("PIR") process for sales representatives to request a medical liaison professional visit for off-label discussions when spurred by a physician's question, the process is seldom needed in practice, because when sales representatives call on high-prescribing doctors, medical science liaisons typically accompany the sales representatives on these calls.  Further, during these calls, the sales representatives do not excuse themselves from liaisons' discussions, as is standard policy within the industry.  They sit "second chair" to the medical science liaison throughout the call.

96.     According to written company policies, medical science liaisons are not permitted to proactively discuss off-label indications with doctors.  Instead, these discussions should occur only if a doctor requests a medical science liaison's expertise on Victoza.  The sales aspect and the off-label discussion should be separate and distinct conversations.  In practice, however, medical liaisons commonly call on doctors, often at a representative's invitation, specifically to initiate an off-label discussion.  Typically, the liaison will begin the call with an on-label discussion of Victoza and then transition spontaneously into an off-label discussion.  Given medical science liaisons' actual practices in the field, they are as much part of the sales force as sales representatives.  In addition, as described *infra*, medical science liaisons spearhead speaker events.