### b.      *Compensation for Off-Label Marketing*

97.      Novo Nordisk rewards its sales representatives in the form of bonuses based on the volume of sales they attain, regardless of whether the sales are off-label. Because off-label scripts have the potential to multiply the size of the target patient base and thus sales volume, Novo Nordisk is knowingly incentivizing off-label marketing.

### c.      *Promotion of Off-Label Uses in Physician Details*

98.      While Novo Nordisk supplied its sales representatives initially with no sales aids except Victoza's label itself, Kennedy was directed at the launch meeting, at district meetings, and in ride-a-longs with her manager, to make a number of off-label claims about Victoza, how it works, and supposed revolutionary benefits it offers to diabetics and non-diabetics alike. Thus, disregarding its own policies and the industry laws, Novo Nordisk trained the sales representatives on how to include off-label indications in their calls on doctors. For example, Novo Nordisk told sales representatives to create hypothetical situations, give hints or wink at the doctor, or suggest that other doctors are prescribing Victoza for off-label indications.

99.      Moreover, as described in detail *infra*, when Kennedy, like the rest of the sales force, received from her manager Impact RX reports in April 2010, which attached not just analysis of Victoza's progress, but voluminous pages of raw data collecting physicians' descriptions of the promotional messages they had been receiving, she was able to confirm that sales representatives nationwide were receiving the same directives to market off-label that her district was receiving. Further, Novo Nordisk was reporting on these marketing tactics in great detail and with enthusiasm, indicating company approval.

### Weight Loss

100.   The "core message" used by sales representatives on calls with physicians is: "Victoza is a once-daily GLP-1 analog that provides significant and sustained reductions in A1C *with the added benefit of weight loss* for individuals with type 2 diabetes who cannot control their diabetes with metformin alone." (emphasis added).   Paul Humenansky, Kennedy's district manager, sent an e-mail on April 8, 2010 reminding his sales representatives to use the core message twice on every call—once in the opening and once in the closing.   This message was effective, as documented in the Impact RX reports.   *See* Exs. 1 and 2.   Following calls from Novo Nordisk sales representatives, doctors were able to recall the majority of the core message unaided.   *See* Exs. 1 and 2.

101.   The core message reflects the importance of weight loss as a theme for Novo Nordisk.   While it arguably adheres to the label, Novo Nordisk expects its sales force in the field to actually market Victoza as a weight-loss drug, and their bonuses depend on it.   Thus, weight loss is presented not simply as an "added benefit," but as the reason to prescribe Victoza and to prefer it to Byetta.

102.   Promising swift weight loss through a pill rather than through diet, exercise, and other lifestyle changes, does diabetics a disservice, however.   The weight loss associated with Victoza in the LEAD trials was mild and measured collectively.   Offering Victoza as a panacea for diabetes-related problems belies the fact that, contrary to Novo Nordisk's assertions, most or all diabetics taking Victoza as directed will find that they must still do the hard work of reforming their lifestyles in order to maintain or improve their health.

### Prevention of Diabetes / Treatment of Metabolic Syndrome

103.    Novo Nordisk also increased its market share by targeting a whole new subset of the population—pre-diabetics.  Novo Nordisk misbranded Victoza by promoting it as a drug suitable for individuals with metabolic syndrome.  "Metabolic syndrome" refers to a cluster of symptoms in pre-diabetics that includes abdominal obesity, atherogenic dyslipidemia (blood fat disorders—high triglycerides, low HDL cholesterol and high LDL cholesterol—that foster plaque buildups in artery walls), elevated blood pressure, insulin resistance or glucose intolerance, prothrombotic state (e.g., high fibrinogen or plasminogen activator inhibitor-1 in the blood, and, finally, a proinflammatory state (e.g., elevated C-reactive protein in the blood).

104.    According to Novo Nordisk and the claims made by its sales representatives in the field, any pre-diabetic person who does not want to have type 2 diabetes later in life should take Victoza as a preventative measure because it will preserve beta cell function.  *See* Ex. 2 Page 70/75 Comments Re: Reduction in A1C.  Novo Nordisk's rationale for this claim is that Victoza, as a GLP-1 agonist, mimics the natural GLP-1 hormone in the pancreas and thus assists the beta cells' ability to trigger the pancreas's release of insulin, which in turn prevents the beta cells from "burning out" over time.

105.    As noted earlier in the Diabetes and Victoza Overview, *supra*, approximately fifty-seven million people in the United States are considered pre-diabetic, which is more than twice the amount of people currently diagnosed with type 2 diabetes.  This is a lucrative off-label message, but, again, it is a misleading one.  It derives no support at all from Victoza's label.  Further, the medical consensus in treating pre-diabetics is that even more so than in diabetics, medications have little or no role to play.  Medications have little impact with this population,

particularly in comparison to the very dramatic impact that diet and exercise can make in preserving pancreatic function and lowering blood glucose levels.

### Reversal of Diabetes / Use with Insulin

106.    In order to expand its market share even further, Novo Nordisk markets Victoza as a revolutionary drug that could reverse diabetes—an unprecedented and scientifically unfounded claim.   Specifically, Novo Nordisk's sales representatives, as directed by the company, claim that Victoza can replace and restore non-functioning beta cells that help the pancreas produce insulin.   And Novo Nordisk markets Victoza as preventing the progression of beta cell dysfunction and "burnout" because Victoza, unlike other diabetes drugs, stimulates the beta cells to release insulin only when blood glucose levels are high.

107.    Further, sales representatives assert to physicians that because insulin resistance increases as diabetes progresses, eventually necessitating insulin treatment, using Victoza in combination with insulin could, by preserving or restoring beta cell function, reduce the need for insulin. *See* Ex. 1 Page 74/78 Comments Re: Targets Beta Cells.   While sales representatives acknowledge the off-label nature of this claim during such promotions—in fact, the label plainly states that Victoza has never been studied in combination with insulin—they add that they are aware of physicians who are using Victoza with insulin and are pleased with the results.   Yet, as Victoza's label warns, using Victoza with insulin may cause serious hypoglycemia—a condition that occurs when blood glucose levels drop low enough to be fatal.   And Novo Nordisk lacks scientific evidence to support the efficacy of Victoza when used with insulin therapy.

43

### d.      *Off-Label Competitive Statements in Physician Details*

### Detailing a "Leave-Behind" Reprint with Competitive Statements

108.    Novo Nordisk also promotes Victoza off-label by making competitive statements about Byetta versus Victoza.   Specifically, sales representatives make competitive statements using the LEAD-6 study.   LEAD-6 is a 2009 journal article published in *The Lancet* comparing the efficacy and safety of Victoza (liraglutide) to that of Byetta (exenatide).   As noted *supra*, because LEAD-6 was not submitted with Victoza's NDA, the FDA has never evaluated it, and it is not mentioned in Victoza's label.

109.    Novo Nordisk distributed the LEAD 6 reprint to sales representatives with an internal memorandum instructing sales representatives to leave behind LEAD on calls, and communicate to physicians the following:

> This is a study I thought you might find interesting and relevant to your practice. It pertains to the use of Victoza (liraglutide [rDNA origin] injection) but I am not able to discuss it with you as it contains information outside of our approved Prescribing Information.   If upon reading it you have any questions, please contact our Drug Information Department.

But as described above, from Victoza's launch, Kennedy and others were simultaneously told to sell LEAD-6 to physicians regardless of its off-label content.   Thus, on every call, representatives make competitive statements about Byetta versus Victoza, including stating that when compared to Byetta, Victoza is more effective, causes less nausea, and is better tolerated— none of which claims is supported by Victoza's prescribing information.

110.    For example, Humenansky forwarded his territory sales representatives an e-mail on March 3, 2010, originally from Novo Nordisk Gulf Coast District Business Manager for the Montgomery, Alabama District, Doug Cole, and approved by Gulf Coast Regional Business Director Albert Vicario, which instructed sales representatives as follows: "On every call you

must compare and contrast the features and benefits of Victoza and why the similarity between the two products [i.e., Byetta and Victoza] stops with the GLP - 1 classification." *See also* Ex. 1 Page1/78 ("Some of the information from the Lead 6 trial was discussed.").

111.    Sales representatives also make competitive statements about Victoza versus Januvia, a once-daily pill manufactured by Merck and classified as a dipeptidyl peptidase-4 (DPP-4) inhibitor, and approved by the FDA in October 2006 for use as an adjunct to diet and exercise to improve glycemic control in adults with type 2-diabetes.   On February 9, 2010, Humenansky sent his sales representatives an e-mail attaching the prescribing information for Byetta and Januvia and instructing the representatives to make competitive statements: "Print, study, and understand these 2 as well as you know and understand Victoza. You can compare pi to pi when a customer demonstrates confusion or asks for dosing information/comparison." Further, Novo Nordisk instructed its sales representatives to insert the LEAD-6 study reprints into clear page protectors and make annotations on the page protectors so that the sales representatives could show the doctors the annotated versions of the study reprints but still preserve the clean copy.  The tactic is meant to circumvent the FDA's guidances prohibiting use of highlighting, annotations, or summaries in disseminating reprints.

112.    To help sales representatives better understand the complex relationships among the anti-diabetes drugs and Victoza, on February 18, 2010, Humenansky forwarded to Relator and others an e-mail originally from Frank Jacobs, Associate Vice President of Diabetes Sales in the Southeast Area, comparing Victoza to the oral anti-diabetes medications.  Jacobs intended this e-mail to serve as both an educational tool as well as a marketing tool to ensure that the sales force could "articulate the difference" between Victoza and the other anti-diabetes drugs and "sell the injection of GLP1" versus the oral, anti-diabetes pills.

   e.      *Role of Speakers and Presentations in Delivering Victoza's Off-
           Label Message*

113.    Novo Nordisk's regional managers set budgets for promotional speaker events.
Kennedy's territory has an $8,000.00 budget for 2010.   To assist sales representatives in
coordinating events—and to record presentations for later use—the company relies on third party
companies, including Scientific Voice, Executive Encounters (from April to June of 2009), and
most recently, HealthLogiX.

114.    It was Victoza's brand management team at Novo Nordisk's U.S. headquarters
that designed the promotional speaker program for the drug.   At launch, thirty-five to forty
"thought and opinion leader" "faculty members" were recruited nationwide to deliver the
promotional speeches.   Sales representatives chosen by the Victoza brand team have coached the
speakers on issues they want addressed during programs, and primary care sales representatives
typically both plan and attend the programs.

115.    The brand team supplies speakers with a uniform slide set for use at Victoza
speaker events.   Slide sets are *not* disseminated to sales representatives.   The slide set includes
both on-label and off-label content, but the off-label slides are arranged so that they may be
"hidden" if those with compliance responsibilities attend the talk.   The slides are usually
employed in response to an off-label inquiry by a participant, but the structure of the talk is
designed to elicit precisely those off-label questions.

116.    In addition to promotional presentations, Novo Nordisk funded educational
presentations, known as "telesessions," in which national experts discussed the benefits of
Victoza.   In an April 14, 2010 email, Christopher Dowdy, Regional Sales Manager for the Gulf
Coast Region, referred to these telesessions as "Once-Daily Victoza telesessions" and instructed
all sales representatives to make "every effort possible to secure [their] highest targeted offices

for this tremendous opportunity to hear from national experts surrounding the benefits of Once-Daily Victoza." Moreover, Novo Nordisk used these "educational" telesessions to influence managed care formulary decisions. In an April 14, 2010 email, Frank Jacobs, Associate Vice President of Diabetes Sales in the Southeast Area, instructed sales representatives to schedule telesessions in order to "drive prescriber demand to drive formulary acceptance during the review process, especially in situations where Victoza requires a prior authorization." Jacobs noted that as of April 14, 2010, Novo Nordisk had held 131 telesessions.

    *f.*     ***Downplaying Safety Issues and Side Effects and Promoting as First Line Therapy***

117.    In clinical studies, Victoza caused thyroid tumors, including thyroid cancer, in some rodents. Studies have not determined whether Victoza causes thyroid tumors or medullary thyroid cancer ("MTC") in humans which may be fatal if not detected and treated early. Despite these warnings' appearance in a black box on the first page of the Victoza label, sales representatives, pursuant to instructions from Novo Nordisk, did not raise these risks with doctors on calls.

118.    Novo Nordisk promoted Victoza as a first-line therapy without mentioning that the label states that the benefits of Victoza must outweigh the risk of cancer and that, given this grave risk, "Victoza is not recommended as first-line therapy for patients who have inadequate glycemic control on diet and exercise." Despite the label's clear language, on March 26, 2010, in an e-mail to Gulf Coast representatives, Regional Business Director Albert Vicario urged the representatives "to continue to position Victoza *early in therapy* and ask [their] targets to think about the patient that they normally would start on a DPP-4 inhibitor, what are their thoughts on starting Victoza instead of the DPP-4 because of the benefits Victoza offers."

119.   In addition to the conspicuous black box warning regarding the risk of thyroid C-cell tumors and medullary thyroid carcinoma, the Victoza label includes a section entitled "WARNINGS AND PRECAUTIONS" to alert physicians to other safety issues associated with Victoza.   Novo Nordisk trained sales representatives to downplay these safety issues and side effects as well during calls with doctors.   Sales representatives were directed to discuss mild side effects that Victoza causes such as gastrointestinal side effects.   But all more serious risks were to be mentioned only once, at most, and then brushed aside.

120.   Moreover, what representatives actually said about these more serious risks downplayed the magnitude of the risk.   For example, on February 9, 2010, in an e-mail entitled "First Day Feedback from Texas," Dallas District Business Manager Bob Kinley stated that the endocrinologists in Dallas and Plano promised him that they would say "MTC issue is not a big deal if/when contacted by their referring PCPs."   Upper level management, including Regional Business Director Albert Vicario, forwarded this message through the chain of command in the sales force, and Humenansky ultimately sent this message to Kennedy and the rest of her Mobile West territory with instructions to "Please read."

**C.   Novo Nordisk's Use of Medical Liaisons and Kickbacks**

121.   Novo Nordisk relies on kickbacks to spread its off-label messages about Victoza, particularly in conjunction with its use of medical liaisons.   Medical liaisons rather than sales representatives are the Novo Nordisk representatives who typically take charge of "wining and dining" high-prescribing physicians.   Kennedy's territory partner, Matt Jones, accompanied the medical liaison Kathi Earles on one such dinner with Dr. Cecil Parker, a high Medicaid prescriber, at a restaurant called True in Mobile.   Because Earles was present, the dinner, which

covered a range of off-label topics related to Victoza, was supposedly educational rather than promotional in nature, but Jones's presence belied that notion.

122.   Shortly before her termination, Kennedy reported on a number of instances of gifts and other remuneration offered to physicians in the Mobile West territory.  For example, in June 2009, Humenansky instructed Matt Jones to purchase bottles of wine for Drs. David Ross and Steve Davis as a welcome gift to be placed in their hotel rooms during the American Diabetes Association's convention in New Orleans.  Only Dr. Ross received the wine, as Dr. Davis canceled his attendance.

123.   Novo Nordisk also allowed Dr. Steve Davis to bring his wife, Beverly Davis, a non-practicing nurse, to many of Novo Nordisk's lavish peer events and dinners, as a courtesy to Dr. Davis. This was done in contradiction to the presentation Novo Nordisk developed and distributed to its sales representatives regarding the FDA regulations of advertising and promotion.  Further, Matt Jones has used Novo Nordisk funds, with Humenansky's blessing, to play golf with Dr. Steve Davis.  Similarly, Matt Jones and Dawn Fredric have used company funds to entertain Drs. McKelvey and Sanders at a bar in Destin, Florida—a popular vacation spot not far from Mobile.

124.   Kennedy reported these violations and others to Bill Thompson of Human Resources via e-mail on April 19, 2010.  Her e-mail included an attached spreadsheet that catalogued the kickbacks and several other FCA violations by Novo Nordisk. As explained below, this e-mail and others sent to Human Resources led Novo Nordisk to retaliate against Kennedy and terminate her employment.

**D.     Novo Nordisk's Marketing Schemes for Victoza Targeted Government Health Programs, Gained Formulary Access by Deceit and other Means, and Caused Claims Arising from Such Schemes to be Submitted for Payment**

**i.     Targeting Government Health Care Enrollees**

125.    Diabetes is a disease that is disproportionately well-represented among patients enrolled in government health care programs in the United States.  It is especially prevalent among the poor and the aged, and thus Medicaid and Medicare Part D spend millions on the disease every year.  Novo Nordisk, given its diabetic specialty, is keenly aware of this component of its customer base.

126.    When Kennedy was terminated, Novo Nordisk was still working to obtain Medicaid coverage for Victoza in several states, including Alabama.  Florida, among other states, had already included the drug on its Medicaid preferred list.  Since her termination, new states, including, but not limited to, Texas, Nevada, and Delaware, have added Victoza to their Medicaid formularies.  Medicare Part D widely covered Victoza within months of launch, and Kennedy's target physicians all had diabetic patients enrolled in Medicare Part D.

127.    Sales representatives and their managers were keenly aware of which doctors had high Medicaid or Medicare populations, and they specifically targeted such doctors and promoted Victoza off-label to them.  For instance, on a ride-along (during which a supervisor accompanies a sales representative on physician calls to observe the representative's performance) Kennedy and Humenansky visited Dr. Mary Honkanen, a lipid expert and a high-prescriber of Byetta.   Kennedy and Humenansky were aware that Medicare Part D and Alabama's health program for state employees were Dr. Honkanen's largest payors, while Medicaid comprised two percent of her practice.  On this call, Humenansky handed LEAD 6 to

Dr. Honkanen and described it in detail.  Kennedy listened as Humenansky improperly told the doctor that Victoza does not cause hypoglycemia and can be used as a weight loss drug.

128.    Novo Nordisk also instructed its sales force to "Strategically Place Co-Pay Cards" during the calls with doctors.

129.    In preparation for Victoza's launch, Novo Nordisk required sales representatives to create "launch plans," which are similar to business plans.  In these plans, sales representatives listed the prescribers he or she would call on, the types of insurance each prescriber accepted, Victoza's formulary status on accepted insurance plans, and the sales representative's "goals" for each prescriber.  One such plan in the possession of Relator, the Mobile West Launch Plan, indicates that some targeted prescribers accept reimbursement from both federal and state healthcare programs, specifically TriCare Humana Military South, the Federal Employee Program BCBS (Fepblue), and the Public Education Employee Health Plan.  TRICARE, the government health program for those in the armed forces, had numerous enrollees living within Mobile territories because of a nearby Air Force base in Biloxi, Mississippi.  Dr. Steve Davis, whom Matt Jones took golfing, was known to treat TRICARE patients.  Moreover, one prescriber in the Mobile West Launch Plan, Dr. Greg McKelvey, who accepts reimbursement from the Public Education Employee Health Plan, serves as a speaker on behalf of Novo Nordisk.

### ii.    Assisting with Coverage and Prior Authorization Forms

130.    Novo Nordisk, seeking to have more prescriptions written and paid for by the government and to gain formulary acceptance, coached sales representatives on how to fill out prior authorization forms.  A prior authorization form is a form that a physician must fill out

when writing a prescription for a drug not on a health care program's formulary or a state Medicaid programs's preferred list.

131.   On January 30, 2010, John Davis, a Novo Nordisk Government Account Executive and Gulf Coast District Business Manager for the Macon, Georgia District, sent an e-mail to Humenansky and others attaching various sample prior authorization forms.  The majority of the attached forms were for government healthcare programs.  That same day, Humenansky forwarded this e-mail and the attached forms to his Mobile West sales force and instructed the sales representatives to "pick the ones that are familiar with your Top 20 and PRINT.  Make it part of your kill book."[15]  On February 18, 2010, Humenansky forwarded an e-mail originally from Lisa Becker, Sr. Strategic Account Executive at Novo Nordisk, with "Step Edit" information on how to fill out forms for Aetna and Cigna coverage.

132.   On March 5, 2010, Humenansky sent an e-mail to Kennedy and her fellow Mobile West sales representatives with a prior authorization form attached to use for applying for Victoza's approval by HealthSpring Insurance.  On April 19, 2010, Kennedy forwarded this e-mail to Bill Thompson in Human Resources, to express her concerns about Humenansky sending an e-mail with materials not approved for promotion by the Division of Drug Marketing, Advertising and Communications ("DDMAC").  Reporting this violation, among others, caused Kennedy's termination.

133.   On March 25, 2010, sales representatives received a memorandum on prior authorization forms that instructed sales representatives not to fill out the forms on behalf of physicians.  On March 29, 2010, Humenansky sent Kennedy and other sales representatives an e-mail that was sent to the managed care liaisons, including Kennedy's managed care liaison, Lori

---

[15] The kill book is a binder of Victoza promotional materials and other related documents that Novo Nordisk sales representatives carried with them on calls to doctors.

Menefee, which directly conflicted with the March 25 memorandum. The e-mail instructed sales representatives on how to apply for prior authorization of Victoza under two government health care programs: Medicare Part D and the locally important TRICARE program.

        **iii.**      **Evidence that Sales Force Delivered Off-Label Messages and Influenced Physicians: Impact RX Reports on Doctors' Description of Victoza Detailing**

134.    While Novo Nordisk has dispensed with traditional call notes, like many pharmaceutical companies, it was keen to track exactly how sales of Victoza were progressing after launch. Novo Nordisk's management commissioned a New Jersey-based pharmaceutical marketing research company called Impact RX to distribute Personal Digital Assistants ("PDAs") to 150 endocrinologists and 150 primary care physicians in several cities. These 300 physicians used these PDAs to record their own notes about Victoza discussions with sales representatives. Impact RX prepared very detailed, weekly reports entitled "U.S. Victoza Weekly Launch Tracker," which summarized data from the physicians' verbatim comments about the sales representatives' calls and provided excerpts of the notes themselves as well. *See* Exs. 1 and 2, Impact RX Reports Weeks 6 & 7. On April 2, 2010, Humenansky forwarded Kennedy an e-mail attaching the Week 7 U.S. Victoza Weekly Launch Tracker, stating that his team of sales representatives "MUST read this." Regional Business Director Albert Vicario, who originally received the e-mail from Alan Heaton, PhD, Senior Manager, Decision Support, Liraglutide Commercialization Team, had forwarded this e-mail and attachment to Humenansky. In the e-mail, Vicario asked his team to "Please take a look at this report; it is full of good stuff."

135.    The results of the attached Week 7 Report reveal that sales were strong. But they also reveal that 65% of the Victoza details discussed by sales representatives included competitive statements about Byetta. *See* Ex. 2. Additionally, the physicians' excerpts reveal

that sales representatives discussed other off-label indications, including weight loss, prevention of diabetes, regression of diabetes, and restoration of beta cell function. *Id.*

136.    For example, doctors stated the following regarding Victoza and weight loss in the Impact RX reports:[16]

- "Remember Victoza helps with once-a-day dosing to lower the blood sugar as well as help decrease weight." Ex. 1, p. 16

- "Its $3 in Medicaid, potentially better at losing weight than Byetta and it's only once daily." Ex. 1, p. 56

- "They said one patient, one doctor, within the first two weeks had a 10-pound weight loss on one patient." Ex. 1, p. 56

- "There is significant weight loss involved." Ex. 1, p. 56

137.    Regarding prevention of diabetes, doctors noted as follows:

- "They're talking about…an injection in a patient that, you know, for the first time heard about being, not even a diabetic, but maybe metabolic syndrome or pre-diabetic." Ex. 1, p. 58

- "Victoza's a new GLP-1 mimic, which has a half-life of eleven hours, and therefore, can, can only be given once a day. It has, it has weight loss possibilities, greater than Byetta, and a 2.2% decrease in hemoglobin A1c, in both metabolic syndrome patients, as well as diabetes 2 patients." Ex. 2, p. 59.

138.    Regarding regression of type 2 diabetes and beta cell restoration, the doctors commented:

- "Discussed new GLP-1 for type 2 diabetes.  It help to lower A1c up to 1.5% and it does

---

[16] Notes are included here exactly as they appeared in the Impact RX reports, verbatim with any grammar or spelling imperfections unaltered.

not cause hypoglycemia and it help to improve beta cell dysfunction." Ex. 1, p. 58

- "New incretin analog. Improved A1c. Rapid-acting. Preserves beta cell function, and replenishes beta cells." Ex. 1, p. 59

- "Once a day administration, improved beta cell function, A1c reduction and weight loss." Ex. 1, p. 63.

139.   And on downplaying the safety risks of Victoza, doctors noted as follows:

- "They talked about the fact that there is medullary carcinoma in the warning, but that it's not a concern that no thyroid monitoring needs to be done. She told me that there's no increase incidence of thyroid cancer in humans." Ex. 1, p. 15

- "black box warning not concerning." Ex. 1, p. 18

- "safe, everyone is prescribing it now." Ex. 1, p. 18

- "no thyroid ca problems." Ex. 1, p. 18

- "Victoza promotes satiety. It promotes weight loss. Studies showed low incidence of medullary thyroid carcinoma in rat studies done. Well tolerated. Safe." Ex. 1, p. 58

140.   Kennedy received three e-mails from her area sales director stating that the launch was going well based on the Impact RX reports.

141.   In addition to the Impact RX reports, Novo Nordisk knew its sales representatives were marketing Victoza off-label because the Feedback Summary memorandum sent on February 19, 2010 mentions that sales representatives consistently discussed Byetta with physicians.  LEAD 6 study comparing Victoza and Byetta was a leave-behind study and should not have been discussed on calls, even when raised by physicians, as Novo Nordisk's policy dictated.

142.   The Impact RX reports thus confirm the existence of a concerted nationwide scheme to promote Victoza off-label, with sales reps targeting high Medicaid, Medicare, TRICARE prescribers.

143.   Claims have been submitted to these programs as a result of such promotions. Novo Nordisk's Chief Financial Officer has stated that:[17]

> "Novo Nordisk A/S, the world's biggest diabetes-drug maker, raised its 2010 forecast for the second time this year after first-quarter profit beat analyst estimates on higher-than-expected sales of a new medicine.   First-quarter net income rose 23 percent to 3.32 billion kroner ($596 million), beating a 2.96 million-kroner average estimate by nine analysts.   Analysts expect Victoza sales to reach 1.14 billion kroner [about $145 million] this year, according to Bloomberg data. Half of patients receiving GLP-1 treatments in the 10th week after the introduction of Victoza are receiving the Novo drug [rather than Byetta], [Jesper Brandgaard, Novo's chief financial officer] said.  Sixty percent of patients being prescribed Victoza have failed to control their blood sugar using conventional oral treatments such as metformin, and between 10 percent and 15 percent are being treated for the first time, Brandgaard said. Another 10 percent are switching from insulin, while the remaining 15 percent to 20 percent switch from Byetta, he said. 'It looks like we are able to grow the market and that is what is crucial to the success of GLP-1s,' he said."

144.   Claims for reimbursing Victoza used to treat off-label uses are generally not qualified for reimbursement by government health programs.  An exception to that rule exists for medically accepted indications as defined in the statutes applying to Medicare, Medicaid, and other government health programs, including those "supported" by listings in a compendium such as DRUGDEX, the July 2010 edition of DRUGDEX lists no off-label uses for Victoza. Therefore, to date, the off-label uses of Victoza promoted by Novo Nordisk, as addressed in these allegations, do not qualify for reimbursement under any federally-funded health care program and claims for these uses submitted to government health plans represent false claims.

---

[17] "Novo Nordisk Lifts 2010 Revenue, Profit Forecasts," *Bloomberg Businessweek* website, available at http://www.businessweek.com/news/2010-04-27/novo-nordisk-lifts-2010-revenue-profit-forecasts-update1-.html.

Further, claims resulting from Novo Nordisk's multiple other misleading off-label claims violate that misbranding statute and represent false claims as well.

## VII.  RETALIATION AGAINST KENNEDY

145.    Kennedy realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

146.    In violation of the False Claims Act 31 U.S.C. § 3730(h), Novo Nordisk took negative employment actions against Kennedy in response to her investigation and reporting of the off-label marketing and kickbacks schemes surrounding Victoza.

147.    For most of her employment for Novo Nordisk, which commenced on January 5, 2009, Kennedy had to endure a hostile work environment with her district manager, Paul Humenansky.  For example, during a trip to Hudson's Treasure Hunt while doctor's offices were closed for lunch, in about March of 2009 - early in Kennedy's employment - Humenansky remarked, passing a display of "Daisy Duke" hot pants, "Your ass would look really good in those."  Kennedy, afraid to endanger her new job, did not reply.  Before beginning at Novo Nordisk, Kennedy was not asked, and did not disclose that she had been in a relationship with Matt Jones, a sales representative in the Mobile West territory.  When Humenansky learned of the prior relationship, he discriminated against Kennedy and was hostile towards her because of the prior relationship and because she questioned illegal marketing practices with regard to Victoza.

148.    On March 8, 2010, Humenansky called Kennedy and accused her of dispersing drug samples without authorization and ordered an immediate audit of Kennedy's house.  On March 9, 2010, the external audit of Kennedy's house proved Kennedy's innocence in the matter.  Novo Nordisk never terminated Kennedy's employment for this situation and even gave

her a raise the week before terminating her job, as noted in an e-mail from Humenansky on March 14, 2010.

149.     The catalyst for her termination was her investigation of the facts underlying this action and the reporting of her findings to her supervisors.

150.     On April 19, 2010 at 9:00 a.m. CST, Kennedy received a surprise conference call with Humenansky and Thompson alleging call falsification.  The alleged "call falsification" refers to an incident in which Kennedy mistakenly logged a call on Dr. Stephen G. Lauten, whose office she visited that day, but who was in Birmingham for the day.  Although Kennedy did not actually interview that specific doctor because he was out of town, Kennedy had made a call on that doctor's practice group in their Mobile, Alabama office.  Kennedy had filled out her call notes as part of her company-recommended pre-call planning.  That evening she submitted all of that day's call notes in bulk, forgetting that her draft call notes for Dr. Lauten reflected that she had met with him.

151.     Immediately after the conference call during which Humenansky began raising spurious accusations related to the alleged call falsification, Kennedy forwarded numerous e-mails to Bill Thompson in Human Resources expressing concern over Novo Nordisk's and Humenansky's use of "homemade" sales pieces not approved for promotion by the Division of Drug Marketing, Advertising and Communications ("DDMAC").  In one of these e-mails, Kennedy explains that Humenansky tried to have Kennedy fired because she had refused to follow his directives that required Novo Nordisk's sales representatives to market Victoza for off-label uses or provide kickbacks as part of the off-label marketing scheme.  Kennedy further explained that Humenansky tried to have her fired because he was afraid she would "blow the whistle" on him  by reporting his illegal conduct to Novo Nordisk or the FDA.  Kennedy also

reported to Human Resources on April 20, 2010 that Humenansky gave his attorney free insulin in exchange for legal services.

152.    Kennedy also expressed her concerns on April 19, 2010 to Human Resources that Novo Nordisk would "turn a blind eye" towards her complaints because Humenansky is a Novo "hall of famer."  Kennedy sent another e-mail the next day, to ask if she should call the "hotline" and to ask if her concerns were being "swept under the rug."  On April 21, 2010, Kennedy sent a follow-up e-mail to Human Resources to state that Humenansky was the only one who had a problem with her prior relationship with Matt Jones and that her working relationship with Jones and their sales were not affected by that prior relationship.  Expressing her concerns about Humenansky's illegal conduct and reporting these violations to Thompson swiftly caused Kennedy's termination.

153.    On April 21, 2010 at 9:00 a.m. CST, Kennedy received a call from Thompson about the compliance issues she had raised, and at 11:30 a.m. CST, Kennedy received a further call from Frank Bigley, Chief Compliance Officer, about both the compliance issues and the e-mail that Kennedy had sent to Thompson regarding FCA violations by Novo Nordisk.

154.    On April 22, 2010 at 1:00 p.m. CST, Kennedy received a call from Regional Business Director Albert Vicario, stating that Novo Nordisk was terminating her employment. Vicario wrote in a termination letter that Novo Nordisk terminated Kennedy's employment "due to call falsification."  Novo Nordisk used the alleged call falsification with Dr. Lauten as a pretext for terminating Kennedy for reporting the Novo Nordisk's FCA violations.

155.    When Kennedy applied for unemployment benefits, she received a call from the Alabama Department of Industrial Relations stating that Novo Nordisk would not contest the benefits because it did not allege that wrongdoing had occurred.

156.   Kennedy had surpassed all sales goals for 2009 and the first quarter of 2010.  At the time of her termination, Kennedy was expecting a check the following week for between $3,500 and $5,000—part of her quarterly bonus.   The week before her termination, her performance was acknowledged with a merit pay raise from $60,000 to $61,500.   Novo Nordisk's decision to terminate Kennedy's employment was clearly driven by her investigation and reporting of False Claims Act violations.

157.   As a result of Novo Nordisk's conduct, Kennedy has suffered damages.  She is entitled to two (2) times the amount of back pay including lost bonuses, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

## VIII.  ACTIONABLE CONDUCT BY NOVO NORDISK UNDER THE FALSE CLAIMS ACT

**A.     Applicable Law**

### i.      False Claims Act

158.   This is an action to recover damages and civil penalties on behalf of the United States and Kennedy arising from the false or fraudulent statements, claims, and acts by Novo Nordisk made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

159.   For conduct occurring before May 20, 2009, the False Claims Act ("FCA") provides that any person who:

(a)    knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(b)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(c)    conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

    (d)     knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.

160.    For conduct occurring on or after May 20, 2009, the FCA provides that any person who:

    (a)     knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

    (b)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (except that this language applies to all claims pending on or after June 7, 2008);

    (c)     conspires to defraud the Government by committing a violation of the FCA;

    (d)     knowingly makes, uses, or causes to be made or used, a false record or statement to conceal material to an obligation to pay or transmit money or property to the Government

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.

161.    The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for themselves and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

162.    Based on these provisions, Kennedy, on behalf of the United States Government and the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New

Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, and Texas, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and the City of Chicago (collectively the "states") seeks through this action to recover damages and civil penalties arising from Novo Nordisk's causation of the submission of false claims to the federal and state governments. In this case, such claims were submitted to the federal and state governments for payment for Novo Nordisk's drug, Victoza. Kennedy believes that the United States and the states have suffered significant damages as a result of false claims for payment for Victoza.

163. There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, Relator Kennedy is an original source as defined therein. Relator Kennedy has direct and independent knowledge of the information on which the allegations are based. As required pursuant to 31 U.S.C. §§ 3730(b) and (e), Relator Kennedy has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) of all material evidence, information and documents related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the United States, the United States Attorney for the Southern District of Texas, and the Attorneys General of the various states, commonwealths, and the District of Columbia, and to counsel for the City of Chicago.

**B.    Novo Nordisk's Violations of the FCA**

      **i.    Novo Nordisk's Illegal Kickback and Off-Label Marketing Schemes Violated the FCA**

164. Because of the illegal acts described above, Novo Nordisk has made or will make millions of dollars in sales of Victoza to Medicaid, Medicare, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefit Plan, and other federal healthcare program patients.

165.     Moreover, Novo Nordisk violated the FDCA by distributing Victoza as a misbranded drug. Novo Nordisk illegally misbranded Victoza because its labeling was false or misleading, its labeling did not bear adequate directions for use, and/or its labeling did not bear adequate warnings against unsafe dosage or methods of administration or application. Novo Nordisk's conduct also violated federal laws prohibiting a manufacturer from promoting off-label uses of its drugs. These claims were not eligible for payment by Medicaid, Medicare Part D, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefit Plan, or other federal healthcare programs because these off-label uses were neither "reasonable and necessary," nor "medically accepted."

166.     Novo Nordisk violated the Anti-Kickback Statute by providing the kickbacks to doctors in the form of "honoraria," consulting fees, gift certificates, dinners, trips, wine, golfing, and many other forms. The sheer number of these schemes, their similarity, and the sparseness of the obligations imposed on physicians in exchange for the cash, point to the conclusion that these "programs" were mere incentives/rewards for prescribing Victoza.

167.     Novo Nordisk knew that its false marketing materials, false and misleading representations and kickbacks by its sales representatives and medical liaisons would induce doctors to write prescriptions for off-label uses or prescriptions tainted by kickbacks. Novo Nordisk also knew that its false marketing, fraudulent misrepresentations and kickbacks would cause physicians and pharmacists to submit claims for fraudulent reimbursement by federal and state healthcare programs.

168.     Novo Nordisk's fraudulent scheme to aggressively and illegally market its drugs and misbrand Victoza and to integrate various forms of illegal kickbacks into its off-label sales campaigns led to increased prescriptions for its drugs. For example, virtually all off-label

prescriptions for Victoza for which Medicaid, Medicare Part D, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefit Plan, and other federal healthcare programs paid were a direct result of these illegal sales campaigns. Thus, these Medicaid, Medicare Part D, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefit Plan, and other federal healthcare program claims for off-label prescriptions are tainted by the associated illegal kickbacks, as well as by Novo Nordisk's "mislabeling" of Victoza. Novo Nordisk's scheme violated the Anti-Kickback Statute and the FDA's prohibitions on the promotion of off-label uses, and therefore caused false claims to be submitted by physicians and pharmacists in violation of the FCA. By taking part in this fraudulent scheme, Novo Nordisk repeatedly and with continued knowledge violated the False Claims Act, 31 U.S.C. § 3729(a).

169.    The ultimate submission by doctors and pharmacists of false pharmaceutical claims to Medicare, the state Medicaid programs, CHAMPUS/TRICARE, CHAMPVA, and Federal Employees Health Benefit Plan was a foreseeable factor in the Government's loss, and a consequence of the scheme. Given the structure of the health care systems, Novo Nordisk's false statements, representations, and records made, used, or caused to be made or used had the potential to influence the Government's payment decision. Consequently, the states and the United States Government have suffered substantial damages.

170.    Because of the illegal acts described above, Novo Nordisk has made or will make millions of dollars in sales of Victoza to patients it would not otherwise achieve. The ultimate submission by physicians and pharmacists of false claims to the state Medicaid programs, Medicare, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefit Plan, and other federal healthcare programs was a foreseeable factor in the government's loss, and a

consequence of the scheme. Consequently, the states and the United States Government have suffered substantial damages.

### ii. Novo Nordisk Conspired with Physicians to Defraud Medicaid in Violation of the FCA

171. Novo Nordisk conspired with physicians to promote off-label uses of Victoza in violation of the FCA and to pay kickbacks to physicians in violation of the Anti-Kickback Statute in order to induce physicians to prescribe high volumes of Victoza. As Novo Nordisk knew would be the case, Novo Nordisk's actions resulted in the submission to state Medicaid programs, Medicare, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefit Plan, and other federal healthcare programs of false and/or fraudulent claims for reimbursement for Victoza, violating the FCA, 31 U.S.C. § 3729(a).

172. Given the structure of the health care systems, false statements, representations, and records made, used, or caused to made or used, by Novo Nordisk had the potential to influence the government's payment decision.

173. Because of the illegal acts described above, Novo Nordisk has made or will make millions of dollars in sales of Victoza to patients it would not otherwise achieve. The ultimate submission by physicians and pharmacists of false claims to the state Medicaid programs, Medicare, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefit Plan, and other federal healthcare programs was a foreseeable factor in the government's loss, and a consequence of the scheme. Consequently, the states and the United States Government have suffered substantial damages.

### iii. Novo Nordisk Retaliated Against Kennedy in Violation of the FCA

174. Novo Nordisk took negative employment action against Kennedy in response to her questioning of the legality and ethics of Novo Nordisk's off-label marketing schemes. At

first, this negative action took the form of criticism.  After Kennedy continued to question Novo

Nordisk's conduct, Novo Nordisk terminated her employment on April 22, 2010.  Because of

Novo Nordisk's conduct, Kennedy suffered negative employment consequences and has suffered

damages, now and in the future.

### iv.      Damages

175.    Victoza prescriptions that resulted from false certification would not have been

reimbursed by Medicare Part D, the state Medicaid programs, CHAMPUS/TRICARE,

CHAMPVA, Federal Employees Health Benefit Plan, ADIS Drug Assistance Programs

("ADAPs"), and other federal healthcare programs, had the U.S. government or the states known

the circumstances under which the requests for reimbursement were submitted and the laws

violated by Novo Nordisk in order to claim reimbursement.  Consequently, the states and the

United States Government have suffered substantial damages.

176.    Generally, customers are willing to pay higher prices for high-quality drugs

versus lower-quality drugs.  Because Novo Nordisk touted Victoza as a drug capable of several

indications, some of which were off-label, the price of Victoza was inflated.  Had Novo Nordisk

marketed Victoza only for the use approved by the FDA, Victoza would have fetched a lower

price on the market.

## IX.  CAUSES OF ACTION

**A.      Count I - False Claims (31 U.S.C. § 3729(a))**

177.    Relator realleges and hereby incorporates by reference each and every allegation

contained in the preceding paragraphs of this Complaint.

178.    As a result of Novo Nordisk's off-label marketing scheme and kickbacks to

physicians to induce them to prescribe Victoza, all of the claims that Novo Nordisk caused

physicians, pharmacists and third-party payers to submit to the state Medicaid programs, Medicare, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefit Plan, and other federal healthcare programs are false or fraudulent. Novo Nordisk knowingly caused such false or fraudulent claims to be presented for payment or approval, in violation of 31 U.S.C. § 3729(a)(1).

179.    The United States Government paid the false and/or fraudulent claims.

180.    By virtue of the false or fraudulent claims that Novo Nordisk knowingly caused to be presented, the United States Government has suffered substantial monetary damages.

**B.    Count II - False Records or Statements (31 U.S.C. § 3729(a))**

181.    Relator realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

182.    Novo Nordisk knowingly made or used, or caused to be made or used, false records or statements, and omitted material facts (a) to get false or fraudulent claims paid or approved by the Government, or (b) that were material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a). The false records or statements included, but were not limited to, the false or misleading materials and other statements provided to physicians, DRUGDEX, and the federal and state governments to induce physicians to prescribe high volumes of Victoza, and the physicians' and pharmacists' and third-party payers' false certifications and representation of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute. Each prescription that was written as a result of the Defendants' illegal marketing practices and/or illegal inducements represents a false or fraudulent record or statement. And each claim for reimbursement for such prescriptions submitted to a federal health insurance program represents a false and/or fraudulent

claim for payment.

183.    By virtue of the false records or statements that Novo Nordisk made or used, the United States Government has suffered substantial monetary damages.

184.    Novo Nordisk further knowingly caused physicians and pharmacists and third-party payers to make or use false records or statements (a) to get false or fraudulent claims paid or approved by the Government, or (b) material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a).

**C.    Count III - Conspiracy (31 U.S.C. § 3729(a))**

185.    Relator realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

186.    Defendants conspired with physicians to promote off-label uses of Victoza in violation of the FCA and to pay kickbacks to physicians in violation of the Anti-Kickback Statute to induce physicians to prescribe high volumes of Victoza, thereby causing all of the physicians' and pharmacists' and third-party payers' claims to the state Medicaid programs, Medicare, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefit Plan, and other federal healthcare programs to be false or fraudulent.    Accordingly, Novo Nordisk conspired to defraud the Government by (a) getting false or fraudulent claims allowed or paid, or (b) committing a violation of the FCA, in violation of 31 U.S.C. § 3729(a).

187.    By virtue of the false or fraudulent claims submitted, paid, or approved as a result of Defendant's conspiracy to defraud the Government, the United States has suffered substantial monetary damages.

**D.    Count IV - Retaliation (31 U.S.C. § 3730(h))**

188.    Relator realleges and incorporates by reference each and every allegation

contained in the preceding paragraphs of this Complaint.

189.   In violation of the False Claims Act § 3730(h), Novo Nordisk took negative employment actions against Relator in response to her investigation and initiation of this claim.

190.   As a result of Novo Nordisk's conduct, Relator suffered negative employment consequences and has suffered damages, now and in the future.

## RELIEF

191.   On behalf of the United States Government, the *qui tam* Relator seeks to receive monetary damages equal to three times that suffered by the United States Government.   In addition, the *qui tam* Relator seeks to receive all civil penalties on behalf of the United States Government in accordance with the False Claims Act.

192.   The *qui tam* Relator seeks to receive on her own behalf, all monetary damages that she is entitled to for Novo Nordisk's retaliatory conduct against her.   In addition, Relator seeks punitive damages on her own behalf.

193.   The *qui tam* Relator seeks to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

194.   The *qui tam* Relator seeks to be awarded all costs and expenses for this action, including attorneys' fees and court costs.

195.   The *qui tam* Relator seeks pre-judgment interest at the highest rate allowed by law.

## PRAYER

196.   WHEREFORE, Relator prays that this Court enter judgment on behalf of the Relator and against Novo Nordisk for the following:

- Damages in the amount of three (3) time the actual damages suffered by the United States Government as a result of Novo Nordisk's conduct;

- Civil penalties against Novo Nordisk equal to $11,000 for each violation of 31 U.S.C. § 3729;

- The maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

- All costs and expenses of this litigation, including attorneys' fees and costs of court;

- Relator's individual damages;

- Pre-judgment interest at the highest rate allowed by law for the retaliatory conduct by Novo Nordisk;

- Punitive damages to Relator for the retaliatory conduct by Novo Nordisk; and

- All other relief on behalf of Relator or the United States Government to which they may be entitled and that the Court deems just and proper.

**E.    Count V - Illinois Whistleblower Reward and Protection Act (740 ILCS *et seq.*)**

197.    Relator repeats and realleges each allegation contained in the preceding paragraphs of this Complaint.

198.    This is a *qui tam* action brought by Relator and the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq.*

199.    740 ILCS 175/3(a) provides liability for any person who-

(a)    knowingly presents, or causes to be presented, to an officer or employee of the State of a member of the Guard a false or fraudulent claim for payment or approval;

(b)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c)    conspires to defraud the State by getting a false or fraudulent claim allowed or paid;

(d)    knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision.

70

200.    In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Illinois Medicaid program.

201.    Novo Nordisk knowingly violated 740 ILCS 175/3(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Illinois from at least January 2010 to the present by violating the Illinois Anti-Kickback Statute 305 ILCS 5/8A-3(b) and the Federal Anti-Kickback Act, as described herein.

202.    As a result of Novo Nordisk's off-label marketing and kickback schemes, all of the claims that Novo Nordisk knowingly caused physicians and pharmacists to knowingly submit to the Illinois Medicaid program are false or fraudulent.   Further, Novo Nordisk knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the Illinois Anti-Kickback Statute (305 ILCS 5/8A-3(b)).   Compliance with federal and state laws and regulations was a condition of payment.

203.    The State of Illinois, by and through the Illinois Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

204.    Given the structure of the health care systems, the false statements, representations, and records made by Novo Nordisk had the potential to influence the State of Illinois's payment decision.

205.    The ultimate submission by physicians, pharmacies, and third-party payers of false and/or fraudulent claims to the state Medicaid program was a foreseeable factor in the State of Illinois's loss, and a consequence of the scheme.

206.    As a result of Novo Nordisk's violations of 740 ILCS 175/3(a), the State of Illinois has been damaged.

207.    There are no bars to recovery under 740 ILCS 175/4(e)(4), and, or in the alternative, Relator is an original source as defined therein.   Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 740 ILCS 175/4(b) on behalf of herself and the State of Illinois.

208.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Novo Nordisk:

To the STATE OF ILLINOIS:

- Three times the amount of actual damages that the State of Illinois has sustained as a result of Novo Nordisk's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that Novo Nordisk caused to be presented to the State of Illinois;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

- Reimbursement for reasonable expenses that Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

**F.    Count VI - California False Claims Act (Cal. Gov't. Code § 12650 *et seq.*)**

209.   Relator repeats and realleges each allegation contained in the preceding paragraphs of this Complaint.

210.   This is a *qui tam* action brought by Relator and the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq.*

211.   Cal. Gov't Code § 12651(a) provides liability for any person who-

(a)    knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof, a false claim for payment or approval;

(b)    knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(c)    conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

(d)    knowingly makes, uses, or causes to made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision;

(e)    is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

212.   In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code §§ 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code §14107.2.

213.     Novo Nordisk knowingly violated Cal. Gov't Code § 12651(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of California from at least January 2010 to the present by violating Cal. Bus. & Prof. Code §§ 650-650.1 and Cal. Welf, & Inst. Code §14107.2 and the Federal Anti-Kickback Act, as described herein.

214.     As a result of Novo Nordisk's off-label marketing and kickback schemes, all of the claims that Novo Nordisk knowingly caused physicians and pharmacists to knowingly submit to the California Medicaid program are false or fraudulent.  Further, Novo Nordisk knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the California Anti-Kickback Statutes (Cal. Bus. & Prof. Code §§ 650-650.1 and Cal. Welf. & Inst. Code §14107.2). Compliance with federal and state laws and regulations was a condition of payment.

215.     The State of California, by and through the California Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

216.     Given the structure of the health care systems, the false statements, representations, and records made by Novo Nordisk had the potential to influence the State of California's payment decision.

217.     The ultimate submission by physicians, pharmacists, and third-party payers of false and/or fraudulent claims to the state Medicaid program was a foreseeable factor in the State of California's loss, and a consequence of the scheme.

218.     As a result of Novo Nordisk's violations of Cal. Gov't Code §12651(a), the State of California has been damaged.

219.     There are no bars to recovery under Cal. Gov't Code § 12652(d)(3), and, or in the alternative, Relator is an original source as defined therein.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of herself and the State of California.

220.     This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Novo Nordisk:

To the STATE OF CALIFORNIA:

- Three times the amount of actual damages that the State of California has sustained as a result of Novo Nordisk's fraudulent and illegal practices;

- A civil penalty of up to $10,000 for each false claim that Novo Nordisk presented or caused to be presented to the State of California;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

- Reimbursement for reasonable expenses that Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

**G.     Count VII - Florida False Claims Act (Fla. Stat. § 68.081 *et seq.*)**

221.     Relator repeats and realleges each allegation contained in the preceding paragraphs of this Complaint.

222. This is a *qui tam* action brought by Relator and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

223. Fla. Stat. § 68.082(2) provides liability for any person who-

(a) knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

(c) conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

224. Novo Nordisk knowingly violated Fla. Stat. § 68.082(2) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Florida from at least January 2010 to the present by violating of the Federal Anti-Kickback Act and the Florida Anti-Kickback Statute (Fla. Stat. § 409.920), as described herein.

225. As a result of Novo Nordisk's off-label marketing and kickback schemes, all of the claims that Novo Nordisk knowingly caused physicians and pharmacists to knowingly submit to the Florida Medicaid program are false or fraudulent. Further, Novo Nordisk knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the Florida Anti-Kickback Statute (Fla. Stat. § 409.920). Compliance with federal and state laws and regulations was a condition of payment.

226. The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, paid the false and/or fraudulent claims.

227.   Given the structure of the health care systems, the false statements, representations, and records made by Novo Nordisk had the potential to influence the State of Florida's payment decision.

228.   The ultimate submission by physicians, pharmacists, and third-party payers of false and/or fraudulent claims to the state Medicaid program was a foreseeable factor in the State of Florida's payment decision.

229.   As a result of Novo Nordisk's violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged.

230.   There are no bars to recovery under Fla. Stat. § 68.087(3) and, or in the alternative, Relator is an original source as defined therein.   Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of herself and the State of Florida.

231.   This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Novo Nordisk:

To the STATE OF FLORIDA:

- Three times the amount of actual damages that the State of Florida has sustained as a result of Novo Nordisk's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that Novo Nordisk caused to be presented to the State of Florida;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

- Reimbursement for reasonable expenses that Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

## H.     Count VIII – Massachusetts False Claims Act (Mass. Gen. Laws Ann. 12 § 5A *et seq.*)

232.    Relator repeats and realleges each allegation contained in the preceding paragraphs of this Complaint.

233.    This is a *qui tam* action brought by Relator and the Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. 12 § 5A *et seq.*

234.    Mass. Gen. Laws Ann. 12 § 5B provides liability for any person who-

(a)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

(c)     conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

(d)     is a beneficiary of an inadvertent submission of a false claim to the commonwealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

235.    In addition, Mass. Gen. Laws Ann. 118E § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or

overtly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Massachusetts Medicaid program.

236.    Novo Nordisk knowingly violated Mass. Gen. Laws Ann. 12 § 5B and knowingly caused hundreds of thousands of false claims to be made, used and presented to the Commonwealth of Massachusetts from at least January 2010 to the present by violating the Federal Anti-Kickback Act and the Massachusetts Anti-Kickback Statute (Mass. Gen. Laws Ann. 118E §41), as described herein.

237.    As a result of Novo Nordisk's off-label marketing and kickback schemes, all of the claims that Novo Nordisk knowingly caused physicians and pharmacists to knowingly submit to the Massachusetts Medicaid program are false or fraudulent.   Further, Novo Nordisk knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the Massachusetts Anti-Kickback Statute (Mass. Gen. Laws Ann. 118E §41).   Compliance with federal and state laws and regulations was a condition of payment.

238.    The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

239.    Given the structure of the health care systems, the false statements, representations, and records made by Novo Nordisk had the potential to influence the Commonwealth of Massachusetts's payment decision.

240.    The ultimate submission by physicians, pharmacists, and third-party payers of false and/or fraudulent claims to the state Medicaid program was a foreseeable factor in the Commonwealth of Massachusetts's loss, and a consequence of the scheme.