# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
UNITED STATES OF AMERICA, *et al.*,        )
*ex rel*. KENNEDY,                                          )
                                                                          )          Civil Action No. 13-1529 (RBW)
                         Plaintiffs,                             )
                                                                          )
             v.                                                        )
                                                                          )
NOVO A/S, *et al.*,                                       )
                                                                          )
                        Defendants.                       )
_____)


## RELATOR KENNEDY'S MOTION FOR IMMEDIATE AWARD OF
## RELATOR'S SHARE

As the first whistleblower to allege the fraud detailed in the Covered Conduct, Relator

Kennedy now seeks an immediate award of at least the minimum 15% of the settlement amount

that she is statutorily entitled to under the FCA and state statutes.

# TABLE OF CONTENTS

I.      Procedural History ....................................................................................................1

II.     The False Claims Act and Analogous State Acts Mandate Payment of Relator's
        Upon Settlement.......................................................................................................3

III.    The Fact that Relator Share Percentage Has Not Yet Been Determined Is No
        Impediment to Ordering Payment of the 15% Minimum Relator's Share from
        Proceeds of the Federal and State Settlements .....................................................5

IV.     Kennedy is First to Allege Elements of the Covered Conduct Fraud, Barring Later-
        Filed Complaints under the First-to-File Rule ......................................................7

        A.      The First-to-File Rule ................................................................................8

        B.      The Covered Conduct ...............................................................................10

        C.      The FDA REMS Program..........................................................................12

        D.      Promotion to Non-Diabetics ....................................................................14

        E.      Kennedy is First to Allege Elements of Fraud in Section i of the Covered
                Conduct .....................................................................................................15

                1.      Pre-Launch Illegal Promotion....................................................16

                2.      Novo Nordisk "Sandwiched" Safety Information Between
                        Promotional Messages to Downplay Risks.................................16

                3.      Novo Nordisk Failed to Disclose Victoza's Risks to Doctors ...17

                4.      Novo Nordisk Downplayed the Magnitude of Victoza's Risks...17

                        i.      Brushing Aside Serious Risks by Discussing Mild Side
                                Effects Instead................................................................18

                        ii.     Using Endocrinologist to Mislead Physicians into Believing
                                that MTC is a non-issue .................................................18

                        iii.    MTC Risk Only Applies to Rats; No MTC Risk to Humans ........19

                        iv.     All Competitor Drugs Have Black Box and so Victoza is No
                                Less Safe ........................................................................20

                5.      Kennedy is the First-to-File the Covered Conduct .....................20

F.      Kennedy is First to Allege the Material Elements of Fraud in Section ii of the Covered Conduct............................................................................................22

G.      The Dastous Action Involves the "Same Material Elements" as the First-Filed Kennedy Action ........................................................................................22

H.      The Later-Filed Complaints that Follow the Dastous Complaint Address the Same Material Elements as the Kennedy Complaint...........................................24

V.     Conclusion ..........................................................................................................26

CERTIFICATE OF CONFERENCE..................................................................................27

CERTIFICATE OF SERVICE ...........................................................................................28

I.      **Procedural History**

**First to File.** On October 15, 2010, Elizabeth Kennedy filed this action in the United States District Court for the Southern District of Texas. The action was transferred to this Court on September 12, 2013.

**Second to File.** On December 28, 2010, Peter Dastous filed an action in the United States District Court for the District of Massachusetts. The action was transferred to this Court on September 7, 2011.

**Third to File.** On January 12, 2011, Lesley Ferrara *et al* filed an action in the United States District Court for the District of Columbia.

**Fourth to File.** On September 2, 2011, David Myers filed an action in the United States District Court for the District of Columbia.

**Fifth to File.** On May 23, 2012, McKenzie Stepe filed an action in the United States District Court for the District of New Jersey. The action was transferred to this Court on February 7, 2013.

**Sixth to File.** On February 22, 2016, Kathy Ann Gratton and Raymond Hippolyte filed an action in the United States District Court for the Northern District of Texas. The action was transferred to this Court on April 28, 2017.

**Seventh to File.** On August 8, 2016, Greg Smith, Clint Houck, and Brent Shireky filed an action in the United States District Court for the District of Columbia. This action was voluntarily dismissed without any claim to the qui tam award and is not further discussed. .

The second, third, fourth, fifth, and sixth cases are referred to as the "later-filed" complaints.

A timeline of this procedural background is provided below, with the actions referred to by the relators' last names:

| Date | Complaint Filed |
|------|-----------------|
| October 15, 2010 | Kennedy Original Complaint |
| December 28, 2010 | Dastous Original Complaint |
| January 12, 2011 | Ferrara et al. Original Complaint |
| September 2, 2011 | Myers Original Complaint |
| May 23, 2012 | McKenzie Original Complaint |
| February 22, 2016 | Gratton & Hippolyte Original Complaint |
| August 6, 2016 | Smith, Houck & Shirkey Original Complaint |

It is undisputed that of all of these relators, Relator Kennedy was the first in time to file her action.

All of the actions alleged that Novo Nordisk committed fraud in marketing its diabetes drug, Victoza;[1] all have been deemed related by the Government and the Court. The Government has long since notified this Court about the existence of "related cases," which the Local Rules define as follows:

> Civil . . . cases are deemed related when . . . they (i) relate to common property, or (ii) involve common issues of fact, or (iii) grow out of the same event or transaction, or (iv) involve the validity or infringement of the same patent.

LCvR 40.5(a)(3). Because all the actions were related, actions filed in other districts were transferred to this Court and assigned to a single judge in accordance with the Local Rules. *See* LCvR 40.5(c), (e).

On July 26, 2017, the United States elected to intervene in this action and the related later-filed actions.[2] On this same day, the United States, Defendant Novo Nordisk Inc., and all

---

[1] Some relators raised other claims as well, such as against other defendants or as to other Novo Nordisk drugs. These are not at issue here and have largely been voluntarily dismissed.

[2] The United States elected to intervene in part as to the "Covered Conduct" that is found in paragraph K of the Settlement Agreement and declined to intervene as to the other asserted claims. Dkt. 73. What comprises "Covered Conduct" is described later in this brief.

the Relators who filed *qui tam* actions against Novo Nordisk pursuant to the False Claims Act

("FCA") executed a Settlement Agreement ("Agreement").

In the Agreement, Novo Nordisk settled federal FCA claims arising from its "Covered

Conduct" by agreeing to pay $43,179,036.87 to the United States under the False Claims Act,

plus accrued interest at a rate of 1.625% from December 7, 2016 until the date of payment

("Federal Settlement Amount") and $ 12.5 million for violating the Food Drug and Cosmetics

Act's misbranding provisions. Novo Nordisk wired the funds to the United States at the time of

the July settlement.

Novo Nordisk also settled state FCA claims arising from its "Covered Conduct" by

agreeing to pay the Medicaid Participating States $3,320,963.13, plus accrued interest at a rate of

1.625% from December 7, 2016 until the date of payment ("Medicaid State Settlement

Amount"). The Medicaid State Settlement Amount was paid to the Medicaid Participating States.

Relators dismissed their *qui tam* claims against Novo Nordisk around this time.  Shortly

afterward, multiple relators voluntarily dismissed retaliation claims.  *See. e.g.,* Dkt. 89.

Remaining for resolution is the payment of the Relator's share of the settlement funds.

## II.     The False Claims Act and Analogous State Acts Mandate Payment of Relator's Share Upon Settlement

The federal False Claims Act mandates payment of a relator's share upon settlement.

Specifically, it holds:

(d) Award to qui tam plaintiff

(1) If the Government proceeds with an action brought by a person under
subsection b [a private person bringing an FCA suit on behalf of the United
States], such person **shall** …[3] **receive** at least 15 percent but not more than 25
percent **of the proceeds of the action or settlement of the claims**, depending
upon the extent to which the person substantially contributed to the prosecution

---

[3] The omitted clause does not apply here; it mandates a lower percentage share in cases in which the relator has
relied significantly on government reports and similar public disclosures.

of the action.[4]

All of the state *qui tam* statutes under which Kennedy brought claims have similar provisions,

using the word "shall" and providing for minimum relator shares of 15%.[5]  Relator Kennedy is

---

[4] 31 U.S.C. § 3730(d)(1) (emphasis added).

[5] *See* **California**, CAL. GOV'T CODE § 12652(g)(2) ("If the state . . . proceeds with an action brought by a qui tam plaintiff . . ., the qui tam plaintiff *shall* . . . receive at least *15 percent* but not more than 33 percent of the proceeds . . . ."); **Colorado**, COLO. REV. STAT. § 25.5-4-306(4) ("If the state proceeds with an action brought by a relator . . . , the relator *shall* . . . receive at least *fifteen percent* but not more than twenty-five percent of the proceeds . . . ."); **Connecticut**, CONN. GEN. STAT. § 4-278(e) (". . . the person bringing such action *shall* receive from the proceeds not less than *fifteen per cent* but not more than twenty-five per cent of such proceeds . . ."); **Delaware**, DEL. CODE ANN. tit. 6, § 1205(a) ("If the Department of Justice proceeds with an action brought by a party . . ., such party *shall* . . . receive at least *15 percent* but not more than 25 percent of the proceeds . . . ."); **District of Columbia**, D.C. CODE § 2-381.03(f)(1)(a)  ("If the District proceeds with an action brought by a qui tam plaintiff . . ., the qui tam plaintiff . . . *shall* receive at least *15%*, but not more than 25%, of the proceeds . . . ."); **Florida**, FLA. STAT. § 68.085(1)(a) ("If the department proceeds with an action brought by a person under this act, . . . the person *shall* receive at least *15 percent* but not more than 25 percent of the proceeds . . . ."); **Georgia**, GA. CODE ANN. § 49-4-168.2(i)(1) (" If the Attorney General proceeds with a civil action brought by a private person . . ., such person *shall* . . . receive at least *15 percent* but not more than 25 percent of the proceeds . . . ."); **Hawaii**, HAW. REV. STAT § 661-27(a) ("If the State proceeds with an action brought by a person . . . , the person *shall* receive at least *fifteen per cent* but not more than twenty-five per cent of the proceeds . . . ."); **Illinois**, 740 ILL. COMP. STAT. 175/4(d)(1) ("If the State proceeds with an action brought by a person . . . , such person *shall* . . . receive at least *15%* but not more than 25% of the proceeds . . . ."); **Indiana**, IND. CODE § 5-11-5.7-6(1) (". . . if the attorney general or the inspector general intervened in the action, the person is *entitled* to receive at least *fifteen percent (15%)* and not more than twenty-five percent (25%) of the proceeds . . . ."); **Louisiana**, LA. REV. STAT. ANN. § 46:439.4(A)(1) (". . . if the secretary or the attorney general intervenes in the action brought by a qui tam plaintiff, the qui tam plaintiff *shall* receive at least *fifteen percent*, but not more than twenty-five percent, of recovery."); **Maryland**, MD. CODE ANN., HEALTH-GEN. § 2-605(a)(1) ("If the State intervenes and proceeds with an action . . ., the court *shall* award the person initiating the action an amount that is: (i) Not less than *15%* and not more than 25% of the proceeds of the action or settlement of the claim; . . . ."); **Massachusetts**, MASS. GEN. LAWS ch. 12, § 5F(1) ("If the attorney general proceeds with an action brought by a relator . . . , the relator *shall* receive at least *15 percent* but not more than 25 per cent of the proceeds . . . ."); **Michigan**, MICH. COMP. LAWS ANN. § 400.610a(9)(a) (". . . if a person other than the attorney general or the attorney general prevails in an action . . . , the court *shall* award the person . . . the following percentage of the monetary proceeds resulting from the action or any settlement of the claim: (a) If the attorney general intervenes, *15%* to 25%."); **Minnesota**, MINN. STAT. § 15C.13 ("If the prosecuting attorney intervenes at the outset in an action brought by a person . . ., the person is *entitled* to receive not less than *15 percent* or more than 25 percent of any recovery . . . ."); **Montana**, MONT. CODE. ANN. §17-8-410(1) (". . . if the government attorney proceeds with an action brought by a person . . ., the person *must receive* at least *15%* but not more than 25% of the proceeds . . . ."); **Nevada**, NEV. REV. STAT. § 357.210(1) (". . . if the Attorney General or a designee of the Attorney General . . . intervenes . . . , the private plaintiff is *entitled* to receive not less than *15 percent* or more than 25 percent of any recovery. . . ."); **New Hampshire**, N.H. REV. STAT. ANN. § 167:61-e(I) ("If the state proceeds with an action brought by a relator . . ., the relator *shall* . . . receive at least *15 percent* but not more than 25 percent of the proceeds . . . ."); **New Jersey**, N.J. STAT. ANN. § 2A:32C-7(a) ("If the Attorney General proceeds with and prevails in an action brought . . ., the court *shall* order the distribution to the person of at least *15%* but not more than 25% of the proceeds . . . ."); **New Mexico**, N.M. STAT. § 27-14-9(A) ("If the department proceeds with an action brought by a person . . ., the person *shall* . . . receive at least *fifteen percent* but not more than twenty-five percent of the proceeds . . . ."); **New York**, N.Y. STATE FIN. LAW § 190(6)(a) ("If the attorney general elects to . . . intervene in the qui tam civil action, then the person or persons who initiated the qui tam civil action collectively *shall* be entitled to receive between *fifteen* and twenty-five percent of the proceeds . . . ."); **North Carolina**, N.C. GEN. STAT. § 1-610(a) (". . . if the State proceeds with an action brought by a qui tam plaintiff . . .,

---

entitled to relator's share of settlement as to each state under whose statute she brought a *qui tam*

claim, namely, California, Colorado, Connecticut, Delaware, District of Columbia, Florida,

Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota,

Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina,

Oklahoma, Rhode Island, Tennessee, Texas, Virginia, and Wisconsin.  This is a simple mandate

at the core of any *qui tam* statute: if the suit is settled, the government must pay the relator her

statutory share out of those proceeds.  Because settlement has occurred, it is time for the

government entities to pay relator's share.

## III.    The Fact that Relator Share Percentage Has Not Yet Been Determined Is No Impediment to Ordering Payment of the 15% Minimum Relator's Share from Proceeds of the Federal and State Settlements

Where the United States elects to intervene in a *qui tam* action, as was the case here, the

FCA requires that a relator be awarded at least 15% but no more than 25% of the proceeds of the

settlement of the claim (the "Relator's Share"). 31 U.S.C. § 3730(d)(1).[6]  As discussed in the

previous section, the pertinent state statutes provide for mostly identical ranges, all with a

minimum relator's share of 15%.  There is currently no agreement as to the relator share

---

the qui tam plaintiff *shall* receive at least *fifteen percent (15%)* but not more than twenty-five percent (25%) of the proceeds . . . ."); **Oklahoma**, OKLA. STAT. tit. 63, § 5053.4(A)(1) ("If the state proceeds with an action brought by a person . . ., the person *shall* . . . receive at least *fifteen percent (15%)* but not more than twenty-five percent (25%) of the proceeds . . . ."); **Rhode Island**, R.I. GEN. LAWS § 9-1.1-4(d)(1) (" If the State proceeds with an action brought by a person . . ., such person *shall* . . . receive at least *fifteen percent (15%)* but not more than twenty-five percent (25%) of the proceeds . . . ."); **Tennessee**, TENN. CODE ANN. § 71-5-183(d)(1)(A) ("If the state proceeds with an action brought by a person . . ., a person *shall* . . . receive at least *fifteen percent (15%)* but not more than twenty-five percent (25%) of the proceeds . . . ."); **Texas**, TEX. HUM. RES. CODE ANN. § 36.110(a) ("If the state proceeds with an action . . ., the person bringing the action is *entitled* . . . to receive at least *15 percent* but not more than 25 percent of the proceeds . . . ."); **Virginia**, VA. CODE ANN. § 8.01-216.7(a) (". . . if the Commonwealth proceeds with an action brought by a person . . ., such person *shall* receive at least *fifteen percent* but not more than twenty-five percent of the proceeds . . . ."); **Wisconsin**, WIS. STAT. § 20.931(11)(A) (". . . if the state proceeds with an action brought by a person . . ., the person who brings the action *shall* receive at least *15 percent* but not more than 25 percent of the proceeds . . . .").

[6] Likewise, as to an alternate remedy, here the FDCA settlement of $12,150,000, relators have the same rights to a relator share as in an intervened *qui tam* case.

percentage to be paid out of the Novo Nordisk federal and state settlements.  This is despite repeated overtures by Kennedy to the United States, which has declined to address the subject. The States have followed suit in deferring such discussions.  Governmental parties' refusal in no way excuses a delay in paying relator's share in any of the settlements, however; at most, it simply necessitates two sets of payments.

Kennedy is entitled to immediately be paid the statutory minimum of 15% of the FCA settlement as a matter of operation of law. *See United States ex rel. Merena v. SmithKline Beecham Corp.*, 1988 U.S. Dist. LEXIS 2028, * 10 (E.D. Pa. 1998) (directing that government pay Relator statutory minimum of 15% without prejudice to right of Relator to make a claim for and to obtain a larger percentage share; finding no prejudice to government where conceded owed at least statutory minimum).  Kennedy's right to receive an interim award derives from the well-accepted notion that, because a plaintiff cannot collect interest on an amount owed by the United States, that interim awards are needed to minimize losses due to delays in payment. *See McKenzie v. Kennickell*, 669 F. Supp. 529, 532 (D.D.C. 1987) (citing *In re Bradley v. School Board of City of Richmond*, 416 U.S. 696 (1974) ("To delay a fee award until the entire litigation is concluded would work substantial hardship on plaintiffs and their counsel . . . .")); *Hanrahan v. Hampton*, 446 U.S. 754, 758 (1980) (Congress intended to allow for awards pendent elite where party has prevailed on at least some claims). Courts also have recognized the need for entry of an order directing immediate payment by the government in other contexts as well. *See Doty v. United States*, 109 F.3d 746, 747 (Fed. Cir. 1997) (court ordered United States to pay judgment where only amount in dispute was calculation of interest and the principal amount to be paid was "fixed and final"). *Dempsey by & Through Dempsey v. United States*, 32 F.3d 1490,

1498 (11th Cir. 1994) (directing that government immediately pay portion of judgment that was

uncontested and owed to plaintiff).

Accordingly, Kennedy respectfully requests entry of an order directing that the United

States pay to Kennedy at least 15% of the Federal FCA Settlement Amount, inclusive of any

accrued interest that Novo Nordisk paid to the United States, and to order the States to pay at

least the same percentage out of proceeds from their settlements.

Kennedy also reserves the right to present to this Court, at a later date, justification to

receive an award of up to 25% of the overall settlement. *See id.* More specifically, Kennedy

plans to separately propose in a status report a briefing schedule for Relator Kennedy and the

United States and the States on the issue of relator's share percentage amount, but with the hope

that the relator and the governmental entities will be able to agree on percentage and avoid that

briefing.

## IV.   Kennedy is First to Allege Elements of the Covered Conduct Fraud, Barring Later-Filed Complaints under the First-to-File Rule

Congress enacted the False Claims Act as a mechanism to fight fraud against the United

States by encouraging persons with knowledge of wrongdoing against the federal government to

sue on the government's behalf. The law accomplishes this objective by treating such persons as

whistleblowers and rewarding them with a percentage of the government's ultimate recovery.

Congress recognized, however, that multiple plaintiffs asserting whistleblower status about the

same or substantially similar allegations would lead to unnecessary duplicative suits and result in

the bounty being shared in diminishingly smaller and unjust amounts. To prevent this, the FCA's

"First-to-File" rule bars subsequent *qui tam* actions that are related—that is, actions that allege

the same material elements of the fraud—to an earlier action. This rule encourages

whistleblowers to report fraud promptly and rewards those whistleblowers by making them sole claimant of the award.

Kennedy was the first relator to allege the material elements of the fraud delineated in the Covered Conduct.  A former Novo Nordisk sales representative who was fired after she warned Novo Nordisk that its marketing practices violated the law, Kennedy was the first person to expose to the Government Novo Nordisk's nationwide, fraudulent scheme to unlawfully market its new diabetes drug, Victoza, (1) by downplaying and misrepresenting the risk of medullary thyroid cancer ("MTC") and; (2) by promoting Victoza to non-diabetics.  Kennedy was thus the first to put the Government on the trail to discover the same fraud that constitutes the rest of the Covered Conduct.  As discussed below, Relator Kennedy submits that the later-filed Dastous complaint and the other later-filed complaints assert the same material elements of fraud as Kennedy's action and are barred under the FCA, leaving Kennedy as the appropriate recipient of the relator share.

### A.       The First-to-File Rule

The FCA's First-to-File rule provides that "When a person brings an action . . . , no person other than the Government may    . . . bring a ***related action*** based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5) (emphasis added). This rule acts as a "nonjurisdictional procedural bar." *United States ex rel. Heath v. AT&T, Inc.*, 791 F. 3d 112, 127 (D.C. Cir. 2015). "Once a suit has been filed under the False Claims Act, the first-to-file rule" bars any person from later bringing a "related" action. *Id.* at 121.[7] This bar serves the FCA's "twin goals of rejecting suits which the government is capable of pursuing itself, while

---

[7] "Related" action and "based on the facts underlying the pending action" are synonymous. *See United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1208 (D.C. Cir. 2011).

promoting those which the government is not equipped to bring on its own." *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 813 F. 3d 214, 217 (D.C. Cir. 2003).

The D.C. Circuit has adopted the "same material elements" standard to determine whether two actions are related. Under this standard, a later-filed action is "related" to an earlier action, and therefore barred, if it alleges the "'same material elements of fraud' as an earlier suit, even if the allegations 'incorporate somewhat different details.'" *Id.* at 217, 218. A later-filed complaint "need not allege identical facts" as the earlier-filed complaint for it to be "related". *Id.* at 218 ("But § 3730(b)(5) does not say that the later filed action must rest on identical facts, and the purpose of the qui tam provisions are against such a reading."); *United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1208 (D.C. Cir. 2011) ("Under this standard, two complaints need not allege identical facts for the first-field complaint to bar the later-filed complaint.").

Instead, "[s]imilarity is assessed by comparing the complaints side-by-side, and asking whether the later complaint 'alleges a fraudulent scheme the government already would be equipped to investigate based on the [the first] [c]omplaint.'" *United States ex rel. Heath v. AT&T, Inc.*, 791 F. 3d 112, 121 (D.C. Cir. 2015) (quoting *United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C. Cir. 2011)); *see also United States. ex rel. Folliard v. CDW Tech. Services, Inc.*, 722 F. Supp. 2d 37, 43 (D.D.C. 2010) ("It is reasonable to conclude that the government, armed with [the first-filed] allegations . . . , was 'equipped . . . on its own' to discover the extent to which defendants had other federal procurement contracts . . . and, in turn, whether any wrongdoing had occurred."). "**Accordingly, complaints are related where the earlier-filed complaint gives the government sufficient notice to discover the fraud in the later-filed complaint**." *United States ex rel. Shea v. Verizon Bus. Network Services Inc.*, 904 F. Supp. 2d 28, 36 (D.D.C. 2012) (emphasis added). This threshold serves to "minimize

'duplicative claims' that "do not help reduce fraud or return funds to the federal fisc, since once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds." *United States ex rel. Folliard v. CDW Tech. Services, Inc.*, 722 F. Supp. 2d 37, 42–43 (D.D.C. 2010).

In determining whether complaints are related, a court must compare the complaints at a "sufficiently high level of generality." *United States. ex rel. Folliard v. CDW Tech. Services, Inc.*, 722 F. Supp. 2d 37, 41. The reason is that "[p]ermitting infinitely fine distinctions among complaints has the practical effect of dividing the bounty among more and more relators, thereby reducing the incentive to come forward with information on wrongdoing" and "is inconsistent with the FCA's purpose of encouraging whistleblowers to approach the government and file suit as early as possible." *United States ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 12 (D.D.C. 2003).

A later-filed complaint cannot avoid the First-to-File's bar "simply by adding factual details or geographic locations to the essential or material elements of a fraud claim against the same defendant described in the prior complaint." *United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C. Cir. 2011) (quoting *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir. 2009)).

### B.   The Covered Conduct

As previously noted, Novo Nordisk and the United States settled federal FCA claims of fraudulent conduct described in the Settlement Agreement as the "Covered Conduct." The "Covered Conduct" is defined in paragraph K as follows:

i    The FDA specifically required the REMS Communication Plan as part of the NDA approval for Victoza. After Victoza was approved, Novo Nordisk provided

the sales force with training to appropriately implement the REMS, but also

provided them with information that had the overall effect of arming them with

message that could create a false or misleading impression with physicians that

the Victoza REMS MTC risk message was erroneous, irrelevant, or unimportant.

Following the training, certain Novo Nordisk sales representatives made false or

misleading statements that were designed to avoid or circumvent the requirements

of the REMS Communication Plan. Those statements included:

a.      the potential risk of MTC associated with Victoza is only applicable to rats
        and mice;

b.      all diabetes have boxed warnings and Victoza is no different and no less
        safe than those other drugs;

c.      because of the differences between rodents and humans it is implausible
        that humans would contract MTC from the use of Victoza;

d.      physicians should not be concerned about MTC because it is easy to treat
        if a patient does get it;

e.      "sandwiching" the MTC risk information between promotional messages;
        and

f.      When delivering to primary care physicians a letter by the May 5, 2011
        modification to the Victoza REMS, certain Novo Nordisk sales
        representatives, executing instructions from Novo Nordisk's Vice
        President, Diabetes Marketing, told primary care physicians in June 2011
        that there were no new safety concerns with Victoza and that the letter was
        simple the second part of the REMS requirement, which was a false or

11

misleading message and contradicted the REMS modification that FDA

deemed to be "new safety information".

ii      Novo Nordisk knowingly promoted the sale and use of Victoza by adult patients

who did not have Type II diabetes, a use for which it was not approved as safe

and effective by the FDA, that was not medically accepted indication as defined

by 42 U.S.C. § 1396-8, and not covered by the Federal Health Care Program.

Settlement Agreement, Paragraph K, Pages 5–7.[8]  Through this conduct, Novo Nordisk caused

false or fraudulent claims for Victoza to be submitted to federally funded health care programs.[9]

Novo Nordisk also entered into separate State Settlement Agreements with each

Medicaid Participating State to resolve state FCA claims arising from Novo's "Covered

Conduct." Each State Settlement Agreement's definition of Novo Nordisk's "Covered Conduct"

mirrors the Federal Settlement Agreement's definition. *See* Texas State Settlement Agreement,

Paragraph J, Pages 5–6. Through this conduct, Novo Nordisk caused false or fraudulent claims

for Victoza to be submitted to each respective State's Medicaid Program. *Id.*

C.      The FDA REMS Program

Section i of the FCA Settlement Agreement's "Covered Conduct" provisions relates to

the downplaying of safety risks and violations of the REMS requirements attached to Victoza

---

[8] The DOJ website does not provide a link to the FCA Settlement Agreement, but only to a simultaneous FDCA Settlement.  The FCA settlement is available at https://www.phillipsandcohen.com/wp-content/uploads/Novo-Nordisk-Federal-settlement-agreement.pdf.  The FDCA settlement is available at https://www.justice.gov/opa/press-release/file/994746/download.  Relator Kennedy reserves the right to pursue through a separate motion payment of relator's share from the FDCA settlement on "alternate remedy" grounds under 3730(c)(5).

[9] The Federal Health Care Programs are the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1 ("Medicare"); the Medicaid Program, 42 U.S.C. §§ 1396-1396w-5 ("Medicaid"); the TRICARE Program, 10 U.S.C. §§ 1071-1110b ("TRICARE"); the Federal Employee Health Benefits Plan, 5 U.S.C. §§ 8901-8914 ("FEHBP"); and the Department of Veterans Affairs, Veterans Health Administration, 38 U.S.C. Chapter 17 ("VA"). Settlement Agreement, Paragraph J, Page 5.

before launch.  REMS is an abbreviation for "Risk Evaluation & Mitigation Strategies."[10] The Food and Drug Administration (FDA) can require a drug manufacturer to implement a REMS plan if the agency determines that additional safety measures and mitigation strategies are needed beyond a drug's labeling to ensure that a drug's benefits outweigh its risks. *See* 21 U.S.C§ 355–1. Each REMS "has a specific safety measure unique to the safety risk associated" with a particular drug, meaning "no two REMS are exactly alike."[11]

A drug's REMS plan may include one or more of the following "elements" or features: (1) Medication Guide (or Patient Package Insert); (2) Communication Plan; (3) Elements to Assure Safe Use (ETASU); and (4) Implementation System. In addition, all REMS plans require a drug manufacturer to submit a "Timetable for Submission of Assessment of the REMS" to assess the effectiveness of REMS safety measures in the 18 month, 3rd year, and 7th year after the REMS is approved.

Because the FDA was concerned about the events of medullary thyroid cancer and pancreatitis that were observed in patients treated with Victoza during clinical trials, as a condition of approval, the agency required Novo Nordisk to implement a REMS plan for Victoza. The REMS that the FDA approved for Victoza initially had two goals: (1) to inform **providers** about the risk of acute pancreatitis and the potential risk of medullary thyroid carcinoma associated with Victoza; and (2) to inform patients about the serious risks associated with Victoza.[12] To achieve these goals, the FDA approved a REMS plan for Victoza consisting of three elements:

---

[10] A Brief Overview of Risk Evaluation & Mitigation Strategies (REMS), 1 (2015), available at https://www.fda.gov/downloads/aboutfda/transparency/basics/ucm328784.pdf. (emphasis added)

[11] *Id.* at 4.

[12] Center for Drug Evaluation and Research, Risk Assessment and Risk Mitigation Review(s), Application Number: 22-341, Appendix A: Victoza REMS, Page 7.  The second goal of the REMS program was later removed.

> (1)    Medication Guide to be dispensed with each Victoza prescription;
>
> (2)    Communication Plan to convey Victoza's risks to healthcare providers likely to prescribe Victoza; and
>
> (3)    Timetable for submission of REMS Assessments.[13]

The Victoza REMS Communication Plan specifically required:

> (1)    Novo Nordisk to mail "**A Dear HCP (DHCP) Letter**" within 60 days after Victoza approval "addressing the potential risks of medullary thyroid tumors and the risk of acute pancreatitis" to healthcare professionals likely to prescribe Victoza;
>
> (2)    Novo Nordisk to mail "**A Direct Mail Letter**" once per year for 3 years post-launch "containing the information included in the DHCP letter" and the "The Highlighted Information for Prescribers" to "all prescribers who are likely to prescribe Victoza";
>
> (3)    Novo Nordisk sales representatives to distribute "**The Highlighted Information for Prescribers**" during the first discussion of Victoza with all [health care professionals] visited during the first sixth months after product launch."[14]

The Victoza REMS also required Novo Nordisk to make the REMS, the DHCP letter, the Medication Guide, the Highlight Information for Prescribers, and the professional labeling available on a dedicated Victoza REMS website.[15]

### D.    Promotion to Non-Diabetics

Section ii of the Covered Conduct pertains to the promotion of Victoza for off-label uses to non-diabetics, such as for weight loss or for the prevention of diabetes.

---

[13] *Id.* at 7–9.

[14] *Id.* at 7–9.

[15] *Id.* at 8.

**E.      Kennedy is First to Allege Elements of Fraud in Section i of the Covered Conduct**

Kennedy's Original Complaint ("Complaint") was the first to alert the Government of

Novo Nordisk's concerted, nationwide scheme to downplay and misrepresent Victoza's potential

risk of medullary thyroid carcinoma (MTC) and risk of pancreatitis. As Kennedy noted in her

Complaint:

> Victoza is not a risk-free medication and may cause serious health risks. The Victoza label has a black box warning entitled "WARNING: RISK OF THYROID C-CELL TUMORS"[16]
>
> ***
>
> In addition to the black box warning, the label further warns that Victoza may cause pancreatitis, which is a potentially deadly inflammation of the pancreas.[17]

Kennedy alleged the following with respect to Novo Nordisk's unlawful marketing scheme:

> Finally, since the time of launch, Novo Nordisk has marketed Victoza off-label by downplaying its safety issues and side effects. Novo Nordisk trained its sales force to make all of these assertions, and it continues to market Victoza accordingly today.[18]
>
> ***
>
> With Victoza's launch, Novo Nordisk committed to a marketing campaign that, as it well knows, diverges from Victoza's FDA approved label in numerous respects. . . . Second, Novo Nordisk **downplays and thus misrepresents the risks of thyroid cancer and pancreatitis** as spelled out on Victoza's label.[19]

Kennedy did not couch Novo Nordisk's illegal marketing campaign as REMS violations, but

instead characterized the scheme as downplaying and misrepresenting Victoza's label and black

box warning. In reality, they are one and the same. To allege that Novo Nordisk downplayed and

---

[16] Kennedy Original Complaint ¶ 72.

[17] Kennedy Original Complaint ¶ 73.

[18] Kennedy Original Complaint ¶ 1.

[19] Kennedy Original Complaint ¶ 77 (emphasis added).

misrepresented the risks of thyroid cancer and pancreatitis is the equivalent to alleging that Novo Nordisk failed to properly "inform providers about the risk of acute pancreatitis and the potential risk of medullary thyroid carcinoma associated with Victoza"—the first goal of the Victoza REMS.

### 1.    Pre-Launch Illegal Promotion

Kennedy revealed to the Government that Novo Nordisk began promoting Victoza to physicians before the drug had FDA approval. For example, Kennedy explained that sales representatives were instructed to "answer questions from doctors regarding Victoza's anticipated black box warning on thyroid C-cell tumors, including medullary thyroid carcinoma (MTC)", even though the FDA had yet to approve a label for the drug.[20] Therefore, Kennedy alerted the Government to the fact that during the pre-launch time period, Novo Nordisk already had in place a marketing scheme to mislead doctors about Victoza's serious safety risks.

### 2.    Novo Nordisk "Sandwiched" Safety Information Between Promotional Messages to Downplay Risks

Kennedy further revealed that on February 2010, after Victoza gained FDA approval, Novo Nordisk assembled its national sales force in Las Vegas to attend a launch meeting, education and training sessions, and an extravagant party.[21] Kennedy explained that during a training session, Novo Nordisk distributed to sales representatives a document entitled "Victoza Launch Roadmap."[22] This training document illustrates how Novo Nordisk strategically and

---

[20] Kennedy Original Complaint ¶ 82.

[21] Kennedy Original Complaint ¶ 84.

[22] Kennedy Original Complaint ¶ 88.

uniformly trained its entire sales force to only communicate and "sandwich" Victoza's safety risks between promotional messages during sales calls.

### 3. Novo Nordisk Failed to Disclose Victoza's Risks to Doctors

Kennedy was the first to allege and disclose to the Government that "sales representatives, pursuant to instruction from Novo Nordisk, did not raise [Victoza's black box] risks with doctors on calls."[23] The Victoza Launch Roadmap provides additional confirmation. It contains scripts for four types of calls—an "Elevator pitch," a Quick call," a "Full Call," and a "Launch call"—but none instruct sales representatives to convey Victoza's safety risks during the call.

### 4. Novo Nordisk Downplayed the Magnitude of Victoza's Risks

Kennedy revealed to the Government that Novo Nordisk trained its sales representatives to downplay the "magnitude" of Victoza's serious risks.[24] Kennedy attached to her Complaint two Impact RX reports entitled "US Weekly Launch Tracker."[25] As Kennedy explained in her action, the Impact RX reports contain "verbatim notes from interviews with doctors after receiving visits from Novo Nordisk sales representatives."[26] The reports call these notes "Physician Recall and Perceptions" and can be found under the "Physician Verbatim" column.[27]

Using these reports, Kennedy "was able to confirm that sales representatives nationwide were receiving the same directives to market off-label that her district was receiving" and noted

---

[23] Kennedy Original Complaint ¶ 117.

[24] Kennedy Original Complaint ¶ 120.

[25] Kennedy Original Complaint ¶ 134 (citing Exs. 1 and 2).

[26] *See* Kennedy Original Complaint ¶ 2.

[27] Kennedy Original Complaint, Exhibits 1 and 2.

that "Novo Nordisk was reporting on these marketing tactics in great detail and with enthusiasm, indicating company approval."[28] The notes found in these weekly reports provided proof to the Government (1) that Novo Nordisk sales representatives were misrepresenting Victoza's safety risks to doctors; and that (2) Novo Nordisk was successful in misleading doctors about Victoza's safety risks.

> ### i.       Brushing Aside Serious Risks by Discussing Mild Side Effects Instead

As it relates to the safety risks and side effects presented in the "WARNINGS AND PRECAUTIONS" section of Victoza's label, Kennedy alleged that "Novo Nordisk trained sales representatives to downplay these safety issues and side effects as well during calls."[29] For example, Kennedy alleged that Novo Nordisk directed sales representatives to "discuss mild side effects that Victoza causes such as gastrointestinal side effects", but that "more serious risks were mentioned only once, at most, and then brushed aside."[30]

> ### ii.      Using Endocrinologists to Mislead Physicians into Believing that MTC is a non-issue

Kennedy revealed that another method Novo Nordisk utilized to downplay Victoza's MTC risk was by enlisting endocrinologists to advance their nefarious scheme:

> [O]n February, 2010, in an e-mail entitled "First Day Feedback from Texas," Dallas District Business Manager Bob Kinley stated that the endocrinologists in Dallas and Plano promised him that they would say "MTC issue is not a big deal if/when contacted by their referring PCPs."[31]

---

[28] Kennedy Original Complaint ¶ 99.
[29] Kennedy Original Complaint ¶ 119.

[30] Kennedy Original Complaint ¶ 119.

[31] Kennedy Original Complaint ¶ 120.

Kennedy explained that Novo Nordisk's upper level business managers exploited this message by forwarding it up through the chain of command, and that the e-mail was then sent down to Novo Nordisk's sales force with the command to "Please read."[32]

### iii.    MTC Risk Only Applies to Rats; No MTC Risk to Humans

Kennedy revealed a different strategy that Novo Nordisk utilized to downplay Victoza's MTC risk, misleading doctors into thinking that the risk only applied to rats, but not humans. In her Complaint, Kennedy provided two doctor notes from the Impact RX "US Weekly Launch Tracker" report that demonstrate that Novo Nordisk sales representatives tailored their messages to downplay the link of MTC in rats with the link of MTC in humans:

And on downplaying the safety risks of Victoza, doctors noted as follows:

- They talked about the fact that there is medullary carcinoma in the warning, but that it's not a concern that not thyroid monitoring needs to be done. She told me that there's no increase incidence of thyroid cancer in humans." Ex. 1, p. 18

   ***

- Victoza promotes satiety. It promotes weight loss. Studies showed low incidence of medullary thyroid cancer in rat studies done. Well tolerated. Safe. Ex. 1, p. 58[33]

Kennedy also included the following doctor notes proving that sales representatives were downplaying the MTC risk: "black box warning not concerning," "safe, everyone is prescribing it now," "no thyroid ca[ncer] problems."[34]

---

[32] Kennedy Original Complaint ¶ 120.
[33] Kennedy Original Complaint ¶ 139 (citing Ex. 1, page 18 and page 58).

[34] Kennedy Original Complaint ¶ 139 (citing Ex. 1, page 18).

iv.    **All Competitor Drugs Have Black Box and so Victoza is No Less Safe**

Kennedy explained throughout her Complaint that Novo Nordisk sales representatives were instructed to make competitive statements about Victoza's superiority against the competitor drugs Byetta and Januvia.[35] According to Kennedy, the Week 7 Impact RX "US Weekly Launch Tracker" report revealed "that 65% of the Victoza details discussed by sales representatives included competitive statements about Byetta."[36] That is not the only thing the report revealed. This same report shows that Novo Nordisk sales representatives downplayed Victoza's black box warning by pointing out that all competitor drugs have a black box warning, thereby implying that Victoza's safety risks were not really an issue. In one example, a doctor provides the following corroborating recollection:

> This is a new product and we discussed dosing. We discussed safety. We had a long discussion about the meaning of the FDAs black box warning, how it came about, her emphasis that it reflected an overly vigilant FDA, and that **Januva and Byetta have similar issues as did metformin when it first came out** . . . .[37]

These comparisons were false and misleading statements.

5.    **Kennedy is the First to File as to the Covered Conduct**

As has been shown, Kennedy is the first person to allege that, "since the time of launch, Novo Nordisk marketed Victoza off-label by downplaying its safety issues and side effects."[38] Although Kennedy did not articulate this fraudulent conduct as a REMS violation, these allegations revealed that Novo Nordisk provided sales representatives with "information that had

---

[35] Kennedy Original Complaint ¶¶ 1, 77, 83, 88, 108, 109, 111.

[36] Kennedy Original Complaint ¶ 135.

[37] Kennedy Original Complaint, Exhibit 2, page 57 (emphasis added).

[38] Kennedy Original Complaint ¶ 1.

the overall effect of arming them with messages that could create a false or misleading impression with physicians that the Victoza REMS risk was erroneous, irrelevant, or unimportant" and that Novo Nordisk "sales representatives made false or misleading statements that [Novo Nordisk] designed to avoid or circumvent the requirements of the REMS Communication Plan." In other words, Kennedy was the first to allege and reveal the "Covered Conduct." See Settlement Agreement, Paragraph K, Pages 5–6. As such, Kennedy was the first person to allege the elements of fraud forming the "Covered Conduct."

In addition, even though Kennedy did not frame the fraudulent conduct as REMS violations, this does not mean that she failed to file these allegations first. [39] First, the First-to-File rule does not contemplate providing allegations of a legal theory, but of the "material elements of fraud"—that is to say, of the facts of the fraud. *See* 31 U.S.C. § 3730(b)(5) ("facts underlying the pending action"). Second, Kennedy's factual allegations regarding Novo Nordisk's fraudulent conduct—the marketing strategies that Novo Nordisk employed to downplay and misrepresent the potential risk of MTC and risk of pancreatitis associated with Victoza—constitute violations of the Victoza REMS. Lastly, Kennedy's allegations put the Government on the trail of the fraud of the other marketing strategies Novo Nordisk employed to downplay Victoza's safety risks, in violation of the requirements of the Victoza REMS program. Consequently, Kennedy is the first to file these fraud allegations.

---

[39] *See Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346–347 (2014) ("Federal pleading rules . . . do not countenance dismissal of complaint for imperfect statement of the legal theory supporting the claim asserted.").

F.     **Kennedy is First to Allege the Material Elements of Fraud in Section ii of the Covered Conduct**

Kennedy also alleged that Novo Nordisk misbranded Victoza by promoting it for non-diabetics.[40] For instance, Kennedy alleged that Novo Nordisk promoted Victoza for "metabolic syndrome" to reach a whole new subset of patients—pre-diabetics.[41] Novo Nordisk instructed sales representatives to make claims in the field that stated that any pre-diabetic who does not want to have type 2 diabetes later in life should take Victoza as a preventative measure because it will preserve beta cell function and prevent "burnout."[42] Kennedy named a specific, somewhat incredulous, physician comment recorded by Impact Rx regarding Novo Nordisk representatives' pre-diabetic marketing claims.[43] Kennedy also alleged that Novo Nordisk touted the weight loss benefits of Victoza for diabetics and non-diabetics alike.[44]

G.     **The Dastous Action Involves the "Same Material Elements" as the First-Filed Kennedy Action**

The Dastous action, the second-filed action, is barred by the First-to-File rule. When viewed at a high level of generality, *United States. ex rel. Folliard v. CDW Tech. Services, Inc.*, 722 F. Supp. 2d at 41, the Dastous action did not alert the Government to any new fraudulent conduct because Kennedy had already filed her complaint containing the essential facts of Novo Nordisk's fraudulent scheme.

The Dastous complaint does allege downplaying of the black box warning; however, it offers no additional essential elements as to that scheme.  As set forth above, Kennedy was the

---

[40] Kennedy Complaint ¶¶ 3, 77.

[41] Kennedy Complaint at Introduction on page 1, ¶¶ 1, 51, 70, 71, 81, 103–05, 136.

[42] Kennedy Complaint ¶104.

[43] Kennedy Complaint ¶ 136.

[44] Kennedy Complaint ¶ ¶ 1, 71, 77, 83, 89; *see also* ¶¶ 100-02.

first relator to allege the downplaying and misrepresenting the risk of medullary thyroid cancer. Dastous has no credible claim that he was first to make these allegations and is entitled to a relator's share.

Dastous also alleges Novo Nordisk submitted false claims to the Government when it promoted Victoza to non-diabetics for weight loss.  The Dastous complaint does not allege Novo Nordisk's larger pre-diabetic campaign where it pitched Victoza as a drug that helped avoid cell burnout.  Alleging a lesser scheme, even if in greater detail, does not avoid application of the first-to-file rule in the D.C. Circuit. To the contrary, under *Batiste*, the United States was already well-equipped from the allegations raised by Kennedy to discover any additional facts the Dastous action added.

In determining whether two complaints are related, "[s]imilarity is assessed by comparing the complaints side-by-side, and asking whether the later complaint 'alleges a fraudulent scheme the government already would be equipped to investigate based on the [the first] [c]omplaint.'" *United States ex rel. Heath v. AT&T, Inc.*, 791 F. 3d 112, 121 (D.C. Cir. 2015) (quoting *United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C.Cir.2011)).  Dastous may attempt to circumvent this side-by-side complaint comparison by arguing that the Government allegedly acted more quickly upon his Complaint than on the Kennedy or Ferrara complaints. But that argument is fatally flawed. "[T]he purpose of the first-to-file bar is not to enable the government to intervene at its discretion in materially similar fraud actions, but to ***protect the first-filed relator*** precisely in order to incentivize private citizens to bring informative claims under the FCA. *U.S. ex rel. Folliard v. CDW Tech. Services, Inc.*, 722 F. Supp. 2d 37, 43 (D.D.C. 2010) (emphasis added). Whether the Government actually put Kennedy's "facts to their best use" is "irrelevant." *Id*. The relevant question is whether, when armed with Kennedy's complaint, the

complaint "would have revealed" to a government investigating agency the fraud that is alleged
in a later-complaint. Id. (quoting *U.S. ex rel. Chovanec v. Apria Healthcare Grp. Inc.*, 606 F.3d
361, 365 (7th Cir. 2010)).

Reviewing the four corners of the Dastous complaint versus the four corners of the
Kennedy complaint reveals that the Dastous action alleges the same elements of the fraud as the
Kennedy action. Accordingly, it is barred by the First-to-File rule.

### H.   The Later-Filed Complaints that Follow the Dastous Complaint Address the Same Material Elements as the Kennedy Complaint

Of all the later-filed complaints, only one arguably raised for the first time material
elements of the fraud described in the Covered Conduct.  Ferrara *et al*.'s Original Complaint
provided more detail as to part i of the Covered Conduct relating to fraudulent conduct
surrounding safety and Victoza's REMS program.

Specifically, the Ferrara *et al.* complaint offered these allegations regarding REMS
violations:

> The FDA also mandated that Novo Nordisk engage in a REMS (Risk Evaluation and
> Mitigation Strategy), which required Novo Nordisk to mail letters to health care
> providers likely to prescribe the drug and distribute copies of the prescribing information
> with information about the black box warning highlighted during the first six months of
> the drug's U.S. marketing to insure safe use of the drug.[45]
>
> ***
>
> The FDA required Novo Nordisk sales representatives to give highlighted prescriber
> information describing the black box warning regarding the risk of thyroid C-cell tumors
> and pancreatitis "during the first discussion of Victoza with all HCPs [health care
> providers] visited during the first six months after product launch." As of April 28, 2010,
> Novo had failed to distribute this Risk Evaluation and Mitigation Strategy (REMS)
> information to a large number of health care providers who were detailed by its sales
> force during this period about Victoza.  In an earlier email, sent by Novo management on

---

[45] Ferrara *et al*. Original Complaint ¶ 55.

> February 18, 2010, sales representatives discussed leaving the required REMS letter with physicians or their staff during a detail but not "verbaliz[ing] the safety message."[46]
>
> \*\*\*
>
> Relator …expressed concern that residents and non-targeted physicians might prescribe Victoza, but not receive the safety message because Novo's computer system did not have a place to add their names and document whether they received the REMS letter. Her supervisor … responded that Novo had a limited number of copies of the REMS letter and it only needed to be given to targeted physicians, not those providers who were not listed in the computer system.[47]

Yet providing more detail is not enough to prevail in first-to-file disputes. *See U.S. ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 217 (D.C. Cir. 2003) (first-to-file bars later-complaints, even if the allegations "incorporate somewhat different details"; *U.S. ex rel. Shea v. Verizon Bus. Network Services Inc.*, 904 F. Supp. 2d 28, 35 (D.D.C. 2012) (first-to-file "bars a subsequent action if it contains 'merely variations' of the fraudulent scheme described in the first action"); *U.S. ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C. Cir. 2011) ("[A] relator cannot avoid § 3730(b)(5)'s first-to-file bar by simply adding factual details or geographic locations to the essential or material elements of a fraud claim against the same defendant described in a prior complaint." (quoting *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir.2009)).

And whether or not these allegations might make out a unique legal theory, they largely involve the facts alleged in the Kennedy action. Ferrara *et al*.'s complaint pled REMS misconduct as part of off-label and misleading marketing, just as Kennedy did. Further, the Government was already well-equipped to investigate those claims from the Kennedy complaint.

---

[46] Ferrara *et al*. Original Complaint ¶ 88.

[47] Ferrara *et al.* Original Complaint ¶ 89.  The Ferrara *et al*. Original Complaint contains additional factual allegations that support their claim that Novo Nordisk's failure to follow its REMS requirements constituted false claims submitted to the Government. *See* Ferrara *et al.*  Original Complaint ¶¶ 90-99.
.

Ferrara et al.'s complaint serves to highlight that no other relator group had any significant allegations to add with regard to the safety or non-diabetics claims.  It is worth noting that the second-filed *Dastous* Complaint had no specific REMS allegations.

As for the Relators who filed their actions fourth, fifth, and sixth, they are the fourth, fifth, and sixth relators to allege that Victoza was marketed to downplay the risk of side effects like medullary thyroid cancer, and for weight loss and other off-label benefits, including non-diabetics.[48]  A strength of this case from the Government's perspective has always been how closely the several complaints, purely on their face, corroborate each other.

Thus, the Dastous complaint adds nothing to Kennedy's allegations of off-label marketing and downplaying cancer risks.  Ferrara *et al.* have the most legitimate, though ultimately insufficient potential challenge to Kennedy's entitlement to share, and in any case they agree to this motion.  And all other relators allege the same material elements of fraud as the prior complaints and are thus barred by the First-to-File rule.  Kennedy is therefore the first-to-file relator in every sense.

## V.    Conclusion

Relator Kennedy requests the Court to grant her motion ordering the United States and the States to immediately pay to her 15% of the FCA and States' Settlement Amounts, inclusive of any accrued interest that Novo Nordisk paid to the United States.

---

[48] The sixth relator group, alleges fraud related to diabetes education, and is continuing to pursue such claims, but to the extent that is a different scheme, they can have no claim to this settlement.

Respectfully submitted,


 /s/ Joel M. Androphy
Joel M. Androphy
Sarah M. Frazier
Berg & Androphy
3704 Travis Street
Houston, TX 77002
Tel:  713-529-5622
jandrophy@bafirm.com
sfrazier@bafirm.com

Counsel for Relator Elizabeth Kennedy


## CERTIFICATE OF CONFERENCE

Counsel for Relator Kennedy separately notified AUSA Darrell Valdez and Greg Kinskey of the Texas Attorney General's Office (who is acting as representative for the States) on October 20 of her intent to file this motion.  Counsel for the United States has indicated that it is not yet prepared to take a position on the motion. The States have not indicated a position on the motion.  The City of Chicago takes no position with regard to this motion.  Although the related cases are not consolidated and thus the other relators are not party to this action, Relators' counsel for the Ferrara *et al.* case support this motion and have said they plan to file an indication of such support in their separate case.  Counsel for Relator Kennedy and Ferrara's counsel reached out to all other relators on October 24 regarding this Motion.  While Counsel have not received word of any final decisions about opposition to this Motion from any of those relator groups, they should be considered as opposing the motion at this time.

## CERTIFICATE OF SERVICE

On this 27th day of October, 2017, the foregoing was served upon Counsel by means of the Court's electronic filing system and as set forth below.

/s/ Sarah M. Frazier_____
Sarah M. Frazier

Counsel for the United States of America via Pacer:

William E. Olson
Trial Attorney, Civil Division
Commercial Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
william.e.olson@usdoj.gov

Darrell C. Valdez
Assistant United States Attorney
United States Attorney's Office for the
    District of Columbia
555 Fourth Street, N.W.
Washington, D.C.  20530
Darrell.Valdez@usdoj.gov

Plaintiff-States Representatives:

Greg T. Kinskey  - via Pacer
Assistant Attorney General
Office of the Texas Attorney General
Civil Medicaid Fraud Division
P.O. Box 12548
Austin, Texas  78711-2548

Lawrence J. Carcare II – via email
Deputy Attorney General
Medicaid Fraud Control Unit
Office of Indiana Attorney General Greg
Zoeller
8005 Castleway Drive
Indianapolis, Indiana 46250

Counsel for Novo Nordisk Defendants via Pacer

Paul E. Kalb
Jaime L.M. Jones
Sidley Austin LLP
1501 K. St. NW
Washington, DC 20005
Tel: (202) 736-8050
pkalb@sidley.com
jaime.jones@sidley.com

Counsel for City of Chicago – via email

Kenneth A, Wexler
Kara A. Elgersma
Wexler Wallace LLP
55 West Monroe Suite 3300
Chicago, IL 60603
KAW@wexlerwallace,com
KAE@wexlerwallace.com

28

Relators in Related Cases – via email

Erika A. Kelton, Esq.
Larry P. Zoglin, Esq.
Phillips & Cohen LLP
2000 Massachusetts Ave., N.W.
Washington, DC 20036
*Counsel for Relator Peter Dastous*

Ann Lugbill, Esq.
Mark Hanna, Esq.
Murphy Anderson PLLC
1701 K Street, N.W., Suite 210
Washington, DC 20006
*Counsel for Relator Lesley Ferrara et al.*

Gregory Y. Porter, Esq.
Bailey & Gasser LLP
910 17th Street, NW
Washington, DC 20006
*Counsel for David Myers*

Todd Bailess, Esq.
Bailess Smith PLLC
120 Capitol St.
Charleston, WV 25301
*Counsel for David Myers*

David Stone, Esq.
Robert Magnanini, Esq.
Stone & Magnanini LLP
100 Connell Dr #2200
Berkeley Heights, NJ  07922
*Counsel for McKenzie Stepe*

Joe Kendall
Jody Rudman
Jamie J. McKey
Kendall Law Group PLLC
3232 McKinney Avenue, Suite 700
Dallas, TX 70524

And

Christopher L. Nelson
James M. Ficaro
Ross M. Wolfe
The Weiser Law Firm
22 Cassatt Avenue
Berwyn, PA  19312
*Counsel for Kathy Ann Gratton
and Raymond Hippolyte*