# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) <br> UNITED STATES OF AMERICA, *et al.*,  ) <br> *ex rel*. KENNEDY,  ) <br>   ) <br>   Plaintiffs,  ) <br>   ) <br>   v.  ) <br>   ) <br> NOVO A/S, *et al.*,  ) <br>   ) <br>   Defendants.  ) <br> _____ ) | Civil Action No. 13-1529 (RBW) |

## RELATOR KENNEDY'S MOTION FOR RELATOR'S SHARE OF AWARD IN FALSE CLAIMS ACT AND ALTERNATE REMEDY FOOD, DRUG, AND COSMETIC ACT CASES

Relator Elizabeth Kennedy files this Motion for 24% of the United States' and the Named Plaintiff States'[1] False Claims Act Recovery in this action and of the related Food, Drug, and Cosmetic Act action that represents an alternate remedy under the False Claims Act, *United States v. Novo Nordisk, Inc.*, No. 17-1820. The settlements involved Novo Nordisk's marketing of its popular diabetes drug, Victoza. The federal portion of the FCA Settlement was $43,179,036.87.[2] The Named Plaintiff States' portion of the FCA Settlement under analogous

---

[1] The Named Plaintiff States are those states named by relator Kennedy (California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, and Wisconsin) plus the states (Iowa, Vermont, and Washington) that were named by either the Ferrara relators or the Gratton relators in addition to those named by relator Kennedy.

[2] Under the FCA Settlement Agreement, Relators are entitled to their pro rata portion of that interest, with the exact amount dependent upon the Court's determination of the appropriate relator share. The Department of Justice, in the pleadings related to its deposit of the 15% minimum relator share in the court depository, represents that the total federal settlement, with accrued interest, is $ 43,624,897.03.  Interest attaches in the same way as to the states' portion.

state statutes is $2,523,836.85. The FDCA Settlement resulted in a Government recovery of $12,150,000.[3] Altogether the federal government recovered $55,329,036.87 plus interest.

 A Memorandum in Support follows and a proposed Order. All Relators in the related cases join Relator Kennedy in support of the Motion and the proposed 24% relator share award derived from the two Government settlements of their qui tam claims.

---

[3] The amount of interest paid by Defendant Novo, if any, on the FDCA Settlement, is not known by Relators.

# TABLE OF CONTENTS

I.      Introduction.................................................................................................1

II.     Procedural History .....................................................................................4

III.    The FDCA Settlement is an Alternate Remedy to Relator Kennedy's FCA Action
        to which Relator Kenney has preserved her claim to a Relator's Share.............................9

        A.      The FDCA Settlement is an Alternate Remedy under 31 U.S.C. §
                3730(c)(5) because of the extensive factual overlap with Relator
                Kennedy's FCA Complaint...................................................................9

        B.      Government Intervention is no exception to Alternate Remedy .........................10

                1.      The plain text of the FCA indicates that an alternate remedy share
                        is available to the Relator irrespective of the Government's
                        intervention in her case ..........................................................10

                2.      The legislative history of the FCA shows that Congress could have
                        limited alternate remedy to a declined *qui tam* relator, but chose
                        not to ...............................................................................12

                3.      The Government's newfound interpretation of "alternate" is
                        contrary to plain text and to its own past positions..................................13

                4.      The Government's current position relies on dicta from cases
                        where the qui tam action was not causally connected to the
                        alternate remedy, or where the qui tam action was declined....................15

                5.      Courts recognize the FCA's public policy goals favoring paying a
                        relator share for an alternate remedy settlement that the
                        Government would not have pursued absent relator's *qui tam*
                        allegations .........................................................................16

        C.      Relators did not waive or release any claim to the FDCA Settlement..................17

IV.     This Court should award Relator Kennedy a 24 percent Relator Share ...........................19

        A.      Relator Share under the FCA...............................................................19

        B.      Application of the Senate Factors, DOJ Guidelines, and Relator Share case
                law shows that Relator Kennedy is entitled to a 24% share ...............................22

                1.      Relators Were Highly Credible Witnesses (DOJ Guideline 9 for
                        Increase)............................................................................24

2.      Relators Contributed Significant Information (Senate Factor 1) ...............25

3.      Relators Alerted the Government to a Serious Safety Issue (DOJ Guideline 4 for Increase) ...........................................................26

4.      Relators Exposed and Corroborated the Existence of a Nationwide Fraud (DOJ Guideline 5 for Increase) ......................................................27

5.      Relators Gave First-Hand Details of the Fraud (DOJ Guideline 6 for Increase) ...................................................................................29

6.      Relators Contributed Significantly to the Result (Senate Factor 2) ...........34

7.      Relators Gave Substantial Assistance in the Government's Investigation (DOJ Guideline 8 for Increase) .............................................34

8.      Relators' Counsel Gave Substantial Assistance (DOJ Guideline 10 for Increase) ...................................................................................36

9.      Relators Substantially Supported and Cooperated with the Government (DOJ Guideline 11 for Increase) ............................................38

10.     The Government Had No Prior Knowledge of the Fraud (Senate Factor 3, DOJ Guideline 7 for Increase) ....................................................39

11.     Relators Have Suffered Substantial Harm and Hardships as a Result of Their Whistleblowing (DOJ Guideline 14 for Increase) ...........40

12.     The FDCA Settlement is a Factor Meriting an Enhanced Relator Share ..............................................................................................42

V.      Conclusion ...........................................................................................43

## **TABLE OF AUTHORITIES**

**Cases**                                                                                    **Page(s)**

*Alexander v. Gardner-Denver Co.*,
    415 U.S. 36 (1974)................................................................................................19

*Cisneros v. Alpine Ridge Group*,
    508 U.S. 10 (1993)................................................................................................11

*Johnson v. Zerbst*,
    304 U.S. 458 (1938)..............................................................................................19

*Rille v. PricewaterhouseCoopers LLP*,
    803 F.3d 368 (8th Cir. 2015) ................................................................................9

*United States v. L-3 Comms. EOTech, Inc.*,*
    921 F.3d 11 (2nd Cir. 2019)................................................................................11

*United States v. Robinson*,
    459 F.2d 1164 (D.C. Cir. 1972) ..........................................................................19

*U.S. ex rel. Alderson v. Quorum Health Group, Inc.*,*
    171 F. Supp. 2d 1323 (M.D. Fla. 2001)..................................................16, 20, 21, 22, 42

*U.S. ex rel. Burr v. Blue Cross & Blue Shield of Florida, Inc.*,
    882 F. Supp. 166 (M.D. Fla. 1995)......................................................................40

*U.S. ex rel. Fowler v. Evercare Hospice, Inc.*,*
    No. 11-cv-00642-PAB-NYW, 2017 WL 491168 (D. Colo., February 7, 2017) ..............41

*U.S. ex rel. Johnson Pochardt v. Rapid City Reg'l Hosp.*,*
    252 F. Supp. 2d 892 (D.S.D. 2003) ................................................................20, 21, 22, 40

*U.S. ex rel. LaCorte v. Wagner*,
    185 F.3d 188 (4th Cir. 1999) ...............................................................................15

*U.S. ex rel. Mustafa v. Najjar*,
    120 F. Supp. 3d 1322 (M.D. Fla. 2015)........................................................6, 16

*U.S. ex rel. Neher v. NEC Corp.*,
    11 F. 3d 136 (11th Cir. 1993) ..............................................................................40

*U.S. ex rel. Pallares v. Itani (Pallares I)*,*
    Slip Op., ECF 79, No. 4:05-cv-03018 (S.D. Tex. July 2, 2010).......................16

*U.S. ex rel. Pallares v. Itani* (*Pallares II*),*
    Slip Op., ECF 91, No. 4:05-cv-03018 (S.D. Tex. November 3, 2010) ............................16

*U.S. ex rel. Pedicone v. Mazak Corp.*,*
    807 F. Supp. 1350 (S.D. Ohio 1992) ...................................................................40

*U.S. ex rel. Shea v. Verizon Communications, Inc.*,*
    844 F. Supp. 2d 78 (D.D.C. 2012) ........................................................20, 21, 24, 40

*U.S. ex rel. Smith v. Lampers*,
    69 Fed. Appx. 719 (6th Cir. 2003) ...................................................................40

## Statutes

1 U.S.C. § 1 ....................................................................................................11

21 U.S.C. § 331 .................................................................................................7

21 U.S.C. § 333 ................................................................................................19

21 U.S.C. § 352(y) ..............................................................................................7

31 U.S.C. § 3730(b)(4)(A) ....................................................................................11

31 U.S.C. § 3730(b)(4)(B) ....................................................................................11

31 U.S.C. § 3730(b)(5) .........................................................................................8

31 U.S.C. § 3730(c)(5) ....................................................1, 9, 10, 11, 13, 15, 18, 42, 43

31 U.S.C. § 3730(d) .................................................................................7, 18, 20

31 U.S.C. § 3730(d)(1) ........................................................................................20

## Federal Legislation

5. Pub. L. No. 99-562, 100 Stat. 3153 (1986) ......................................................13, 20

Act of December 23, 1943, ch. 377, 57 Stat. 608 .......................................................19

## Legislative History

132 Cong. Rec. H9382–03 (Oct. 7, 1986) ...............................................................20

S. Rep. 99-345, 1986 U.S.C.C.A.N. 5266 ...........................................................12, 13, 20, 21

## <u>Briefs</u>

Brief for Intervenor United States of America, *U.S. ex rel. Guardiola v. Renown Health*, Case No. 16-17205 (9th Cir. 2017)....................................................................12

## I.  INTRODUCTION

Qui tam Relator Kennedy seeks an award of a fully compensatory "relator's share" of government recovery in two 2017 settlements with Defendant Novo Nordisk, Inc.: the first settlement under the False Claims Act (FCA) and analogous state laws, and the second settlement under the Food, Drug, and Cosmetic Act (FDCA).

The two Victoza Settlements arose initially from Relator Kennedy's 2010 False Claims Act (FCA) *qui tam* complaint, and would never have been reached were it not for the information and assistance provided by Relator Kennedy and the other Relators who joined with her to prosecute the action together ("Relators" or the "allied Relators"). As such, the FDCA settlement qualifies as an "alternate remedy" under the False Claims Act.

To date, the Government has declined to pay a fully compensatory amount and, in particular, has advised that it will not pay a relator's share as to the separate FDCA Settlement that the Government entered into with Novo Nordisk simultaneously with the FCA settlement, even though it did not disclose the FDCA settlement publicly, to this Court, or to Relators until weeks later. Thus, two issues are now before this Court:

1)  The appropriate relator share percentage that Kennedy, and by extension the allied Relators, deserve for Relators' assistance to and cooperation with the United States Government and the Named Plaintiff States in their investigation, prosecution, and settlement of the claims raised in Kennedy's *qui tam* complaint; and[4]

2)  Entitlement to a relator's share of the FDCA settlement under the FCA's "alternate remedy" provisions of 31 U.S.C. § 3730(c)(5).

Relator Elizabeth Kennedy commenced this *qui tam* action against Novo Nordisk on October 8, 2010. She kicked off seven years of investigation—both civil and criminal—

---

[4] The United States was not willing to discuss share percentage until the first-to-file dispute was resolved in this Court. Relator has not been able to resolve share percentage since with either the United States or the Named Plaintiff States. "Government" in this filing means the United States.  The States have no part in the FDCA Settlement.

following which the Government reached two settlement agreements with Novo Nordisk in July 2017 to resolve the claims. The FCA settlement was signed by the parties on or about July 26, 2017, a Stipulation of Voluntary Dismissal of the FCA action was submitted by the parties on August 3, 2017, Dkt. 76, and an Order of Dismissal of the FCA action was entered on September 1, 2017. Dkt. 84. The Relators in all six cases, including those filed after that of Relator Kennedy, signed the FCA Settlement Agreement to which they, Novo Nordisk, and the United States were parties. FCA Settlement Agreement, at 1 (attached hereto as Exhibit A).[5] The Government did not file its own Complaint in Intervention, relying upon the Relators' allegations.

The Government separately entered into the FDCA Settlement Agreement[6] on the same day that the FCA Settlement was finally signed, July 26, 2017. On that day, attorneys for the Government signed and dated a complaint alleging that Novo violated the FDCA. FDCA Dkt. 1.[7] The Government waited four days after the FCA action was dismissed by the Court on September 1, 2017 before it filed its FDCA Complaint on September 5. The Government issued a press release the same day, announcing the FDCA case and settlement together with the FCA case and settlement. Only then did Relators learn that the Government had diverted $12.15 million in settlement funds to the FDCA action. Frazier Declaration ¶ 19 (hereto attached as Exhibit C).  Despite the complete overlap between the factual allegations in the FDCA complaint and the FCA complaint, the diversion and labeling of the funds as "the FDCA action" provided the Government an excuse for denying Relators any portion of that separate settlement amount.

---

[5] The Named Plaintiff States executed separate settlement agreements with Novo Nordisk and Relators.
[6] The FDCA Settlement Agreement was not filed with the court, but is available at https://www.justice.gov/opa/pr/novo-nordisk-agrees-pay-58-million-failure-comply-fda-mandated-risk-program, and is hereto attached as Exhibit B.
[7] FDCA Dkt. refers to Case No. 17-1820.

Contrary to the Government's contentions, Relators have not waived their *qui tam* rights to a share of that FDCA alternate remedy.

The FCA settlement was primarily based upon Defendant Novo Nordisk's false claims submitted to Medicare and other government payors from sales generated from conduct arising from its violations of Congress' 2007 drug safety enforcement scheme, known as "Risk Evaluation and Mitigation Strategies" ("REMS"). To the best of Relators' knowledge, this is the first FCA civil settlement basing liability upon violations of REMS. Relators put forth REMS as an innovative basis for liability and provided legal research and analysis to the Government to support an FCA theory of liability based upon Novo Nordisk's intentional disregard for REMS' marketing restrictions that FDA had specifically developed in order to approve Victoza for sale to the public.

Government arguments that Relators somehow released claims the Government hid from Relators are legally unpersuasive and upend the policy objectives of the FCA.  Nowhere in the plain text of the settlement agreement do Relators waive their right to alternate remedy.

But for the actions of Relator Kennedy and the other Relators, there would not have been any settlement of the FCA or FDCA actions. The Relators were all former Novo Nordisk employees who had direct and personal experience with Defendant's misconduct. The Government's case was dependent upon the first-hand information, critical knowledge, and key documents provided by Relator Kennedy, along with significant assistance rendered by the allied relators, who filed their own actions against Novo Nordisk. Relators and their counsel provided the Government with a wealth of critical knowledge, evidence, witnesses, and key documentary materials, as well as legal research and analyses that led to this settlement.

Since Relator Kennedy's action was filed in 2010, nearly nine years have elapsed and no portion of a relator's share has been paid. During these trying nine years, Relators have experienced extreme hardships arising from their roles as whistleblowers. All lost their jobs because they tried to stop the fraud that Novo Nordisk was perpetrating upon the Government. Relator Kennedy lost three jobs and her home because of her whistleblowing. She continues to experience job insecurity. Sadly, Relators Ferrara and Stepe passed away during the wait to resolve this case, Ferrara leaving behind three minor children.[8]

Based on the individual and collective contributions and sacrifice of Kennedy and the allied Relators, their relationship to the settlement outcome, and the legal authority supporting a fully compensatory award, Relator Kennedy deserves at least 24% of the proceeds of the Federal Settlement Amount and FDCA Settlement Amount.  As the settlements totaled $55.279 million, a 24% share is $13.267 million.

## II.   PROCEDURAL HISTORY

Relator Kennedy commenced her FCA suit against Novo Nordisk on behalf of the United States and numerous state *qui tam* statutes on October 15, 2010.  Her Original Complaint detailed Novo Nordisk's nationwide, fraudulent scheme of promoting Victoza for off-label uses, paying illegal kickbacks to physicians so that they would assist the company in their illicit marketing efforts, and unlawfully marketing Victoza by downplaying and misrepresenting the drug's serious safety risks to doctors. Kennedy turned over to the Government crucial evidence that corroborated and supported her allegations. Other relators later filed five related actions against Novo Nordisk alleging the same and similar violations.

After many years, Relators learned from Will Olson, attorney for the Department of Justice's Civil Frauds Section, that a putative settlement had been reached with Novo Nordisk.

---

[8] The fifth-filed relator, Relator Stepe, died of cancer in February 2018.

Frazier Declaration ¶ 9.  On January 18, 2017, Mr. Olson e-mailed Relators' counsel a final draft of the "covered conduct" to be released in that settlement; it contained no mention of an FDCA settlement, nor did initial drafts of the settlement agreement. Frazier Declaration ¶ 11. Mr. Olson sought confirmation from all Relators that the FCA settlement was fair, adequate, and reasonable, eventually specifying in response to repeated counsel questioning that the request pertained to the FCA settlement amount and the "covered conduct."  Exhibit E. A May 5, 2017 settlement draft conveyed by Mr. Olson, made no mention of the FDCA action either, and paragraph 7 of the Terms and Conditions reserved other rights under the FCA, including "sharing in the proceeds of this Agreement."  Frazier Declaration ¶ 12. On July 7, 2017, Mr. Olson e-mailed Relator's counsel a draft settlement that provided the first bare reference to an FDCA Settlement, without specifying even an amount or whether the matter was civil or criminal:

> H. Contemporaneous with the execution of this Agreement, Novo Nordisk will enter into a separate agreement with the United States of America to resolve an action brought in the United States District Court for the District of Columbia under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 332, arising from the sale of Victoza ("FDCA Settlement Agreement").[9]

The draft preserved from dismissal the right to demand relator's share under FCA section 3720(d) related to the "Agreement." Frazier Declaration ¶ 16.The final FCA Settlement Agreement maintained this language, FCA Settlement Agreement ¶ 6, at 10, as did the stipulation of dismissal. Dkt. 76.

On July 7, 2017, when the FDCA provision first appeared, and throughout the settlement process, Relators and their counsel had no intent to surrender their rights to a full compensatory award for their whistleblowing, including in any alternate remedy claim pursued by the

---

[9] Despite this term, there was no such "action brought in the United States District Court for the District of Columbia under the Federal Food, Drug, and Cosmetic Act."  As discussed above and later, such an FDCA action was not even filed until September 5, 2017.

Government, much less one whose basic attributes, such as the amount, were unknown. Frazier Declaration ¶ 16.  For years before the case settled in 2017, counsel for Kennedy knew from periodic status calls with Mr. Olson that a parallel criminal case was in negotiations and would have to be resolved before the FCA action. *Id.* ¶ 5. On calls occurring on January 6, 2016 and July 20, 2016, Mr. Olson had mentioned an FDCA settlement, but in the context of a parallel criminal proceeding. *Id.*

Counsel cannot recall learning at any time during negotiations that the settlement was not criminal or purely a non-financial administrative procedure. Indeed, in fourteen years of FCA practice, counsel cannot name any other case in which the Government pursued a similar alternate *civil* action. Frazier Declaration ¶ 14.

The United States formally intervened in Relators' actions on July 26, 2017.  Dkt. 73. The United States, Novo Nordisk, and all Relators who filed *qui tam* actions contemporaneously entered into and executed a Settlement Agreement ("FCA Settlement Agreement"), in which Novo Nordisk agreed to pay the United States and the Medicaid Participating States the collective amount of $46.5 million ("Total Settlement Amount"). The FCA Settlement Agreement specifies only an FCA settlement amount; there is no mention of an FDCA financial settlement. FCA Settlement Agreement ¶ 1 at 8.

While Relators were not party to it nor provided notice, on the same day that the FCA settlement agreement became effective, July 26, 2017, the United States and Novo Nordisk confidentially entered into and executed a different Settlement Agreement ("FDCA Agreement"), and attorneys for the United States signed and dated a civil action (the "FDCA Complaint") against Novo Nordisk pursuant to the Food, Drug, and Cosmetic Act ("FDCA"). Frazier Declaration ¶ 19. The FDCA complaint alleged that from February 2010 through and

December 2012, Novo Nordisk had misbranded Victoza pursuant to 21 U.S.C. § 352(y), in

violation of the FDCA, 21 U.S.C. § 331. In the FDCA Agreement, Novo Nordisk agreed to settle

the civil claims arising from Covered Conduct described in the FDCA Complaint by paying the

Government the sum of $12,150,000 ("FDCA Settlement Amount") under a theory of

disgorgement of (some portion of) Novo Nordisk's ill-gotten Victoza profits.[10] No relator

consented to the FDCA Agreement, nor was the Court's review sought as to the propriety of the

settlement. Frazier Declaration ¶ 20. Indeed, the FDCA Complaint was not even yet filed,

although the case was already "settled."

A month after the July 26, 2017 FCA Settlement documents were signed, on September

1, 2017, this Court entered an Order unsealing the Relators' complaints, approving the FCA

settlement, and entering a partial order of dismissal, and retaining jurisdiction regarding relators'

eligibility for a relator share. Dkt. 85 ("The Court shall retain jurisdiction to adjudicate, if

necessary, Relator Kennedy's claim, if any, to a share of the proceeds of the Total Settlement

Amount pursuant to 31 U.S.C. § 3730(d) and pursuant to any similar state statute."). Four days

later, the Government filed the FDCA action, *United States v. Novo Nordisk, Inc.*, No. 17-1820

that it had prepared in July and apparently had waited for the FCA action to be dismissed before

filing. In filing the action, the Government filed a notice of designation, wherein it conceded that

the FDCA action was "related" to Relators' FCA actions because the FDCA Complaint involved

"common issues of fact" and because it grew "out of the same event or transaction." FDCA Dkt.

2. The Government concurrently filed a Stipulation of Dismissal indicating that a Settlement

Agreement of the FDCA action was executed on July 26, 2017, prior to filing the FDCA action.

FDCA Dkt. 3. The Court dismissed the FDCA action with prejudice on September 11, 2017.

---

[10] *See* Department of Justice, Novo Nordisk Agrees to Pay $58 Million for Failure to Comply with FDA-Mandated Risk Program, available at https://www.justice.gov/opa/pr/novo-nordisk-agrees-pay-58-million-failure-comply-fda-mandated-risk-program.

FDCA Dkt. 5. No notice was provided to Relators or their Counsel of these events, nor were they aware of them at the time. Frazier Declaration ¶ 19.

Relators did not learn that the Government had filed an FDCA Action and reached an FDCA settlement until after the Government released a September 5, 2017 press release that announced both settlements. Frazier Declaration ¶ 19. There is no record that DOJ informed the Court of the separate FDCA $12.15 million settlement until September 2017.

After seeking the broadest possible agreement among relators, Kennedy sought this Court's ruling that she was first to file under the FCA, with the support of Relators Dastous and the *Ferrara* Relators. The Government refused to pay any relator share in the interim, but eventually agreed to place the minimum 15% relator share of the FCA settlement into the Court's interest-bearing depository, where it remains. On April 8, 2019, this Court held definitively that Relator Kennedy was the first-to-file relator entitled to relator's share in the FCA settlement, and therefore entitled to at least the minimum 15% relator's share. Dkt. 112.[11] The Court declined to rule at that time on Relator Kennedy's contention that under the FCA's "alternate remedy" provisions, Relator Kennedy and the allied Relators were entitled to a relator's share of the Government's FDCA settlement, but invited her to file a specific motion in that regard.

On April 8, 2019, this Court ruled that the claims in the later-filed actions are barred by the first-to-file provision at 31 U.S.C. § 3730(b)(5), and therefore that Kennedy is the sole relator entitled to at least a 15% share of the Total Settlement Amount. Dkt. 112 at 27, 34. This Court declined to rule on Kennedy's claim to a share of the FDCA Settlement Amount and set a briefing schedule, under which this brief is submitted. *Id.*

---

[11] Post-ruling, as announced at the May 8 hearing in this case, the opposing relators have agreed not to appeal. An agreed motion to release funds in the court registry will be filed shortly.

### III.   THE FDCA SETTLEMENT IS AN ALTERNATE REMEDY TO RELATOR KENNEDY'S FCA ACTION TO WHICH RELATOR KENNEDY HAS PRESERVED HER CLAIM TO A RELATOR'S SHARE.

#### A.   THE FDCA SETTLEMENT IS AN ALTERNATE REMEDY UNDER 31 U.S.C. § 3730(c)(5) BECAUSE OF THE EXTENSIVE FACTUAL OVERLAP WITH RELATOR KENNEDY'S FCA COMPLAINT.

When the Government pursues and settles an alternate remedy under 31 U.S.C. § 3730(c)(5), relators are entitled to a share of the recovery where they demonstrate that the conduct contemplated in the settlement overlaps with that in the relator's complaint. *U.S. ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634, 650 –651 (9th Cir); *Rille v. PricewaterhouseCoopers LLP*, 803 F.3d 368, 374 (8th Cir. 2015) (endorsing *Bledsoe*'s overlap test); *U. S. ex rel. Mustafa v. Najjar*, 120 F. Supp. 3d 1322, 1326 (M.D. Fla. 2015) (relator's *qui tam* complaint sufficiently detailed conduct in a settlement outside the FCA).

Extensive overlap exists between Kennedy's FCA Complaint (Dkt. 1) and the FCA Settlement Agreement, on the one hand, and the FDCA Complaint (FDCA Dkt. 1), on the other hand, as to facts, legal violations, and time period. Relator Kennedy described this overlap in great detail at pages 4 to 13 of her reply brief in the previous briefing.  Dkt. 102.  Specifically, in the FDCA Settlement Agreement, Novo admits facts largely duplicating the FCA Settlement Agreement allegations. Moreover, the Government virtually admitted that the FDCA suit is an FCA alternate remedy in preparing its "Notice of Designation of Related Civil Cases Pending" listing the Kennedy action as related to its FDCA case. FDCA Dkt. 2.

Because the conduct laid out in the FDCA settlement and complaint unquestionably overlaps with that in the relator's complaint and with covered conduct released in the settlement of her claims, the FDCA settlement fully qualifies as an alternate remedy.  As discussed below,

the United States' attempt to create a new loophole in the FCA in order to avoid paying relator's

share is contrary to law.

**B.    GOVERNMENT INTERVENTION IS NO EXCEPTION TO ALTERNATE REMEDY.**

**1.    The plain text of the FCA indicates that an alternate remedy share is available to the Relator irrespective of the Government's intervention in her case.**

In the face of a clearly overlapping FDCA settlement, the Government, in its previous

brief, argued that an alternate remedy can only exist if the Government does not intervene in a

Relator's FCA action. Ferrara Dkt. 91 at 17–18.[12] There is no statutory basis for this argument;

the plain text of the FCA's alternate remedy clause does not support the Government's position.

> **Notwithstanding subsection (b)**, the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. **If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section. Any finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to an action** under this section. For purposes of the preceding sentence, a finding or conclusion is final if it has been finally determined on appeal to the appropriate court of the United States, if all time for filing such an appeal with respect to the finding or conclusion has expired, or if the finding or conclusion is not subject to judicial review. [Emphasis added.] 31 U.S.C. § 3730(c)(5)

As explained below, the alternate remedy provision begins with the phrase,

"Notwithstanding subsection (b)," which refers to the FCA section prescribing the government's

options to intervene, decline, or dismiss a relator suit. The Government reads this paragraph as

providing that notwithstanding a Government decision not to intervene, the Government may

pursue an alternate remedy, in which the relator will have the same rights as she would in her *qui*

*tam* action. But subsection (b) encompasses *both* a Government decision to intervene, under

---

[12] Ferrara Dkt. refers to Case No. 11-0074.

§ 3730(b)(4)(A), *and* a Government decision not to intervene, under § 3730(b)(4)(B). *United States v. L-3 Comms. EOTech, Inc.*, 921 F.3d 11, 27 (2nd Cir. 2019) (interpreting "notwithstanding" clause to mean "notwithstanding which of the options presented by subsection (b)" that the Government adopts, that is, declination or intervention). *See also Cisneros v. Alpine Ridge Group, 508* U.S. 10, 18 (1993) (interpreting "notwithstanding" clauses in statutes broadly).

The Government's position, as applied here, has been that when it elects intervention, the relator has no right in the "other proceeding" of § 3730(c)(5), even if that proceeding qualifies as an alternate remedy. Again, the plain text contradicts this position. Section 3730(c)(5) refers to both "the action" and "another proceeding"—the clear implication is that the other proceeding is not a *substitute* for a non-intervened FCA action, but an *additional* proceeding available to the Government *whether or not it intervenes*.[13] Therefore the provision "If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section" cannot be read to mean that the person initiating the action *loses* its rights if the Government proceeds on both tracks. All that provision means is that the relator is entitled to the alternate remedy regardless. *See L-3 Comms. EOTech, Inc.*, 921 F.3d at 26 (casting doubt on whether § 3730(c)(5) is limited to a declination scenario, "given other FCA provisions that

---

[13] The DOJ's argument seems to rely in part upon language in the FCA that refers to the "alternate remedy" in the singular and, thus, DOJ contends, allows the Government to designate one remedy as the FCA remedy and all others to be some other proceeding not required to abide by the protections for relators who brought the original FCA qui tam action. However, the U.S. Code is not so interpreted. This same statute would have the identical meaning were all provisions in the plural under 1 U.S. Code § 1:

> In determining the meaning of any Act of Congress, unless the context indicates otherwise—
> words importing the singular include and apply to several persons, parties, or things;
> words importing the plural include the singular …

envision the government's pursuit of other proceedings even after it has intervened in a qui tam action. . .").

Notably, the alternate remedy provision is not located within the Act's declined case provision. Instead it is freestanding, like the clauses on intervention and declination, and is found in § 3730(c)'s section on "Rights of the parties to Qui Tam action," indicating that alternate remedy is an independent right of a relator, not tied to intervention or declination.

2.  **The legislative history of the FCA shows that Congress could have limited alternate remedy to a declined *qui tam* relator, but chose not to.**

The legislative history is in accord that the alternate remedy is a standalone right, independent of DOJ decisions on intervention in the *qui tam*. Prior to the FCA's1986 amendments, § 3730(c) contained only two subsections, with no alternate remedy provision:

> (c)(1) If the Government proceeds with an action, the person bringing the action may receive an amount the court decides is reasonable for disclosing evidence or information the Government did not have when the action was brought. The amount may not be more than 10 percent of the proceeds of the action or settlement of a claim and shall be paid out of those proceeds.

> (2) If the Government does not proceed with an action, the person bringing the action or settling the claim may receive an amount the court decides is reasonable for collecting the civil penalty and damages. The amount may not be more than 25 percent of the proceeds of the action or settlement and shall be paid out of those proceeds. The person may also receive an amount for reasonable expenses the court finds to have been necessarily incurred and costs awarded against the defendant.

31 U.S.C. § 3730(c) (1982). The 1986 Senate Report shows that the Senate only proposed to add the alternate remedy provision as subsubsection (3) to § 3730(c):

> (3) Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to it, including, but not limited to, any administrative civil money penalty proceeding.

S. REP. NO. 99-345, at 41 (1986). Instead of assigning the alternate remedy provision to the intervention subsubsection, at (c)(1), or the declination subsubsection, at (c)(2), the Senate

designated it as a third and separate subsubsection, showing its intent for alternate remedy to apply irrespective of Government intervention decisions.

Ultimately, Congress' 1986 amendments went beyond the proposed Senate changes, adding three subsubsections to 3730(c), including an enhanced alternate remedy provision, containing four clauses, as subsubsection 5. Pub. L. No. 99-562, 100 Stat. 3153, 3156 (1986). Among the changes to subsection (c) was an amendment to subsubsection (1) giving the relator the right to continue as a party to the action, "subject to the limitations in paragraph (2)," a new addition to 3730(c). 100 Stat. at 3155. Congress could have easily made subsubsection 1 subject to the Alternate Remedy provision at subsubsection 5, but did not.

The Government previously selectively quoted from the Senate Judiciary Committee Report on the 1986 FCA amendments to suggest that the FCA's alternate remedy provisions only apply in cases where the Government declines intervention. Ferrara Dkt. 91 at 16–17. But the language of that same report suggests alternate remedies <u>are available</u> after government intervention. The report explains the purpose of the FCA's alternate remedy provision is to clarify:

> that the Government, <u>once it intervenes</u> and takes over a false claim suit brought by a private individual, may elect to pursue any alternate remedy for recovery of the false claim which might be available under the administrative process.

S. Rep. No. 99-345, at 27 (emphasis added).

### 3. The Government's newfound interpretation of "alternate" is contrary to plain text and to its own past positions.

While the Government obviously must "elect" either to decline or intervene in a qui tam action, it apparently takes the position that the FCA's alternate remedy provision nevertheless gives it a right to pursue two separate settlement agreements, while limiting a relator to a remedy from just one of these. Yet the FCA contemplates this multiplicity of government actions when

13

referring in a single sentence to both an "action" and a "proceeding." 31 U.S.C. § 3730(c)(5).[14]

In complex government investigations, remedies may be "alternate" to each other; but "alternate" need not mean "one and only." Nothing in the FCA forces an "election" among these remedies, and in fact, the Government frequently "elects" to have more than one remedy, including remedies obtained from suits that are "declined" but where the relator pursues the claims.[15]

The Government does not itself consistently take the position that the alternate remedy provision is limited to declined cases. As recently as May 2017, the Government argued regarding alternate remedies:

> The FCA confers a right to a share of the government's recovery on a relator who satisfies the statutory prerequisites, regardless of whether the government has intervened in the action. The only difference is the size of the relator's share . . .

Brief for Intervenor United States of America at 11, *United States ex rel. Guardiola v. Renown Health*, Case No. 16-17205 (9th Cir. 2017). Elsewhere the Government argued that relators are only entitled to a share of an alternate remedy if the Government *intervened* in the FCA claim. *Bledsoe*, 342 F.3d at 647. The *Bledsoe* court rejected this argument, observing that under such an interpretation:

> [T]he government would frequently carry the incentive to decline to intervene in an action and, having been apprised of possible FCA violations by a private citizen, to independently pursue an investigation of the alleged FCA violator(s). Such a result would not further Congress' legislative intent that the government and private citizens collaborate in battling fraudulent claims, and it would impede, not further, Congress' legislative intent to encourage private citizens to file *qui tam* suits.

*Bledsoe*, 342 F.3d at 649.

---

[14] Further discussion *supra* at Section III.a.2.i.

[15] As to remedies in declined suits, in fact, the line between intervened and declined cases is hazy at best when it comes to settlement; the Government commonly settles cases without intervening at all, but carrying the threat of doing so. Frazier Declaration ¶ 21.  Putting too fine a point on intervention would make for highly unpredictable application of the alternate remedy clause.

    **4.**    **The Government's current position relies on dicta from cases where the qui tam action was not causally connected to the alternate remedy, or where the qui tam action was declined.**

In its refusal to deem the FDCA settlement the result of an "alternate remedy," the Government has previously relied on *dicta* in cases in which it declined to intervene, such as *United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 192 (4th Cir. 1999). Ferrara Dkt. 91 at 17. But *LaCorte* was based on the *causal relationship* between the FCA case and the purported alternate remedy, not the Government intervention decision. In *LaCorte*, relators argued that 31 U.S.C. § 3730(c)(5) entitled them to share in the global settlement of lawsuits apart from their FCA suit. Because some claims in those suits arose from an audit program arising from relators' earlier FCA case settlements, relators argued they were entitled also to a share of the new settlements. *LaCorte*, 185 F.3d at 192. The *LaCorte* court rejected that argument:

> The fact that the [audit program] was part of the settlement of Wagner and Dehner's original qui tam suit confers on them no entitlement to proceeds resulting from the later findings. There is no ground in the statute for recovery based on such attenuated "but for" causation. Therefore, nothing in the Global Settlement can be considered an "alternate remedy" to any part of the original action. As a result, section 3730(c)(5) is no longer relevant to Wagner and Dehner's situation.

*Id.*

Unlike the LaCorte relators who relied upon an attenuated "but for" causation argument, Relator Kennedy's entitlement to share in the Government alternate remedy is based on her *qui tam* allegations that contain the allegations on which the Government's FDCA settlement is based.

>  **5.     Courts recognize the FCA's public policy goals favoring paying a
>         relator share for an alternate remedy settlement that the Government
>         would not have pursued absent relator's *qui tam* allegations.**

Courts repeatedly grant an alternate remedy relator share where the government

intervened in the relator's *qui tam*.[16] One Texas district court, addressing issues like those here,

emphasized that the FCA alternate remedy provisions are intended to protect relators from being

deprived of a relator share where the Government pursues remedies beyond the *qui tam* action:

> The alternate remedy provision was enacted to protect the relator where the
> Government, in essence, takes advantage of loopholes in the statute to unfairly
> limit or bar the relator's share in the Government's recovery . . . .

*Pallares II,* slip op. at 32. In *Pallares II,* the court awarded the relator a share of both her *qui tam*

case and separate government claims that she contributed to developing. The Court found that

limiting her share to the *qui tam* was contrary to Congressional intent:

> In light of the **clear intention of the 1986 amendments to encourage private
> enforcement, in light of the statute's express concern that the government
> not be able to reduce or avoid allowing the relator a share of the recovery**
> which the court in its discretion determines appropriate, by pursuing an
> alternate remedy, in light of the government's settlement of the entire criminal
> action for far less than the value of the expired/altered date claim despite evidence
> of Defendants' wealth, this Court concludes [that Pallares should receive 24% of
> both her own civil claims and the Government's].

*Pallares,* slip op. at 32–33 (emphasis added).

The FCA alternate remedy provision compels this Court to award a relator share of all

Government recoveries arising from relator claims, regardless of intervention. The plain text of

the statute, the legislative history, the Government's own previous positions, and several court

---

[16] *See, e.g., U.S. ex rel. Pallares v. Itani* (*Pallares I*), Slip Op., ECF 79, No. 4:05-cv-03018 at 35-38 (S.D. Tex. July 2, 2010); *U.S. ex rel. Pallares v. Itani* (*Pallares II*), Slip Op., ECF 91, No. 4:05-cv-03018 (S.D. Tex. November 3, 2010) at 27-33 (granting relator share of alternate remedy in FCA case where  Government intervened);  *U.S. ex rel. Mustafa v. Najjar*, 120 F. Supp. 3d 1322, 1327-28 (M.D. Fla. 2015) (granting relator a share of a recovery from a defendant that relator had not named in the qui tam action because relator's complaint gave the government knowledge of Defendant's fraud); *U.S. ex rel. Alderson v. Quorum Health Group, Inc.*, 171 F. Supp. 2d 1323, 1349 (M.D. Fla. 2001) (granting relator in an intervened FCA case a share of an "administrative recoupment claim" that the Government had attempted to segregate from the FCA settlement amount because the administrative claim concerned "fraud or similar misconduct.").

rulings all support this outcome. No statute or precedent directs this Court to deprive Relator

Kennedy of a share of the FDCA alternate remedy.

### C.   RELATORS DID NOT WAIVE OR RELEASE ANY CLAIM TO THE FDCA SETTLEMENT

The Government previously suggested that Relators "waived" their rights to share in the

FDCA Settlement Amount. Ferrara Dkt. 91 at 16. Nowhere in the Settlement Agreement or the

stipulations of dismissal that adopted the Agreement is there any waiver of Relators' right to a

share of the FDCA Settlement Amount, nor is there any waiver or release of claims against the

Government at all. In only one instance in the Settlement Agreement did Relators release any

rights and that was as to Defendant Novo Nordisk, not as to the United States:

> ***Relators *** release Novo Nordisk *** from any civil monetary claim the Relators have on behalf of the United States for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733 that *** Relators *** would have standing to bring arising from or relating to the claims Relators asserted or could have asserted in the Civil Actions against Novo Nordisk.

FCA Settlement Agreement at 9–10. There is no release of the United States as to Relators'

claims to a share of the alternate recovery. Relators' shares are payable by the United States, not

by a defendant. Indeed, Novo Nordisk has fully paid the United States, and the United States, not

the defendant, is holding the relator share funds at issue.

Relators expressly preserved their statutory rights to a relator share arising from

settlement of their *qui tam*:

> the Parties and Relators *** agree that they each retain all of their rights pursuant to the False Claims Act on the issue of the **share percentage**, if any, that Relators should receive **of any proceeds of the settlement of their claims**, and that no agreements concerning Relator share have been reached to date.

Settlement Agreement at 11. The language is basic and simple: Relators retain their rights to the

"share percentage" of "any proceeds of the settlement of their claims." Notably, the reservation

of rights as to a relator share is not limited to recoveries under the FCA Settlement Agreement, but extends to all their "rights pursuant to the False Claims Act" as to a share of "any proceeds of the settlement of their claims." Elsewhere the FCA Settlement Agreement states:

> The stipulation shall provide that Relators' claims for a share of the proceeds of the Federal Settlement Amount . . . shall not be dismissed until they are settled, adjudicated, or otherwise resolved, and shall further provide that the Court shall retain jurisdiction to adjudicate, if necessary, any Relator's claim for a share of the proceeds of the Civil Action pursuant to 31 U.S.C. § 3730(d) and pursuant to any similar state statute.

Settlement Agreement at 15-16. This statutory provision, which includes the right to relator's share from an alternate remedy, was ***not waived***. Settlement Agreement at 15. There is no limitation to this language. Had the Government, which drafted this language, desired to eliminate a relator share of an alternate remedy, the language should have been proposed, discussed among counsel, and contained in the Agreement because a relator share of alternate remedy is guaranteed by the FCA. The FCA's clear instruction is to treat alternate remedy rights as though they are rights within the FCA action: "If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights as such person would have had if the action had continued under this section." § 3730(c)(5). *See U.S. ex rel. Bledsoe*, 342 F.3d at 649: ("There is no language in the FCA suggesting that a relator's statutory right to a share of the proceeds from the settlement of claims he or she had asserted may be properly abrogated by an agreement to which relator was not a party").

Even if it were to be found that Relator Kennedy's alternate remedy claim somehow fell outside the scope of claims preserved in settlement, she still has not waived the right to proceed with an alternate remedy claim. When the FCA Settlement Agreement was signed in July of 2017, Relator Kennedy did not know of the FDCA Settlement Agreement. She had no notice of the allegations upon which the FDCA action would be based, its amount, or whether it was civil

or criminal.[17] That cannot be intelligent waiver. *See, e.g., Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 n.15 (1974) (holding waiver of rights must be voluntary and knowing); *United States v. Robinson,* 459 F.2d 1164, 1168–69 (D.C. Cir. 1972) (Waiver "is ordinarily an intentional relinquishment or abandonment of a known right or privilege."), *citing Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

Moreover, finding waiver here would reward the tactic of pursuing a two-prong settlement, concealing from the relators and the Court that there was to be an alternate remedy recovery until after obtaining relators' agreement that the primary FCA settlement was "fair, adequate, and reasonable," and ensuring that FCA dismissal occurred before Relators or the Court were aware of the alternate remedy settlement, (much less that it was related, civil, and amounted to a settlement of the relators' claims). Such methods to protect a $ 12.15 million settlement from relator's share conflicts with the FCA alternate remedy provision and its important policy rationale, to properly and fairly reward whistleblowing relators for bringing FCA violations to the Government's attention.

## IV.   THIS COURT SHOULD AWARD RELATOR KENNEDY A 24 PERCENT RELATOR SHARE

### A.   RELATOR SHARE UNDER THE FCA

The FCA rewards whistleblowers with a percentage share of the Government's recovery. When originally enacted during the Civil War, the bounty was 50%. By 1943, weakening amendments reduced the relator share to no more than 10% of the proceeds.[18] Amidst press reports and government oversight hearings about defense contracting abuses, fraud, and

---

[17] In fact, Relator had long suspected a criminal prosecution based on Government case updates, the rights to a relator share of which is hotly contested by the Government, unlike a civil case. Because the FDCA provides for both civil and criminal remedies, the Settlement Agreement did not correct that expectation. *See* 21 U.S.C. § 333 (describing criminal and civil penalties for violations of the FDCA). Frazier Declaration ¶¶ 9–17.

[18] Act of December 23, 1943, ch. 377, 57 Stat. 608.

outrageous overcharges for everything from military hammers and coffee pots, to toilet seats. Congress amended the FCA in 1986 to allow a relator to obtain a greater award for providing greater assistance, providing a range of 15% to 25% in intervened cases and up to 30% in non-intervened cases.[19] The FCA provides that the percentage share that a relator shall receive depends upon the "substantial contribution" of the Relator. 31 U.S.C. § 3730(d)(1). ("If the Government proceeds with an action brought by a person under subsection (b), such person shall…receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action.") The purpose of allowing a higher reward was to "encourage assistance from the private citizenry that can make a significant impact on bolstering the Government's fraud enforcement effort." *Quorum Health*, 171 F. Supp. 2d at 1331 (quoting S. REP. 99-345, at 28).

The FCA's legislative history provides, and courts have agreed, that the 15% minimum share is a "finder's fee" that a person bringing a case "should receive as a matter of right." S. REP. 99-345, at 28; *accord U.S. ex rel. Johnson Pochardt v. Rapid City Reg'l Hosp.*, 252 F. Supp. 2d 892, 897 (D.S.D. 2003). "This incentive compensation is paid to a relator 'even if that person does nothing more than file the action in federal court.'" *U.S. ex rel. Alderson v. Quorum Health Group, Inc.*, 171 F. Supp. 2d 1323, 1332 (M.D. Fla. 2001) (quoting 132 Cong. Rec. H9382–03 (Oct. 7, 1986) (statement of Rep. Berman)). Where, as here, the Relators did far more than file a complaint, they are entitled to a fully compensatory recovery at the upper end of the 15% to 25% range.

Courts rely upon the "Senate Factors" and, to a lesser degree, the "DOJ Guidelines," as helpful considerations for determining an appropriate relator's share. *U.S. ex rel. Shea v. Verizon*

---

[19] 100 Stat. 3153 at 3156-57; S. REP. 99-345 at 2-8.

*Communications, Inc.*, 844 F. Supp. 2d 78, 81 (D.D.C. 2012) (awarding a 20% relator share despite DOJ contention that 16% was appropriate).

**Senate Factors.** The Senate legislative history provides three factors ("Senate Factors") that a court should consider in deciding the appropriate relator's share:

    (1)    The significance of the information provided to the government by the *qui tam* plaintiff;

    (2)    The contribution of the *qui tam* plaintiff to the result; and

    (3)    Whether the information in the suit provided by the relator was previously known to the government.

*Quorum Health*, 171 F. Supp. 2d at 1331 (citing S. REP. 99-345, at 28). Congress "staggered the allowable percentages of recovery so that courts may take various factors into consideration and use discretion in determining awards within those ranges." S. REP. 99-345, at 28.

**DOJ Guidelines.** The Department of Justice established internal guidelines in 1996 that the DOJ, *qui tam* attorneys, and courts utilize to negotiate relator's share. *See Johnson Pochardt*, 252 F. Supp. 2d at 899.[20] These DOJ Guidelines are "merely internal standards and not federal

---

[20] The DOJ Guidelines' factors meriting an increased relator share percentage are:

    (1)    The relator reported the fraud promptly
    (2)    When he learned of the fraud, the relator tried to stop the fraud or reported it to the supervisor or the Government.
    (3)    The *qui tam* filing, or the ensuing investigation, caused the offender to halt the fraudulent practices.
    (4)    The complaint warned the Government of a significant safety issue.
    (5)    The complaint exposed a nationwide practice.
    (6)    The relator provided extensive, first-hand details of the fraud to the Government.
    (7)    The Government had no knowledge of the fraud.
    (8)    The relator provided substantial assistance during the investigation and/or pre-trial phases of the case.
    (9)    At his deposition and/or trial, the relator was an excellent, credible witness.
    (10)    The relator's counsel provided substantial assistance to the Government.
    (11)    The relator and his counsel supported and cooperated with the Government during the entire proceeding.
    (12)    The case went to trial.
    (13)    The FCA recovery was relatively small.
    (14)    The filing of the complaint had a substantial adverse impact on the relator.

DOJ Relator Share Guidelines; *see also Johnson Pochardt*, 252 F. Supp. 2d at 899 n. 1.

regulations" and therefore not binding. *Id*. (citing *Quorum Health*, 171 F.Supp.2d at 1333).

Courts frequently cite and apply the DOJ Guidelines, while using discretion to diverge from the

Guidelines when finding, for example, that factors that "increase" or "decrease" "contradict one

another," "suffer other theoretical problems," and in some instances are "noticeably unhelpful."

*Quorum Health*, 171 F.Supp.2d at 1334 n. 24.[21]

Should this Court desire an analysis under the DOJ Guidelines, this Court should

consider only the relevant Guidelines that in the Court's own judgment are actually "useful

considerations when determining the relator's share." *Johnson Pochardt*, 252 F. Supp. 2d at 900.

### B.   APPLICATION OF THE SENATE FACTORS, DOJ GUIDELINES, AND RELATOR SHARE CASE LAW SHOWS THAT RELATOR KENNEDY IS ENTITLED TO A 24% SHARE

Relator Kennedy and her allied Relators provided substantial assistance to the

Government on an important matter. They suffered substantial harm arising from their

whistleblowing. Analysis of the facts in light of the Senate and DOJ factors fully supports

---

The DOJ Guidelines' factors supporting a decreased relator share percentage (but not below the 15% minimum) are:

(1)   The relator participated in the fraud.
(2)   The relator substantially delayed in reporting the fraud or filing the complaint.
(3)   The relator, or relator's counsel, violated FCA procedures.
(4)   The relator had little knowledge of the fraud or only suspicions.
(5)   The relator's knowledge was based primarily on public information.
(6)   The relator learned of the fraud in the course of his Government employment.
(7)   The Government already knew of the fraud.
(8)   The relator, or relator's counsel, did not provide any help after filing the complaint, hampered the Government's efforts in developing the case, or unreasonably opposed the Government's positions in litigation.
(9)   The case required a substantial effort by the Government to develop the facts to win the lawsuit.
(10)  The case settled shortly after the complaint was filed or with little need for discovery.
(11)  The FCA recovery was large.

DOJ Relator Share Guidelines; *see also Johnson Pochardt*, 252 F. Supp. 2d at 899 n. 2.

[21] For example, the DOJ Guidelines punish a relator if a case settles too quickly (DOJ Guideline 10 for Decrease), and reward a relator if a case proceeds to trial (DOJ Guideline 12 for Increase). This ignores two important tenets of FCA practice. First, a strong case is likely to lead to intervention, which in turn is likely to lead to a settlement, as was the case with Relators' actions against Novo. The DOJ Guidelines thus paradoxically and unfairly punish relators for bringing strong cases. Similarly, the DOJ Guidelines punish a relator if the FCA recovery is large (DOJ Guideline 11 for Decrease), and reward a relator if the FCA recovery is small (DOJ Guideline 13 for Increase).

awarding a relator share of 24% of the Government's recovery, in both the FCA and FDCA cases.

The following six circumstances cause this case to vary substantially from other cases, supporting her request:

1. **Nationwide safety issue**

   Kennedy and the allied Relators **exposed REMS violations**, critical to both the FCA and FDCA actions, as a result of which Defendant's downplaying of thyroid cancer risk and its failure to warn doctors were halted (DOJ Guidelines 3, 4 & 5);

2. **Factual and legal contributions**

   Kennedy and the allied Relators made **continuing and important contributions** to the government investigation via interviews, briefing, and documentary evidence, on factual issues (such as witness lists and rare sales representative call data), and legal analyses (such as legal research and analysis on the novel theory of REMS violations as an FCA violation); making possible an FBI "raid" on the hospital office of a prominent Novo Nordisk paid-speaker physician (DOJ Guidelines 6, 8, and 10). The REMS legal theory forges a new and needed path forward to combat off-label marketing fraud and its consequences, including harm to patients, in future cases.

3. **Highly credible, corroborating, diligent relators:**

   Kennedy and all allied Relators were insiders in diverse locations, and **independently credible;** each one's information **bolstered the others;** and all Relators **promptly reported** the fraud internally and to the Government (which had not known of the fraud), with Relators in the 3 earliest cases disclosing and filing their actions within months of Victoza's approval and marketing launch (DOJ Guidelines 1, 2, 7, 9).

4. **Extensive hardship:**

   Relator Kennedy, Relators in the *Ferrara* action*, and at least two other Relators **lost their jobs** as a result of their whistleblowing and suffered continued discrimination in securing future employment (DOJ Guideline 14). Ms. Kennedy lost **two more jobs and her home was foreclosed upon**. One relator was blackballed and barred from calling upon physicians influenced by Novo Nordisk staff spreading false, adverse, and unsubstantiated rumors about her. Relators' suffering was aggravated by **extensive delay** from filing (2010) until settlement (2017) and resolution (still pending in 2019) not of Relators' making.

5. **Sacrifice to Government interests:**

Relator Kennedy worked hard to reach agreement with the other relators, delaying first-to-file briefing for months in order to **build the broadest possible agreement**, making the "first to file" issues less problematic for both the Court and the Government,  and delaying litigation of relator share percentage in the meantime (DOJ Guideline 11).

6. **Size of recovery:**

The Government's recovery was **relatively small**, given that global sales Victoza sales for 2011 alone were $5.99 billion.  While off-label marketing cases have figured among the largest FCA recoveries, here the off-label marketing claim was settled for $8 million. (DOJ Guideline 13).

The above six circumstances encompass *all* positive Senate Factors and DOJ Guidelines for determining share percentage that courts have accepted as useful. The only criteria not met is that this case did not proceed to trial (DOJ Guideline 12). However, courts reject this criteria for its unfairness, refusing to reduce relator share awards on such grounds.  FCA cases rarely go to trial. Notably, *the United States has never taken a False Claims Act case for fraudulent pharmaceutical marketing to trial*. Therefore, courts ignore the DOJ Guidelines regarding whether the case went to trial. See *U.S. ex rel. Shea*, 844 F. Supp. 2d at 90.

1. **Relators Were Highly Credible Witnesses (DOJ Guideline 9 for Increase).**

Relators were all experienced, conscientious, and knowledgeable Novo Nordisk sales and marketing personnel who had intimate, first-hand knowledge of the company's unsafe marketing of Victoza. Relator Kennedy, upon graduation from the University of South Alabama, began her career in the pharmaceutical industry working for Eli Lilly as a Diabetes Care Representative in 2006. In January 2009, rival Novo Nordisk recruited her as part of its sales force expansion in advance of Victoza's FDA approval and sales "launch" of Victoza to sell Victoza in a South Central territory including Alabama.  During the depths of the recession in 2009, she earned a raise and a bonus due to her outstanding sales. She surpassed all sales goals for 2009 and the first

quarter of 2010. [22]  Nevertheless, on April 22, 2010, Novo Nordisk illegally retaliated against Kennedy by firing her for reporting the company's fraudulent and illegal marketing schemes. Kennedy Original Complaint ¶ 154.

Relator Peter Dastous was employed by Novo from 2007 to January 2011 as an Endocrinology Diabetes Care Specialist ("EDCS"), responsible for marketing Victoza to endocrinologists in South Carolina and north Georgia. He had first-hand knowledge of Novo sales and marketing practices regarding Victoza in the southeastern United States.  Dastous left the company when his complaints about marketing began to affect his treatment by supervisors.

Relators Ferrara *et al.* were Midwestern Nordisk specialty and institutional representatives, with decades of experience in the medical field and pharmaceutical sales and marketing. They opposed illegal Novo Nordisk conduct internally and one objected specifically to Novo Nordisk's REMS violations. Both were wrongfully terminated.

Relators' allegations corroborated each others' credibility with their detail and consistency.  The Government relied on all Relators and found them truthful.  It relied on some for assistance in associated criminal probes, executing warrants or subpoenas based on their detailed credible reporting of facts. These are paramount indicators of Relators' credibility and contributions to the Government's success.

## 2.    Relators Contributed Significant Information (Senate Factor 1).

It is unquestioned that Relator Kennedy and others contributed significant information to the Government's recovery. First, their information was significant because it involved a serious safety issue, Novo Nordisk's failure to abide by the REMS limitations on Victoza marketing activities and minimization of the risk of medullary thyroid cancer ("MTC") in certain vulnerable populations. Second, the information was significant because it showed that Novo

---

[22] Kennedy's Original Disclosure, Tab 66.

Nordisk was engaged in a concerted, nationwide fraud against the Government. Third, this information was significant because Relators provided extensive, first-hand details of the fraud, which allowed the Government to gain valuable insight into Novo Nordisk's misconduct.

      **3.**      **Relators Alerted the Government to a Serious Safety Issue (DOJ Guideline 4 for Increase).**

Perhaps more so than any pharmaceutical marketing FCA *qui tam* case to date, this case is focused squarely on a safety issue: Novo Nordisk's violation of the REMS plan it authored and that the FDA imposed on Victoza due to the risk of MTC (medullary thyroid cancer). Relator Kennedy's complaint and multiple factual disclosures alerted the Government of schemes involving *significant patient safety issues*. Her complaint includes the following allegations:

> Victoza is not a risk-free medication and may cause serious health risks. The Victoza label has a black box warning entitled "WARNING: RISK OF THYROID C-CELL TUMORS"[23] ***

> In addition to the black box warning, the label further warns that Victoza may cause pancreatitis, which is a potentially deadly inflammation of the pancreas.[24] ***

> Finally, since the time of launch, Novo Nordisk has marketed Victoza off-label by downplaying its safety issues and side effects. Novo Nordisk trained its sales force to make all of these assertions, and it continues to market Victoza accordingly today.[25] ***

> With Victoza's launch, Novo Nordisk committed to a marketing campaign that, as it well knows, diverges from Victoza's FDA approved label in numerous respects. First, Novo Nordisk misbrands Victoza *** Second, Novo Nordisk **downplays and thus misrepresents the risks of thyroid cancer and pancreatitis** as spelled out on Victoza's label.[26]

---

[23] Kennedy's Original Complaint ¶ 72.
[24] Kennedy's Original Complaint ¶ 73.
[25] Kennedy's Original Complaint ¶ 1.
[26] Kennedy's Original Complaint ¶ 77 (emphasis added).

The United States acknowledged that Novo Nordisk's misconduct created significant safety concerns for Victoza patients. In announcing the FCA settlement, the United States focused on patient safety:

- "Novo Nordisk Inc. sales representatives misled physicians by failing to accurately disclose a **potential life threatening side effect of a prescription drug, and needlessly increased risks to patients** being treated with this drug…." (Assistant Director in Charge Andrew W. Vale, FBI Washington Field Office).

- "Today's resolution demonstrates the Department of Justice's continued commitment to ensuring that drug manufacturers comply with the law. When a **drug manufacturer fails to share accurate risk information with doctors and patients**, it deprives physicians of information vital to medical decision-making." (Acting Assistant Attorney General Chad A. Readler of the Justice Department's Civil Division.)

- "Novo Nordisk's actions **unnecessarily put vulnerable patients at risk**. We are committed to holding companies accountable for violating the integrity of the FDA's efforts to ensure that doctors and patients have accurate information that allows them to make appropriate decisions about which drugs to use in their care.[27] (U.S. Attorney Channing D. Phillips for the District of Columbia.)

Relators' complaints described Novo Nordisk's downplaying of Victoza's black box safety warnings. Relator Kennedy and her fellow Relators thus alerted the Government of serious health risks that Novo Nordisk caused by subjecting Victoza patients to risk of thyroid cancer. Their pleadings and supplemental research and factual memos provided the Government with the details as to how Novo Nordisk's conduct violated FDA's required Victoza REMS program.

### 4.      Relators Exposed and Corroborated the Existence of a Nationwide Fraud (DOJ Guideline 5 for Increase).

Relator Kennedy and the others exposed a nationwide fraud, corroborated with substantial, detailed, and reliable evidence. They provided specific details of the extensive marketing fraud, as exemplified below:

---

[27] Department of Justice Press Release, Novo Nordisk Agrees to Pay $58 Million for Failure to Comply with FDA-Mandated Risk Program, available at https://www.justice.gov/opa/pr/novo-nordisk-agrees-pay-58-million-failure-comply-fda-mandated-risk-program (September 5, 2017).

As a result of this nationwide scheme, Novo Nordisk has violated and continues to violate the False Claims Act and reap profits far beyond those it could achieve from legitimate promotion.[28]***

[W]hen Kennedy, like the rest of the sales force, received from her manager Impact RX reports in April 2010, which attached not just analysis of Victoza's progress, but voluminous pages of raw data collecting physicians' descriptions of the promotional messages they had been receiving, she was able to confirm that sales representatives nationwide were receiving the same directives to market off-label that her district was receiving. Further, Novo Nordisk was reporting on these marketing tactics in great detail and with enthusiasm, indicating company approval.[29]***

The Impact RX reports thus confirm the existence of a concerted nationwide scheme to promote Victoza off-label, with sales reps targeting high Medicaid, Medicare, TRICARE prescribers.[30]

Kennedy provided key information about marketing Victoza to non-diabetics and the downplaying of Victoza's MTC risk, as evidenced in Impact RX reports and other disclosures.

The United States agrees that Novo Nordisk's fraudulent conduct occurred nationwide and relied upon Relators' information in its related FDCA civil complaint. Therein, the Government alleged that Novo Nordisk trained sales representatives *around the country* to downplay Victoza's black box warning:

Directly following FDA's approval . . . , NNI provided the sales force with training to appropriately implement the REMS but also provided them with information to counter and neutralize the required MTC risk message.

FDCA Dkt. 1 ¶ 16. This training included a skit that was performed for the "entire sales force," which suggested that rat studies were not relevant to humans. *Id.* ¶ 17.

Further, an FDA March 2011 poll of physicians confirmed Relators' nationwide allegations, revealing that only about half of primary care doctors called on by Novo Nordisk knew of the black box warning or the need to screen patients for critical family medullary thyroid cancer history.  As a result, the FDA imposed a new requirement on Novo Nordisk to

---

[28] Kennedy's Original Complaint ¶ 3.
[29] Kennedy's Original Complaint ¶ 99.
[30] Kennedy's Original Complaint ¶ 142.

circulate a new REMS warning letter to physicians, which the United States stated was subverted by Novo Nordisk's nationwide directive to sales representatives to accompany the letters with downplaying oral messages.  Novo Nordisk's Vice President of Marketing directed further misconduct via a voicemail message to the entire Victoza sales force. FDCA Dkt. 1 ¶ 23.

Kennedy's complaint exposed a nationwide fraud that was unfolding as she reported it. Relators in the subsequent-filed cases described similar conduct in the Midwest and Coastal Southeast, and elsewhere, rendering impossible any potential defense that the marketing alleged was the product of "rogue" employees or localized misconduct.

### 5.      Relators Gave First-Hand Details of the Fraud (DOJ Guideline 6 for Increase).

Relator Kennedy provided extensive first-hand details of Novo Nordisk's fraud. As a Victoza sales representative, she promoted Victoza directly to doctors and underwent extensive company training. She received supervisors' constant written and verbal communications on how to market Victoza for unlawful off-label uses and without regard to safety requirements. As a result, Kennedy possessed and shared with the Government in-depth, first-hand knowledge and understanding of Novo Nordisk's schemes that were essential to the FCA and FDCA Settlements. She amassed a wealth of material evidence, consisting of internal company documents and her own notes and recollections of events. Kennedy presented this information to the Government in her Complaint and in numerous written disclosures. *See* Kennedy's Original Complaint; Frazier Declaration ¶ 5 (containing a list of all disclosures made to the Government).

Relator Kennedy's Complaint provides extensive details of Novo's fraudulent schemes, including first-hand knowledge that Novo Nordisk:

- illegally promoted Victoza before the drug had FDA approval;

- illegally promoted Victoza for non-diabetics, specifically for treating "pre-diabetics;" regression or reversal of type 2 diabetes; restoration of beta cell function; and prevention of beta cell "burnout";

- targeted physicians participating in Medicare Part D or who were high Medicaid prescribers, thereby showing that the fraud was being committed against the Government and involved federal funds,

- placed doctors on a continuum, such as "Fast Adopting Experts," "Safety Conscious Byetta Users" or "Slow Adopter" categories, to perpetrate the scheme;

- utilized medical liaisons to initiate off-label discussions, in violation of company policy and industry guidelines; and

- as a matter of practice and policy, turned a blind eye towards violations of laws, industry guidelines, and company policies.

Kennedy Complaint ¶¶ 82, 77, 125–133, 93, 96, 152. Subsequently filed Complaints of the other Relators had similar allegations.

Moreover, Relator Kennedy provided detailed first-hand evidence of Novo Nordisk strategies to undermine its REMS-mandated marketing restrictions, downplaying and misrepresenting Victoza's risk of acute pancreatitis and MTC, including that Novo Nordisk:

- "sandwiched" safety information between promotional messages to downplay risks

- failed to disclose Victoza risks to doctors

- downplayed the magnitude of Victoza's risks by

  - brushing aside serious risks by discussing mild side effects instead

  - using endocrinologists to mislead physicians that MTC was a non-issue

  - suggesting that the MTC risk applied to rats only, not to humans

  - representing that because all competitor drugs have black box warnings, Victoza was just as safe

Specifically, in her Pre-Filing Disclosure and Original Disclosure, Kennedy explained that in early February 2010, after Victoza FDA approval, Novo Nordisk assembled its national

sales force for a Las Vegas launch meeting that included educational seminars, training sessions, and an extravagant party.[31] Kennedy turned over a key document entitled "Victoza Launch Roadmap" distributed to sales representatives in a training session, which shows exactly how Novo Nordisk strategically trained sales representatives to "sandwich" MTC risk information between promotional messages.[32]



The Roadmap instructed sales representatives to convey Important Safety Information "as part of Novo Nordisk's ongoing commitment . . . to communicate certain risks, and to ensure that Victoza® is prescribed and taken safely."[33] This deceptive statement failed to inform sales representatives that Victoza was subject to an FDA-mandated REMS program. The Roadmap failed to inform sales representatives that the REMS was required was to ensure that Victoza benefits outweighed its risks or that REM's goal was to inform health care providers specifically

---

[31] Kennedy Pre-Filing Disclosure ¶ 66; Kennedy Original Disclosure ¶ 70.
[32] Kennedy Pre-Filing Disclosure, Tab 5, Page 13; Kennedy Original Disclosure, Tab 5, Page 13.
[33] *Id.* at 12; *Id.* at 12.

of risks of acute pancreatitis and MTC, not merely "certain risks." The Roadmap raised a red flag to the Government about Novo Nordisk's commitment to REMS.

A February 9, 2010 email that Relator Kennedy gave the Government revealed that, from the beginning, Novo Nordisk top management knew that their perverse marketing strategy was succeeding in downplaying the magnitude of Victoza's serious risks. In the e-mail, a Novo Nordisk business manager enthusiastically notes that "The Endo's are very excited about Victoza" and discusses how they are not worried about MTC just because it was found in rats. [34] Near the end of his e-mail, the manager notes that:

> "All [endocrinologists] also said they would advocate this position and say the **MTC issue is not big deal** if/when contacted by their referring PCPs." [35]

Upper level management forwarded this message throughout the sales force and it ultimately came to Relator Kennedy, with instructions to "Please read."  Novo Nordisk blatantly disregarded Victoza safety risks and found a way to subvert required warnings by hiring endocrinologists to advocate that "MTC … is not [a] big deal."[36]

Kennedy aided the Government by informing it that Novo Nordisk had dispensed with using traditional sales call notes and had instead hired a consulting company, Impact RX, to capture doctors' recollections of sales calls promoting Victoza and rival drugs.   Novo Nordisk disseminated these detailed Impact RX reports, entitled "US Weekly Launch Tracker," to sales representatives with great enthusiasm, indicating company approval of false and misleading promotional messages.   Relator Kennedy provided these reports with damaging doctor comments to the Government.[37] Such alarming remarks included:

---

[34] Kennedy Pre-Filing Disclosure Tab 17; Kennedy Original Disclosure Tab 17.
[35] Kennedy Pre-Filing Disclosure Tab 17 (emphasis added); Kennedy Original Disclosure Tab 17 (emphasis added).
[36] Kennedy Pre-Filing Disclosure Tab 17; Kennedy Original Disclosure Tab 17.
[37] Pre-Filing Disclosure Tab 1 and 2; Original Disclosure Tab 1 and 2.

- "They talked about the fact that there is medullary carcinoma in the warning, but that it's not a concern that ***no thyroid monitoring needs to be done***." Tab 1, p. 13.

- " . . . . Talked about the safety aspects and as far the medullary thyroid cancer, showing there is ***no increased risk*** in patients . . . ." Tab, p. 13.

- "safe, everyone is prescribing it now." Tab 1, p. 14.

- "black box warning not concerning Tab 1, p. 14.

- " . . . the particular safety profile of Victoza and its comparison with Byetta with probable better efficacy and ***similar results with . . . pancreatitis*** . . . ." Tab, p. 14.

- "***no thyroid ca problems***" Tab 1, p. 14.

- "Went into the study from The Lancet on the comparison, the efficacy of the drug, and side effects. Also discussed the pancreatitis issue that is seen in this category." Tab 1, p. 14.

- "Detailing regarding Victoza with Novo Nordisk rep. . . . No black-box warning for Victoza. However, medullary thyroid carcinoma was noted in rat studies done prior to launching Victoza." Tab 1, p. 59.

- " . . . . Victoza promote satiety. Studies showed ***low incidence of medullary thyroid carcinoma in rat*** studies done. Well tolerated. Safe." Tab 1, p. 59.

- " . . . ***no pancreatitis, caution with medullary thyroid cancer***." Tab 1, p. 60.

- "This was a fairly short visit. Not planned. Victoza was discussed. It was a give-and-take, related to molecule. ***Half-life was covered, also risks of medullary thyroid cancer in rats, the native risks in humans is 1.5 a million***, according to drug rep. . . ." Tab 1, p. 73.

These reports confirm that Victoza sales representatives nationwide were receiving the same directives to market unlawfully.

Kennedy's fellow Relators provided crucial first-hand information. The *Ferrara* Relators specifically pled REMS program violations, the same that formed the major theory of liability in the 2017 FCA and FDCA Settlements. Relators elaborated in interviews and disclosures on the

sales visit conduct that violated the REMS program requirements for Victoza.[38] Relators

witnessed Novo Nordisk misconduct in the field in Alabama, Mississippi, South Carolina, Ohio,

New Jersey, New York, and elsewhere.

### 6.     Relators Contributed Significantly to the Result (Senate Factor 2).

Relator Kennedy's contribution to this case were significant, constructive, and of high

quality. As described above, she provided substantial investigatory assistance to the Government,

both in evidence and in interviews. She proved herself to be a credible witness. Her experienced

counsel provided substantial assistance, including developing legal theories, research, and

considerable investigatory support. She supported and cooperated with the Government through

the proceedings. The same is true of all Relators.

### 7.     Relators Gave Substantial Assistance in the Government's Investigation (DOJ Guideline 8 for Increase).

Relator Kennedy provided the Government with substantial assistance throughout the

case, including through numerous disclosures. Frazier Declaration ¶¶ 5, 6. In her Pre-Filing

Disclosure with 33 exhibits, Kennedy provided the Government with proof that Novo Nordisk

oral sales pitches to doctors included unlawful off-label and unsafe messages and that the doctors

in fact received these messages.

---

[38] As an example, Relator Dastous stated this in a February 24, 2011 disclosure (and also discussed in his 2012 interview) his knowledge of a training and plans to circumvent REMS:

> In 2009, around the time that Novo originally expected to launch Victoza, Novo gave the MSL team a much more proactive role.  Novo headquarters assigned the MSLs targets, referred to as Key Opinion Leaders ("KOLs") that they were required to see several times per POA – much like a field sales representative.  …  The new role for the MSL team is illustrated by the manner in which they utilized the "Knudsen article". . . . The Knudsen article reported on a Novo-sponsored study that concluded that the GLP1 hormone does not stimulate the human thyroid to the same extent as rodent thyroids.  The purpose of the study was to address and minimize concerns over Victoza's "black box" warning that cautions that rats given Victoza had a higher risk of developing thyroid c-cell tumors.  Novo headquarters instructed the MSL teams to discuss the Knudsen article proactively with physicians who otherwise might have waited 6-12 months before prescribing Victoza to see if any safety issues arose.

Relator Kennedy, like other Relators, provided the Government with additional, corroborating evidence of Novo Nordisk's nationwide fraud in subsequent disclosures. Her Original Disclosure, with 22 additional exhibits, contains a list of doctors that Novo Nordisk targeted in the Victoza campaign, strategic profiles of top target doctors, Novo Nordisk's regional launch plan, and numerous management e-mails to the sales force on how to sell Victoza using unlawful, unsafe, and off-label messages.

After filing her Complaint in 2010, the Department of Justice extensively interviewed Relator in 2011. She apprised the Government of her Novo Nordisk work experiences and elaborated upon her Complaint allegations. Relator Kennedy responded to subsequent Government requests for assistance, evidenced by her five supplemental disclosures.

In her First Supplemental Disclosure, Kennedy furnished 55 more exhibits, such as company literature (including her notes detailing messages from trainers imparted orally during training sessions), expense reports, and e-mails providing proof of off-label messaging. She provided the Government with Novo Nordisk's "Thyroid Abnormalities / Pancreatitis Backgrounder" sales aid distributed to sales representatives.[39] Kennedy explained that sales representatives were instructed, after communicating the Victoza black box warning, to never raise it again.[40] If pressed by physicians about this black box, Kennedy informed the Government that sales representatives were "directed to handle any physician questioning on this subject by responding that 'unless you're treating rats, I don't really think you need to worry about it, do you?"[41] She gave the Government copies of Feedback Summaries, a mechanism

---

[39] Kennedy's First Supplemental Disclosure Statement ¶ 12, Tab 61.
[40] Kennedy's First Supplemental Disclosure Statement ¶ 14.
[41] Kennedy's First Supplemental Disclosure Statement ¶ 14.

through which Novo Nordisk tracked the progress and effectiveness of its marketing scheme and that supplemented Novo Nordisk's Impact RX information.[42]

Relator Kennedy compiled a list of potential Government witnesses. Upon request, in her Second Supplemental Disclosure she augmented the Territory Planning Report with notes on her communications with specific doctors and detailed how a typical conversation could be converted into an off-label message. She supplemented this information in her Fifth Supplemental Disclosure. In her Third Supplemental Disclosure, Kennedy sent the Government additional details it requested regarding Novo Nordisk's speaker program.

All Relators provided substantial assistance throughout the investigation. Shortly after the filing of the *Dastous* and *Ferrara* Complaints and after the initial interview of Relator Dastous, the Boston U.S. Attorney Office, in concert with the D.C. U.S. Attorney Office, issued a subpoena to Novo Nordisk on February 16, 2011. Relator Dastous gave a second relator interview on April 5, 2012. The *Ferrara* Relators' substantial assistance is more fully described in the attached Declaration of Counsel for the *Ferrara* Relators, describing meetings and other assistance to government attorneys. Drawing on their continued contacts at Novo Nordisk and with assistance of Counsel, they provided the Government with over 70 detailed memoranda and amended complaints containing factual information about marketing practices, speaker programs, and witnesses, as well as legal communications.

### 8.    Relators' Counsel Gave Substantial Assistance (DOJ Guideline 10 for Increase).

Relator Kennedy's counsel has significant FCA experience, specifically with pharmaceutical marketing cases. Frazier Declaration ¶ 4. That experience informed the drafting of a complaint that described in a comprehensive manner a conspiracy that was conceived in the

---

[42] Kennedy's First Supplemental Disclosure Statement ¶ 23, Tabs 71–76.

company's senior leadership and marketing departments to work around the FDA drug safety parameters, further planned by sales management, trainers, district sales managers, medical science liaisons, sales representatives, and medical specialists. With counsel's thorough preparation, Relator Kennedy provided detailed facts when the Government interviewed her. She came prepared with specific written information about target physicians and other details otherwise difficult to recall with the passage of time. Counsel took full advantage of her substantial company materials and highlighted important documents for Government Counsel so that, for example, they fully understood that the Impact RX information was rare direct evidence of improper marketing.

Relator's counsel had dozens of communications with the Government and its numerous agencies, including the U.S. Attorney's Office and Main Justice in aid of its investigation. Relator's Counsel drafted subpoenas for the Government, offered to assist in reviewing documents, and responded to all questions arising from the Government's inquiry. Counsel constantly probed for information regarding Victoza marketing, kept Government attorneys apprised of legal and factual developments such as: when Victoza's label changed; resolution of another REMS-related case; and reports REMS program effectiveness and the science of the risks at issue.[43] At Government request, Kennedy and her counsel supplied legal and factual analyses, recommendations on tactics, damage calculations, and an August 2013 memorandum on satisfying legal falsity in fraudulent pharmaceutical marketing cases other than those focused on off-label indications. Frazier Declaration ¶ 8.

Counsel for the second and third-filed relators, law firms Phillips & Cohen and Murphy Anderson, contributed significant work to the case. Murphy Anderson provided the Government

---

[43] Kennedy's Fourth Supplemental Disclosure Statement; Frazier Declaration ¶ 6 (February 15, 2013 e-mail; June 24, 2013 e-mail; May 12, 2016 e-mail).

with a thoroughly researched legal memorandum with accompanying factual analysis setting

forth the novel and original legal theory of why Novo Nordisk's REMS violations were,

likewise, violative of the False Claims Act. Multiple amended complaints by Relators gave new

evidence and law supportive of the REMS-based theory of recovery. The REMS theory not only

became the primary basis for the settlement with Novo, but now provides the FDA, DOJ, and

other government agencies with new and effective tools in enforcing compliance with

pharmaceutical marketing and drug safety regulation.

> **9.     Relators Substantially Supported and Cooperated with the Government (DOJ Guideline 11 for Increase).**

As discussed above (DOJ Guidelines 8 and 10 for Increase), Relator Kennedy supported

and cooperated with the Government, and through her counsel, played a substantial role in

developing legal arguments, theories, and strategies pertaining to Novo Nordisk's fraudulent

conduct. Relators' Counsel all supported the Government's seal extension requests, including

speaking in support of the Department of Justice's investigation and candor in hearings in which

the Court desired reassurance from them. Frazier Declaration ¶ 7. In sum, Relator Kennedy's

contribution and efforts to this case have been significant and constructive.

At the Government's urging, Relator Kennedy and the other Relators agreed to settlement

of this FCA action and to the FCA settlement amount, which was considerably less than the

potential liability first suggested at the outset, and despite unknowns regarding the FDCA

settlement. Frazier Declaration ¶ 18. Relator Kennedy delayed first-to-file litigation and deferred

litigating relator share percentage and alternate remedy, as a courtesy to the Government and to

help simplify these complex proceedings for all involved, including this Court. Frazier

Declaration ¶ 22. Throughout the litigation, Relators undeniably substantially contributed to the

Government's investigation and resolution of the case and have made sacrifices when asked to do so by the Government.

### 10. The Government Had No Prior Knowledge of the Fraud (Senate Factor 3, DOJ Guideline 7 for Increase).

The Government did not have prior knowledge of Novo Nordisk's fraud. Victoza was approved by the FDA in January 2010. The Government was unaware that before this date, Novo Nordisk was already directing sales representatives to directly promote Victoza to target physicians. These marketing activities clearly violated the FDCA, since Victoza had yet to obtain an approved label and its REMS obligations were not final until January 2010. The conduct continued, though neither Victoza sales figures nor reimbursement data could confirm marketing statements taking place in physicians' private offices.  Kennedy and the other relators supplied that information.

Months after Relators' *qui tam* revelations, the FDA eventually began developing evidence of illegal marketing, with a March 2011 poll of doctors. But by then, Relator Kennedy, Relator Dastous, and the *Ferrara* Relators had filed suit and provided detailed narrative and documentary disclosures. The Department of Justice and FDA investigators learned from them about the REMS violations and very specific behaviors such as the downplaying of rat studies ("Doctor, you don't treat rats, do you?) and "running out" of REMS-required warning letters to be delivered to physicians, etc. Relators' complaints likely factored into FDA's decision to poll physicians about Victoza safety messages.

At no point has the Government indicated that it had knowledge of fraudulent Victoza marketing before Relator Kennedy filed suit. Relator Kennedy and her fellow Relators deserve credit for revealing Novo Nordisk's fraudulent marketing strategies.

### 11.    Relators Suffered Substantial Harm and Hardships as a Result of Their Whistleblowing (DOJ Guideline 14 for Increase).[44]

The harm that a whistleblower suffers is an extremely important consideration. "[A] qui tam relator suffers substantial harm and the *qui tam* provisions of the FCA are intended to remedy that harm." *U.S. ex rel. Neher v. NEC Corp.*, 11 F. 3d 136, 137–138 (11th Cir. 1993). Such harm includes "severe emotional strain due to the discovery of his unwilling involvement in fraudulent activity," substantial ramifications to the relator's employment, and financial burdens. *Id.* Often it is difficult to quantify the relator's harm incurred from coming forward. "[Q]*ui tam* relators face the Hobson's choice of keeping silent about the fraud, and suffering potential liability (and guilty consciences), or reporting the fraud and suffering repercussions, some as extreme dismissal." *Id.*

As a result, courts are extraordinarily sensitive to instances where a whistleblower has suffered hardships in pursuing a *qui tam* action. Courts recognize that "…a relator may be entitled to the statutory maximum percentage in situations where the relator has suffered personal or professional hardship." *U.S. ex rel. Burr v. Blue Cross & Blue Shield of Florida, Inc.*, 882 F. Supp. 166, 169 (M.D. Fla. 1995) (awarding relator only 15% due to extreme opposition to Government's efforts and nominal contributions). Such adversities are reflected in the relator share percentage courts award.[45]

---

[44] For greater detail concerning Kennedy's hardship while protecting her ability to maintain employment, see Kennedy Declaration (filed herewith under seal as Exhibit A to a motion seeking to allow maintenance of the seal).

[45] *See U.S. ex rel. Johnson Pochardt v. Rapid City Reg'l Hosp.*, 252 F. Supp. 2d at 902 (awarding 24% share because *qui tam* "wreaked havoc" on relator's life: "she and her husband sold their business to ensure financial stability," she lost a well-paying job with range of benefits, her chances of being hired at a similar position were greatly reduced, she suffered a deterioration in health, and she separated from her husband on several occasions); *U.S. ex rel. Pedicone v. Mazak Corp.*, 807 F. Supp. 1350, 1353 (S.D. Ohio 1992) (awarding maximum 30% relator share in a non-intervened case that did not go to trial where he "pursued this action at considerable personal and professional expense to himself" and because the maximum percentage "would encourage other potential whistleblowers to take risks similar to those taken by the qui tam Plaintiff in this matter to expose fraud against the United States"), *overruled on other grounds by U.S. ex rel. Smith v. Lampers*, 69 Fed. Appx. 719 (6th Cir. 2003). Adverse financial impact on a relator's employment and income is considered. *See U.S. ex rel. Shea*, 844 F. Supp. 2d at 88 (discussing lucrative consulting position that relator gave up in order to pursue *qui tam* action); *U.S. ex rel.*

As a result of filing her *qui tam* action against Novo Nordisk, Relator Kennedy suffered considerable financial difficulties. Her whistleblowing has inflicted substantial harm to her personal life, health, emotional well-being, and career. *See generally* Kennedy Declaration. With young children to raise and many years left until retirement, the effects of her whistleblowing are enduring and severe. *Id.* ¶ 14.

After being retaliated against and wrongly terminated by Novo Nordisk on April 22, 2010, Kennedy had trouble finding and sustaining employment in the pharmaceutical industry. *Id.* ¶ 9.  To make ends meet, she took short-term non-professional jobs selling printers and recruiting for-profit college students. *Id.*  Eventually Kennedy was able to secure employment with a second pharmaceutical company, but lost that job when a Novo Nordisk sales representative observed her working and as a result, retaliatory calls were made to her new employer. *Id.* ¶ 11. By mid-2011, she was a newly-divorced, unemployed mother of a preschooler, with a mortgage she could not sustain.  She lost her home in foreclosure. *Id.*

Relator Kennedy found a third pharmaceutical sales position in late 2011. She remarried and had a second child.  After the September 2017 unsealing of this case, a company compliance officer contacted her with a trumped-up disciplinary issue, calling her by a version of her name found in her Novo Nordisk *qui tam* case caption, but not her company records. Terminated again, Kennedy was unable to secure permanent work, depriving her young family of its primary source of income. *Id.* The stress and depression of going through false accusations and retaliatory termination for the third time took a great toll. *Id.* ¶ 14. Now, with a brand new job, she remains anxious and concerned that she will be victimized yet again for her whistleblowing. *Id.* ¶ 15.

---

*Fowler v. Evercare Hospice, Inc.,* No. 11-cv-00642-PAB-NYW (D. Colo., February 7, 2017) (in case where relators sought 23% relator share, government argued that 18% relator share was appropriate since discipline and termination was not "sufficient personal hardship" to merit an increased award; court awarded 20% relator share, citing DOJ's additional factual development involving particular patient files DOJ that was reflected in the Government's Complaint)).

Relator Kennedy's whistleblowing has imposed upon her numerous hardships, none of which she brought upon herself, causing an extreme and painful disruption in her personal life and professional career.

Relator Kennedy's fellow Relators have similarly suffered great hardship. They were terminated in many instances or forced by discipline related to their whistleblowing to find another job.[46]  Whistleblowing has adversely impacted the living *Ferrara* Relators' ability to keep and hold a job in pharmaceutical sales and provide support their young children. The retaliatory actions by Novo Nordisk employees and those affected by their ill will is ongoing and has persisted long after discharge.

The facts here show Relators' "formidable personal and legal difficulties encountered by during and because of this litigation." Nonetheless, Relators were not "dissuaded from promptly disclosing alleged fraud and doggedly pursuing" the claims against Novo Nordisk. *U.S. ex rel. Alderson v. Quorum Health Group, Inc.*, 171 F. Supp. 2d 1323, 1338 (M.D. Fla. 2001) (24% relator share awarded, rejecting government arguments for a lower percentage).

## 12. The FDCA Settlement is a Factor Meriting an Enhanced Relator Share.

Relators have a statutory right to a relator share of the FDCA Settlement Amount as an alternate remedy under 31 U.S.C. § 3730(c)(5). However, should this Court determine that the FDCA Settlement is not an FCA "alternate remedy," then it certainly should consider the funds garnered in the FDCA Settlement as a factor meriting an increased relator share of the FCA Settlement. The factual overlap of the Government's FDCA action with Relators' FCA complaints, the Government's designation in filing the action as "related" to the Ferrara case, and the purposeful delay in filing the FDCA action until after the FCA Settlement was approved

---

[46] *See* Declaration of Counsel in the Ferrara Action, attached as Exhibit D.

by the Court, all indicate that the FDCA recovery would not have occurred but for Relators' efforts. Moreover, under DOJ Guideline 13, a smaller recovery should merit a larger relator share. A natural corollary to Guideline 13 holds that where the Government recovers additional related funds from an FCA Defendant outside the FCA Settlement process, that relator should receive a higher relator share as compensation for assisting the Government in obtaining an additional recovery in another, albeit not FCA, enforcement action.

V.      **CONCLUSION**

Relator Kennedy, supported by the other Relators who brought similar, later actions against Defendant Novo Nordisk about its illegal and unsafe Victoza marketing practices, seeks this Court's determination that she is entitled to a fully compensatory relator share award, based on both the FCA Settlement and the FDCA Settlement, and an alternate remedy under the FCA's 31 U.S.C. § 3730(c)(5) provision. While the maximum award of 25% is justified based on Kennedy's overall contributions, enhanced by those of all other Relators with whom she will share the recovery, Relator Kennedy submits that the facts fully support a 24% relator share award. A high award will encourage other whistleblowers to stand up against fraud and show that courts will reward relators appropriately for the contributions they make and the harms they endure.

Victoza's approval was conditioned on patient safety precautions authorized by Congress under the 2007 REMS legislation. The FDA insisted on a special Victoza REMS plan to ensure that physicians learned of the drug's substantial risks. Some at the FDA likely understood Novo Nordisk's high sales expectations and the temptation to downplay safety risks and inflate off-label claims of weight loss. But sales and reimbursement data alone cannot demonstrate if a pharmaceutical company is steering clear of the temptation to downplay critical safety issues

when marketing a drug. Here, such misconduct would make Victoza particularly unsafe for a certain vulnerable patient population with family health history of thyroid cancer or a personal medical history of pancreatitis.

The evidence needed to justify an investigation and serve subpoenas came from information and sources to which Relators, not the United States, were privy: individual sales-related conversations between Novo Nordisk sales representatives and doctors in the privacy of a doctor's office; sales training sessions; company voicemail messages; district managers' best practices" directives; and internal "Impact RX" reports recording physician comments after sales calls. These private communications could only be known with the help of a whistleblower and could only be successfully prosecuted with the aid of whistleblower evidence to substantiate the allegations.

Accordingly, Relator Kennedy requests a Relator's Share award of 24% of the Federal Settlement Amount ($43,179,036.87), the Medicaid State Settlement Amount of the Named Plaintiff States' ($2,523,836.85), and the FDCA Settlement Agreement ($12,150,000), plus *pro rata* interest thereon.[47]

### Exhibit List

| Exhibit No. | Description |
| --- | --- |
| A | FCA Settlement Agreement |
| B | FDCA Settlement Agreement |
| C | Declaration of Sarah M. Frazier |
| D | Declaration of Ann Lugbill |
| E | January 27, 2017 E-mail from Mr. Olson to Relators' Counsel |

*Please note that Relator's Declaration is concurrently filed as Exhibit A to a motion to seal.*

---

[47] The funds to be paid by the United States to Relator Kennedy come to $10,362,968.85, representing 24% of the $43,179,036.87 Federal Settlement Amount and interest, plus $605,720.84, representing 24% of the Medicaid State Settlement Amount of the Named Plaintiff States, plus $ 2,916,000, representing 24% of the $ 12,150,000 FDCA Settlement and the *pro rata* share of any interest thereon to be determined, for a total of $ 13,385,975.29, plus FDCA interest, if any.

Dated: June 12th, 2019.  Respectfully submitted,

<u>/s/ Sarah M. Frazier</u>
Joel M. Androphy
Sarah M. Frazier
Berg & Androphy
3704 Travis Street
Houston, TX 77002
Tel: 713-529-5622
jandrophy@bafirm.com
sfrazier@bafirm.com

*Counsel for Plaintiff Elizabeth Kennedy*

## <u>CERTIFICATE OF SERVICE</u>

On this 12th day of June, 2019 the foregoing was served upon Counsel by means of the Court's electronic filing system and as set forth below.

<u>/s/ *Sarah M. Frazier*</u>
Sarah M. Frazier

<u>Counsel for the United States of America</u>
<u>via Pacer</u>:

William E. Olson
Trial Attorney, Civil Division
Commercial Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
william.e.olson@usdoj.gov

Darrell C. Valdez
Assistant United States Attorney
United States Attorney's Office for the District of Columbia
555 Fourth Street, N.W.
Washington, D.C. 20530
Darrell.Valdez@usdoj.gov

<u>Attorney for the State of Indiana and the Plaintiff-States' Representative</u>
<u>via Pacer</u>:

Lawrence J. Carcare II – via email
Deputy Attorney General
Medicaid Fraud Control Unit
Office of Indiana Attorney General Greg Zoeller
8005 Castleway Drive
Indianapolis, Indiana 46250
(317) 915-5319 (office)
(317) 232-7979 (fax)
Lawrence.Carcare@atg.in.gov