# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* KENNEDY,<br><br>          Plaintiffs,<br><br>     v.<br><br>NOVO A/S, *et al.*,<br><br>          Defendants. | )<br>)<br>)<br>)    Civil Action No. 13-1529 (RBW)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION**

1. I, Sarah M. Frazier, duly swear under penalty of perjury the following:

2. My name is Sarah M. Frazier. I am over 18 years old. I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated.

3. I am counsel for Elizabeth Kennedy, Plaintiff in the above-captioned case.

4. I have represented *qui tam* relators under the False Claims Act (FCA) for over fourteen years. I have significant FCA experience, specifically with pharmaceutical marketing cases. I am one of the few attorneys to take an off-label marketing case through discovery and summary judgment proceedings.

5. Throughout the course of this litigation, I have supplied to the Government disclosures containing Relator's evidentiary and documentary support of her claims. On October 8, 2010, I forwarded to the Government a copy of Relator's Pre-Filing Disclosure Statement, which included 33 exhibits (labeled Tab 1–33). On October 15, 2010, I forwarded to the Government a copy of Relator's Original Disclosure Statement, which included an additional 22 exhibits (labeled

Tabs 34–55). On August 31, 2011, I forwarded to the Government a copy of Relator's First Supplemental Disclosure Statement, which included an additional 56 exhibits (labeled Tabs 56–111). On November 10, 2011, I forwarded to the Government a copy of Relator's Second Supplemental Disclosure Statement, which included an excel spreadsheet exhibit. On January 26, 2012, I forwarded to the Government a copy of Relator's Third Supplemental Disclosure Statement. On April 17, 2012, I forwarded to the Government a copy of Relator's Fourth Supplemental Disclosure Statement. On July 30, 2012, I forwarded to the Government a copy of Relator's Fifth Supplemental Disclosure Statement.

6. I have also sent additional informal disclosures and supplements to the Government in these proceedings. On June 6, 2011, I sent the Government and update regarding the Victoza label and REMS. On July 15, 2011, I sent the Government information pertaining to certain search terms of interest to the Government. On February 29, 2012, I sent to the Government information regarding news reports on Victoza. On July 9, 2012, I sent to the Government a new article pertaining to Victoza. On June 24, 2013, I sent to the Government other investigatory material concerning Victoza. On May 12, 2016, I sent to the Government information related to a settlement that the Government reached with another pharmaceutical company.

7. At the outset of this action, I have supported the Government's requests for seal extensions, including speaking in support of the Department of Justice's investigation and candor in hearings in which the Court desired reassurance from Relator's counsel at the latter part of the seal period.

8. At the Government's request, I supplied legal and factual analyses, recommendations on tactics, damage calculations, including, for example, an August 13, 2013 memorandum on satisfying legal falsity in fraudulent pharmaceutical marketing cases where off-

label indications are not the focus. All in all, I have supplied the Government with over 20 disclosures, factual communications, and legal analyses.

9. For years before the United States settled with Novo Nordisk in 2017, I knew from periodic status calls with Will Olson, the attorney for the Department of Justice's Civil Fraud Section in charge of the case, that a parallel criminal case was in negotiations, and would have to be resolved before the FCA action. On calls occurring on January 6, 2016 and July 20, 2016, Olson mentioned to me a Food, Drug, and Cosmetic Act (FDCA) settlement, but in the context of a parallel criminal proceeding.

10. The FDCA contains civil and criminal remedies, and in fact I have tried criminal misbranding cases under the FDCA in the past as defense counsel.

11. Will Olson circulated drafts of the "covered conduct" language to relators' counsel before he circulated full settlement drafts. On January 18, 2017, Olson e-mailed me and other Relators' counsel a final draft of the "covered conduct" to be released in the putative settlement; it contained no mention of a FDCA settlement, nor did initial drafts of the settlement agreement. Olson sought agreement that the settlement was fair, adequate, and reasonable, eventually specifying in response to my repeated questioning about the scope of such agreement that the agreement was as to the settlement amount and the covered conduct. I have an email containing this exchange, a true and correct copy of which is attached as Exhibit E.

12. A May 5 settlement draft conveyed by Olson made no mention of the FDCA action either, and paragraph 7 reserved other rights under the FCA, including "sharing in the proceeds of this Agreement."

13. The settlement draft of July 7, 2017 was the first one to reference the FDCA Settlement, without specifying an amount or whether the matter was civil or criminal.

14. On July 7, 2017, when the FDCA provision first appeared in a settlement draft, its appearance did not put me on notice that an additional civil remedy was planned, and I do not recall otherwise learning that fact during settlement negotiations. Further, while it is fairly common for the Government to pursue an administrative remedy in addition to a *qui tam* action, whether intervened or declined, I cannot think of another instance in which the Government has pursued a similar alternate *civil* action.

15. The right to a relator share in a criminal disposition versus a civil or administrative remedy has been especially hotly contested by the Department of Justice in recent years. To make an informed decision about pursuing any recovery as an alternate remedy, I needed to know whether the recovery was criminal or civil and its amount, among other important factors.

16. At no time during settlement negotiations did I intend to surrender any alternate remedy claim belonging to my client, much less one whose basic attributes, such as the amount, were unknown. The July 7, 2017 draft preserved from dismissal the right to demand relator's share under FCA section 3720(d) related to the "Agreement."

17. The final settlement and stipulation preserved this right in the "Civil Action," defined as the relators' suits, including Relator Kennedy's. It is this same right to relator's share that my client now seeks, via today's motion.

18. At the Government's urging, Relator Kennedy and the other Relators agreed not to oppose the Total Settlement Amount of this FCA action, which was considerably less that the potential liability first suggested at the outset, and despite unknowns regarding the FDCA Settlement.

19. I now know that the Government entered into a separate FDCA Settlement Agreement on July 26, 2017, the same day the FCA Settlement was signed. The Government

issued a Press Release on September 5, 2017 announcing both settlements, and it was through this press release that I first learned that the Government had diverted $12.15 million in settlement funds into a separate FDCA case.[1] There had been no earlier notice. I also learned at that time that the FDCA action was filed four days after this court entered a dismissal on September 1, 2017.

20. No relator consented to the FDCA Settlement Agreement, nor was the Court's review sought as to the propriety of the agreement. I was surprised by these developments and recall that the counsel for the other relators had the same reaction.

21. In my experience, the line between intervened cases and declined cases can be hazy at best when it comes to settlement. The Government commonly settles cases without intervening at all but with the threat that it will do so. It is often prepared to intervene if settlement negotiations stall in such instances. For this reason, statistics on rates of intervention can be significantly understated and fail to include many cases in which the Government has "elected" intervention.

22. Throughout the duration of this case, Relator Kennedy and counsel worked hard to reach agreement with the other relators so that everyone could obtain a share of the Government recovery, even those who were precluded by the FCA's first-to-file rule. Relator delayed briefing of first-to-file for several months in order to build the broadest possible agreement and to make the "first to file" issues less problematic for both the Court and the Government. Relator took these actions knowing that this would delay litigation of relator share percentage.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 12, 2019

Sarah M. Frazier

---

[1] This press release can be found at https://www.justice.gov/opa/pr/novo-nordisk-agrees-pay-58-million-failure-comply-fda-mandated-risk-program.