**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| *ex rel.* KENNEDY, | ) | |
| | ) | Civil Action No. 13-1529 (RBW) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NOVO A/S, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**UNITED STATES' RESPONSE TO RELATOR KENNEDY'S**
**MOTION FOR RELATOR'S SHARE OF AWARD IN THE FALSE CLAIMS ACT**
**AND ALTERNATE REMEDY FOOD, DRUG, AND COSMETIC ACT CASES**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

INDEX OF EXHIBITS .................................................................................................... v

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

LEGAL STANDARDS .................................................................................................... 4

ARGUMENT .................................................................................................................. 6

  I. KENNEDY IS NOT ENTITLED TO ANY SHARE OF THE FDCA SETTLEMENT ...... 6

    A. KENNEDY DISMISSED ANY CLAIM UNDER SECTION 3730(C)(5) TO A SHARE OF THE FDCA SETTLEMENT .......................................................... 6

    B. THE FDCA SETTLEMENT IS NOT AN ALTERNATE FCA REMEDY UNDER 31 U.S.C. § 3730(C)(5).................................................................................... 8

      1. BASED ON ITS PLAIN LANGUAGE, SECTION 3730(C)(5) ONLY APPLIES WHEN THE UNITED STATES OBTAINS A RECOVERY IN A PROCEEDING IN LIEU OF THE FCA ACTION. ...................................................................... 8

      2. THE FDCA SETTLEMENT CANNOT BE AN ALTERNATE REMEDY BECAUSE IT IS NOT A SUBSTITUTE RECOVERY FOR THE SAME FRAUDULENT CONDUCT THAT KENNEDY ALLEGES. ................................. 16

  II. THIS COURT SHOULD NOT AWARD KENNEDY A RELATOR SHARE PERCENTAGE EXCEEDING 18 PERCENT OF THE FCA SETTLEMENT..................... 18

    A.STANDARDS FOR DETERMINING RELATOR'S SHARE PERCENTAGE ......... 19

    B.THIS COURT SHOULD NOT CONSIDER THE CONTRIBUTIONS OF THE RELATORS BARRED FROM A SHARE BY THE FIRST-TO-FILE BAR IN DETERMINING KENNEDY'S SHARE ....................................................... 20

    C.KENNEDY PROVIDED HELPFUL, BUT LIMITED, CONTRIBUTIONS. ............. 21

    D.THE SETTLEMENT WAS THE PRODUCT OF SIGNIFICANT WORK BY THE UNITED STATES ........................................................................................ 26

    E.THE ABSENCE OF LITIGATION SUPPORTS A LOWER SHARE. ...................... 26

    F.OTHER FACTORS RAISED BY KENNEDY DO NOT SUPPORT A 24 PERCENT RELATOR SHARE AWARD. ....................................................................... 27

CONCLUSION.................................................................................................................. 29

## TABLE OF AUTHORITIES

**Statutes**

21 U.S.C. § 332 ............................................................................................................... 7

21 U.S.C. § 355–1 .......................................................................................................... 2

31 U.S.C. § 3730 ................................................................................................... passim

31 U.S.C. §§ 3729-3733 ................................................................................................ 1

31 U.S.C. § 3729…….……………………………………………………………...…18

**Cases**

*Ervin and Assoc., Inc. v. United States*,
    2003 U.S. Dist. LEXIS 2506420 (D.D.C. Aug. 14, 2003) ..................................... 16

*Hughes Aircraft Co. v. Jacobson*,
    525 U.S. 432 (1999) ................................................................................................ 8

*United States ex rel. Alderson v. Quorum Health Group, Inc.*,
    171 F.Supp.2d 1323 (M.D. Fla. 2001) ............................................................ 16, 28

*United States ex rel. Babalola v. Sharma*,
    746 F.3d 157 (5th Cir. 2014) ........................................................................... 10-11

*United States ex rel. Barajas v. United States*,
    258 F.3d 1004 (9th Cir. 2001) .................................................................. 10, 16, 17

*United States ex rel. Bledsoe v. Cmty. Health Sys.*,
    342 F.3d 634 (6th Cir. 2003) ................................................................................ 10

*United States ex rel. Burr v. Blue Cross and Blue Shield of Florida, Inc.*,
    882 F. Supp. 166 (M.D. Fla. 1995) ...................................................................... 20

*United States ex rel. Coughlin v. Int'l Business Machines Corp.*,
    992 F. Supp. 137 (N.D.N.Y. 1998) ................................................................ 20, 27

*United States ex rel. Fox. v. Northwest Nephrology Assoc.*,
    87 F. Supp. 2d 1103 (E.D. Wash. 2000) .............................................................. 19

*United States ex rel. LaCorte v. Wagner*,
    185 F.3d 188 (4th Cir. 1999) ................................................................................. 9

*United States ex rel. Mustafa v. Najjar*,
    120 F.Supp.3d 1322 (M.D. Fla. 2015) ................................................................ 16

*United States ex rel. Oehm v. Nat'l Air Cargo, Inc.*  Case No. 05-CV-242S, ECF No. 31,
(W.D.N.Y. Feb. 15, 2008) …………………….................................................................11, 12-13

*United States ex rel. Pallares v. Itani*, Case No. 4:05-c-v-03018, ECF No. 79,
(S.D. Tex. Jul. 2, 2010)…………………………………………………………………………15

*United States ex rel. Pallares v. Itani*, Case No. 4:05-c-v-03018, ECF No. 91 at 33-34
(S.D. Tex. Nov. 3, 2010)....................................................................................... ......16

*United States ex rel. Shea v. Verizon Communs., Inc.,*
844 F. Supp. 2d 78 (D.D.C. 2012) ................................................................... 24-25

*United States ex rel. Simmons v. Samsung Elec. Am. Inc.*,
116 F.Supp.3d 575 (D. Md. 2015) .................................................................. 19-20

*United States ex rel. Springfield Terminal Ry. v. Quinn*,
14 F.3d 645 (D.C. Cir. 1994) .......................................................................... 19

*United States ex rel. Wittenberg v. Public Utility District No. 1 of Skamania Cnty., No. 3:14-CV-00213- AC*, 2016 WL 6518438 *4 (D. Ore. Nov. 1, 2016) ........................................... 21

*United States v. Covington Technologies, Co., No. CV-88-5807-JMI*
(BX), 1991 WL 643048 *1 (C.D. Cal. Oct. 21, 1991) .................................... 19, 27

*United States v. General Electric,*
808 F. Supp. 580 (S.D. Ohio 1992) ................................................................ 19

*United States v. L - 3 Communs. EOTech, Inc.,*
921 F.3d 11 (2d Cir. 2019) ............................................................................ 14

*United States v. Kurlander,*
24 F.Supp.3d 417 (D. N.J. 2014) ................................................................... 16

*United States v. Robinson*,
710 F.3d 434 (D.C. Cir. 2013) ...................................................................... 89

*United States v. Slatten*,
865 F.3d 767 (D.C. Cir. 2017) ...................................................................... 8

## Legislative Materials

S. Rep. No. 99-345, at 1 (1986), *reprinted* in 1986 U.S.C.C.A.N. 5266. ......................... 5, 10, 20

# INDEX OF EXHIBITS

Exhibit 1:     Declaration of William E. Olson

Exhibit 2:     Copy of *United States ex rel. Oehm v. Nat'l Air Cargo, Inc.*  Case No. 05-CV-242S, ECF No. 31, at 9 (W.D.N.Y. Feb. 15, 2008)

Exhibit 3:     February 9, 2010, E-mail Chain

v

**INTRODUCTION**

On July 26, 2017, with the consent of the relators, the United States and Novo Nordisk, Inc. ("Novo Nordisk") reached a settlement agreement to resolve claims that Novo Nordisk violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, by causing false or fraudulent claims for Victoza to be submitted to, or causing purchases by, Federal Healthcare Programs. When the FCA Settlement Agreement became effective, Relator Elizabeth Kennedy ("Kennedy") was aware that the United States was entering into a contemporaneous settlement agreement with Novo Nordisk under the Food, Drug and Cosmetic Act ("FDCA"). With this awareness, the parties submitted a joint stipulation of dismissal under which Kennedy agreed that the FCA Settlement was a fair resolution of her claims and only retained a claim to a share of the FCA Settlement.

The Court later ruled that Kennedy is the only proper relator as to the settled FCA allegations. ECF No. 112 at 30-32. Kennedy's current motion now asks the Court to resolve two final issues: (1) whether she is entitled to a share of the FDCA Settlement recovery as an "alternate remedy" under 31 U.S.C. § 3730(c)(5) and (2) to what percentage of the relevant proceeds is she entitled to. Kennedy demands 24 percent of both the FCA Settlement, or $10.47 million, and the FDCA Settlement, or $2.94 million, for a total award of $13.41 million.

This Court should deny Kennedy's claim under Section 3730(c)(5) to a share of the FDCA Settlement Amount for three reasons. First, Kennedy dismissed her claim to such a share. Second, where as here the government settled Kennedy's *qui tam* action, and Kennedy agreed the settlement was fair, adequate, and reasonable, Kennedy has no right to a share of the FDCA Settlement Amount under Section 3730(c)(5) because the United States did not choose this recovery in lieu of seeking a recovery in this *qui tam* action. Third, the FDCA Settlement

involved a recovery for Novo Nordisk's alleged shipments of misbranded Victoza in interstate commerce under the FDCA that could not be remedied through this *qui tam* action.

This Court should also deny Kennedy's claim to a share of 24 percent of the FCA Settlement.  Taking into full consideration Kennedy's contributions, she should be awarded no more than $7,852,481.46 (or 18 percent) of that settlement.  While Kennedy made contributions that warrant an award of up to $1.35 million above the statutory minimum, Kennedy's contributions ended several years ago and the settlement was the result of the United States' additional and extensive investigation of and dealings with Novo Nordisk.  Kennedy's helpful but limited contributions warrant a relator share at the lower rather than the higher end of the statutory range.

## BACKGROUND

On January 25, 2010, the Food and Drug Administration ("FDA") approved a New Drug Application ("NDA") for Victoza as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.  *Id*. at 2, Recital B.  The FDA approved labeling for Victoza included a warning about the unknown risk of thyroid C-Cell tumors, including medullary thyroid cancer ("MTC") associated with the use of Victoza.  *Id*. at 2-3, Recital C.  The FDA approved the NDA for Victoza with a Risk Evaluation and Mitigation Strategy ("REMS") to ensure that the benefits of Victoza outweighed the potential risks, including the potential risk of MTC associated with Victoza.  *Id*. at 3, Recital D, *see also* 21 U.S.C. § 355–1.

The REMS required Novo Nordisk to develop a Communication Plan that included steps for communicating information about the potential risk of MTC associated with Victoza to healthcare providers.  ECF No. 116-1 at 3, Recital E.  The Victoza REMS Communication Plan required Novo Nordisk to communicate this information in various forms, including in a letter to likely prescribers and in a "Highlighted Information for Prescribers" ("HIP-D") document

2

provided by Novo Nordisk sales representatives who met with healthcare providers for the primary purpose of increasing the number of Victoza prescriptions those healthcare providers issued.  *Id*.

On July 26, 2017, the United States entered into a Settlement Agreement with Novo Nordisk and the relators in seven separately filed *qui tam* actions,[1] to resolve allegations that Novo Nordisk violated the FCA based on conduct arising from its marketing, promotion, and sale of Victoza in the January 1, 2010, to December 31, 2014 time-frame.  *See* ECF 116-1 ("FCA Settlement Agreement").  The FCA Settlement resolved allegations that Novo Nordisk caused false or fraudulent claims for Victoza to be submitted to, or caused purchases by, Federal Healthcare Programs in violation of the FCA.  *Id*. at 6-8, Recital K.  Pursuant to the FCA Settlement Agreement, Novo Nordisk paid the United States and the Medicaid Participating States the sum of $46.5 million, plus accrued interest.  *Id*. at 9, ¶ 1.  Of the $46.5 million, $43,179,036.87 was the federal recovery and $3,320,963.13 was the States' recovery.  *Id*.  The federal settlement amount represents a damages recovery under the FCA for losses to Federal Healthcare Programs.

Contemporaneous with the execution of the FCA Settlement Agreement, the United States and Novo Nordisk entered into a separate settlement agreement to resolve claims that Novo Nordisk violated the FCDA in its shipments of Victoza in interstate commerce.  ECF 116-2 ("FDCA Settlement Agreement").  Pursuant to the FDCA Settlement Agreement, Novo

---

[1] The *qui tam* actions against Novo Nordisk other than this action were:  *United States, et al. ex rel. Dastous v. Novo Nordisk, Inc*., Civ. Action No. 11-01662 (D.D.C.); *United States, et al., ex rel. Ferrara, et al. v. Novo Nordisk, Inc., et al*., Civ. Action No. 1:11-cv-00074 (D.D.C.); *United States, et al., ex rel. Myers v. Novo Nordisk, Inc.*, Civ. Action No. 1:11-cv-01596 (D.D.C.); *United States, et al., ex rel. Stepe v. Novo Nordisk, Inc., et al.*, Civ. Action No. 1:13-cv-00221 (D.D.C.); *United States, et al., ex rel. Doe v. Novo Nordisk, Inc., et al.*, Civ. Action No. 1:17-00791 (D.D.C.) and *United States ex rel. Smith, et al. v. Novo Nordisk, Inc*., Civ. Action No. 16-1605 (D.D.C.).

Nordisk paid the United States $12,150,000 as disgorgement of ill-gotten gains from its sales of Victoza.

After execution of the FCA Settlement Agreement, six of the groups of relators disputed which of them was entitled to a share of the FCA recovery.[2]  In her motion asserting that she was the only proper relator, Kennedy also claimed to reserve the right to file a separate motion for a share of the proceeds of the FDCA Settlement pursuant to 31 U.S.C. § 3730(c)(5).  ECF No. 96 at 15, n.8.  On April 8, 2019, the Court ruled that under the first to file bar of the FCA, Kennedy was the only relator eligible to receive a share of the FCA settlement and that she is entitled to an award of at least 15 percent of the federal proceeds of the FCA Settlement Agreement.  ECF Nos. 111-112.  The Court declined to rule on Kennedy's claim to a share of the FDCA Settlement Amount because it was neither properly raised in a motion nor adequately briefed.  *Id*.  The Court dismissed the claims of the remaining relators to a relator share with prejudice on July 25, 2019.[3]

On June 12, 2019, Kennedy filed her current motion that presents the following two final issues for Court resolution.  ECF No. 116.  First, Kennedy asks the Court to determine whether she is entitled to a share of the FDCA Settlement recovery as an "alternate remedy" under 31 U.S.C. § 3730(c)(5).  Second, Kennedy asks the Court to determine to what share percentage, if any, above 15 percent of the applicable recovery she is entitled.

## LEGAL STANDARDS

The FCA is the Federal Government's primary tool for recovering money lost from the United States Treasury due to fraud.  *See* 132 Cong. Rec. H9382-03 (Oct. 7, 1986) (Statement of

---

[2] Relators in the *Smith, et al.,* Civ. Action No. 16-1605, action did not seek a relator share award.

[3] *See* 1:11-cv-01662-RBW, ECF No. 87, 1:11-cv-00074-RBW, ECF No. 105; No. 1:11-cv-01596, ECF No. 83; 1:13-cv-00221-RBW, ECF. No. 73; 1:17-cv-00791-RBW, ECF No. 86.

Rep. Glickman); S. Rep. No. 99-345, at 1 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266.  The FCA contains a provision allowing a private person — a "relator" — to file what is known as a *qui tam* action on behalf of the United States to recover the Government's damages, receiving in return a bounty in the form of a share of the recovery.  When the United States intervenes in and settles claims in a *qui tam* action, as the United States did here, a qualifying relator is entitled to a share of between 15 and 25 percent of the proceeds of the FCA recovery received by the federal government.  31 U.S.C. § 3730(d)(1).

 A successful *qui tam* relator is also entitled to receive reasonable attorneys' fees, expenses, and costs from defendants.  *Id*.  In addition, the FCA protects relators from retaliation. 31 U.S.C. § 3730(h).  Under this section, a whistleblower is "entitled to all relief necessary" to make her whole if she is "discriminated against" in her employment as a result of having brought the *qui tam* action.  *Id*.

Thus, in addition to a share of the United States' recovery, a relator may separately recover from a defendant additional amounts for attorneys' fees as well as any damages or other monies necessary to compensate her for any retaliation she suffered as a result of being a whistleblower.  It is our understanding that Kennedy separately resolved her claims for attorneys' fees and other relief from Novo Nordisk.  *See* ECF Nos. 89, 91.

In addition, the FCA contains an "alternate remedy" provision, 31 U.S.C. § 3730(c)(5), that provides a relator rights where the government chooses to pursue the same FCA allegations contained in the relator's *qui tam* through other means in lieu of the *qui tam* action.  For the reasons discussed below, Kennedy dismissed her claim under Section 3730(c)(5), and even if the Court does not deem that claim dismissed, she is not entitled to a share of the proceeds of the FDCA Settlement recovery under that provision because it does qualify as an alternate remedy.

## ARGUMENT

I.    **Kennedy Is Not Entitled to Any Share of the FDCA Settlement.**

    A.  **Kennedy Dismissed Any Claim Under Section 3730(c)(5) To A Share of the FDCA Settlement.**

The Court should reject Kennedy's claim to a share award of the civil FDCA settlement under 31 U.S.C. § 3730(c)(5) because Kennedy voluntarily dismissed any such claim.  Prior to filing her joint stipulation of dismissal in this case, Kennedy knew that the United States was entering a separate settlement with Novo Nordisk, contemporaneous with the FCA settlement, to resolve claims under the FDCA.

In her declaration in support of Kennedy's Motion, Kennedy's counsel Sarah M. Frazier acknowledged her awareness of a United States settlement with Novo Nordisk in addition to the FCA settlement, even if she had not been informed of the terms of such a settlement. Specifically, Frazier notes that she knew about the federal investigation of Novo Nordisk being conducted in parallel to the FCA investigation and that she discussed the potential settlement separate from the FCA resolution with counsel for the United States, including in two 2016 phone calls.  ECF No. 116-3 at 4, ¶ 9.  Moreover, Frazier acknowledges that the draft FCA Settlement Agreement of July 7, 2017, that she received referenced the separate FDCA Settlement.  *Id*. at 116-3 at 4, ¶ 13.  On July 24, 2017, Kennedy and her counsel, Frazier, executed the FCA Settlement Agreement which stated in Recital H that:  "Contemporaneous with the execution of this Agreement, Novo Nordisk will enter into a separate agreement with the United States of America to resolve an action brought in the United States District Court for the District of Columbia under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 332, arising from the sale of Victoza ('FDCA Settlement Agreement')."  *See* ECF No. 116-1 at 5-6, 25.  Kennedy does not contend that counsel for the United States ever told her or her counsel that

the resolution separate from the FCA settlement would not have a monetary component. *See* Declaration of William E. Olson ¶ 15, attached as Exhibit A.

With this knowledge that United States and Novo Nordisk were entering a settlement agreement separate from the FCA resolution, the parties filed a joint stipulation of dismissal of Kennedy's *qui tam* action on August 3, 2017. The joint stipulation asked the Court only to retain jurisdiction over Kennedy's claim to a share of the proceeds of the FCA *qui tam* action under 31 U.S.C. § 3730(d) and not any claim to a share of a recovery outside of this civil action under 31 U.S.C. § 3730(c)(5). *See* ECF No. 76 at 2-3. Presumably, Kennedy only sought to retain a share of the FCA Settlement because she stipulated that the FCA Settlement fairly and reasonably resolved her *qui tam* allegations. *Id*. at 2. The stipulation provided that:

> The United States, the Named Plaintiff States, and Relator further stipulate that Relator's claims, if any, for a share of the proceeds of the Federal Settlement Amount pursuant to 31 U.S.C. § 3730(d) or the Medicaid State Settlement Amounts pursuant to any similar state statute shall not be prejudiced until they are settled, adjudicated or otherwise resolved. The Court shall retain jurisdiction to adjudicate, if necessary, Relator Kennedy's claim, if any, to a share of the proceeds of the Civil Action pursuant to 31 U.S.C. § 3730(d) and pursuant to any similar state statute.

*Id*. The term "Federal Settlement Amount" refers solely to the federal FCA recovery in the FCA Settlement Agreement. *See* ECF No. 116-1 at 9.

Consistent with the parties' joint stipulation, the Court entered an order only retaining jurisdiction over Kennedy's claim to a share of the FCA settlement amount. ECF No. 85 at 2. The Court's order provided that:

> 3.      This dismissal is without prejudice to Relator's claim, if any, for a share of the proceeds of the Federal Settlement Amount pursuant to 31 U.S.C. § 3730(d) or the Medicaid State Settlement Amounts pursuant to any similar state statute.

> 4.      The Court shall retain jurisdiction to adjudicate, if necessary, Relater Kennedy's claim, if any, to a share of the proceeds of the Total Settlement Amount pursuant to 31 U.S.C. § 3730(d) and pursuant to any similar state statute.

*Id.* Based on the stipulation and dismissal order, this Court should find that Kennedy did not preserve a claim to a share of the FDCA recovery under Section 3730(c)(5).

**B.  The FDCA Settlement Is Not An Alternate FCA Remedy Under 31 U.S.C. § 3730(c)(5).**

Kennedy's claim to a share of the FDCA Settlement also fails because that settlement simply does not qualify as an alternate remedy.  The FCA's alternate remedy provision, 31 U.S.C. § 3730(c)(5), provides a relator rights where the government chooses to pursue the same FCA allegations contained in the relator's *qui tam* through other means in lieu of the *qui tam* action.  In this case, the United States did not settle the relator's claims through other means.  Rather, the United States settled Kennedy's *qui tam* action, a settlement that Kennedy agreed was fair, adequate, and reasonable.  Moreover, the FDCA settlement was not a substitute for any FCA action because it involved a recovery for Novo Nordisk's alleged shipments of misbranded Victoza in interstate commerce under the FDCA that could not be remedied through the FCA.

**1.  Based On Its Plain Language, Section 3730(c)(5) Only Applies When the United States Obtains a Recovery in a Proceeding In Lieu of the FCA Action.**

In interpreting a statute, the Court begins with the statutory text.  *See, e.g.*, *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999); *United States v. Slatten*, 865 F.3d 767, 832 (D.C. Cir. 2017).  The D.C. Circuit has stated that when the statutory language's "meaning is plain and unambiguous as to the disputed issue, that is where we stop." *United States v. Robinson*, 710 F.3d 434, 435 (D.C. Cir. 2013).

Section 3730(c)(5) only provides a relator rights where the United States has elected to pursue claims that the relator raised in the *qui tam* action through an *"alternate"* remedy.  31 U.S.C. § 3730(c)(5).  Specifically, Section 3730(c)(5) provides in pertinent part:

> Notwithstanding subsection (b), the Government *may elect to pursue its claim through any alternate remedy* available to the Government, including any

> administrative proceeding to determine a civil money penalty.  If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have *had if the action had continued under this section*.  Any finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to an action under this section.

31 U.S.C. § 3730(c)(5) (emphasis added).

 "Alternate" means "a choice between two or among more than two objects or courses." Webster's Third New International Dictionary (1993).  Applying this plain meaning of the term "alternate,"  a relator has no rights under Section 3730(c)(5) where the United States did not choose to pursue a claim raised by a relator through a proceeding in lieu of the *qui tam* action but instead settled relator's claim in the *qui tam* action.

Circuit courts have consistently recognized and applied this plain meaning of the term "alternate" within Section 3730(c)(5).  In *United States ex rel. LaCorte v. Wagner*, the Fourth Circuit addressed a district court ruling that Section 3730(c)(5) authorized relators from a *qui tam* action in which the United States previously intervened and settled to intervene in portions of a settlement of a subsequently filed *qui tam* action against different defendants that allegedly would not have occurred but for relators' initial *qui tam* action. 185 F.3d 188, 190 (4th Cir. 1999).  Finding that the alternate remedy provision does not confer intervention rights, the *LaCorte* court held that "Section 3730(c)(5) simply preserved the rights of the original qui tam plaintiffs when the government resorts to an alternate remedy *in place of the original action*." *Id.* at 191 (emphasis added).  The *LaCorte* court further found that the United States' settlement of the subsequent *qui tam* action could not have been an "alternate" remedy as to the initial *qui tam* relators because the United States had "intervened in the [initial] action, prosecuted it, and settled it with plaintiffs' consent." *Id.* at 192.

Similarly, the Sixth and Ninth Circuits both recognized the plain meaning of the term "alternate" within Section 3730(c)(5) when remanding cases for consideration of relators' alternate remedy claims where the United States reached settlements in actions in lieu of pursuing the *qui tam* actions. *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 342 F.3d 634, 637, 649-51 (6th Cir. 2003); *United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1012-13 (9th Cir. 2001). The *Bledsoe* court held "that a settlement pursued by the government *in lieu of* intervening in a *qui tam* action asserting the same FCA claims constitutes an 'alternate remedy' for purposes of 31 U.S.C. § 3730(c)(5)." 342 F.3d at 349 (emphasis added). The *Barajas* court likewise recognized the plain meaning of "alternate" in Section 3730(c)(5) as referring to a remedy that the United States chooses in lieu of pursuing relator's *qui tam* action when stating:

> The use of the term ''alternate remedy'' makes clear that the *government must choose one remedy or the other; it cannot choose both*. If the government chooses to intervene in a relator's action, and if the government recovers any proceeds in the action, the relator has a right to a share of those proceeds. If the government chooses not to intervene in the relator's action, but, instead, chooses to pursue ''any alternate remedy,'' the relator has a right to recover a share of the proceeds of the ''alternate remedy'' to the same degree that he or she would have been entitled to a share of the proceeds of an FCA action.

258 F.3d at 1010 (emphasis added).

The Fifth Circuit also applied this plain meaning of the term "alternate" when affirming a district court's ruling that a relator has no claim to a share under Section 3730(c)(5) of a recovery that the government obtained prior to the filing of the relators' *qui tam* action. *United States ex rel. Babalola v. Sharma*, 746 F.3d 157, 161-63 (5th Cir. 2014). Holding "that for a remedy to be 'alternate' to the qui tam proceeding, there must have been two proceedings from which to choose," the *Babalola* court observed that "[t]he word 'alternate,' as used in this context, is

defined as 'a choice between two or among more than two objects or courses.'" *Id*. at 162

(*quoting* Webster's Third New International Dictionary (1993) at p. 63).

The legislative history for the alternate remedy provision is consistent with the plain

meaning of the term "alternate" ultimately enacted in Section 3730(c)(5). Specifically, the 1986

Senate Report indicates that the alternate remedy provision provides a relator a right to recover if

the United States ultimately elects to pursue its claims through an administrative remedy in lieu

of the *qui tam* action. S. Rep. No. 99-345, at 27, 1986 U.S.C.C.A.N. at 5292.[4] The 1986 Senate

Report contains no suggestion that the alternate remedy provision was intended to provide a

relator a right to an award of a recovery outside of the *qui tam* action when the United States

obtained a recovery in the *qui tam* action. *See, e.g. United States ex rel. Oehm v. Nat'l Air*

*Cargo, Inc.* Case No. 05-CV-242S, ECF No. 31, at 9 (W.D.N.Y. Feb. 15, 2008), attached as

Exhibit B ("The Senate Committee report confirms that Congress envisioned the 'alternate

remedy' provision to apply only when the government elects not to intervene in or pursue the

relator's *qui tam* action").

The fundamental limitation on the scope of Section 3730(c)(5) – that it applies only when

the government attempts to settle the relator's claim through a remedy other than settlement of

the *qui tam* action itself – does not mean that a relator is bereft of any remedy in a situation

---

[4]  In relevant part, the 1986 Senate Report stated:

> The Committee intends that if civil monetary penalty proceedings are available, the Government *may elect to pursue the claim either judicially or through an administrative civil penalty proceeding. In the event that the Government chooses to proceed administratively*, the qui tam relator retains all the same rights to copies of filings and depositions, to objections of settlements or dismissals, to taking over the action if the Government fails to proceed with 'reasonable diligence', *as well as to receiving a portion of any recovery. . . . While the Government will have the opportunity to elect its remedy, it will not have an opportunity for dual recovery on the same claim or claims.*

Sen. Rep. No. 99-345, at 27, 1986 U.S.C.C.A.N. at 5292 (emphasis added).

where the government settles both the relator's *qui tam* action and non-FCA claims and the relator feels that the government has unfairly shifted the proceeds from the *qui tam* settlement to the non-FCA settlement.  In that circumstance, the relator may invoke its rights under 31 U.S.C. § 3730(c)(2)(B) to challenge the fairness, adequacy, and reasonableness of the *qui tam* settlement.  *See* 31 U.S.C. § 3730(c)(2)(B) (providing that the United States can settle a *qui tam* action over the objection of a relator only "if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances").

Where a settlement of a *qui tam* action passes muster under Section 3730(c)(2)(B) as being a fair, adequate, and reasonable resolution of the relator's claims, the relator may not do an end run around Section 3730(c)(2)(B) by trying to use Section 3730(c)(5) as a vehicle for claiming an additional share of a non-FCA settlement.  Nothing precludes the government from seeking parallel recoveries along with the settlement of a *qui tam* action as long as the relator recovers fair value for the resolution of its *qui tam* claims.  In such circumstances, the relator is not entitled to claim a share of the non-FCA settlements absent a separate award provision allowing a share of such a settlement (which, notably, the FDCA does not have).

This critical point – that the relator's right to challenge the sufficiency of the settlement of a *qui tam* action lies under Section 3730(c)(2)(B) and not Section 3730(c)(5) - was highlighted by the district court in *Oehm*.  Case No. 05-CV-242S, ECF No. 31.  In *Oehm*, the United States reached a global resolution with *qui tam* defendants that consisted of a settlement of the *qui tam* action, a payment by the corporate defendant of restitution, a criminal fine and a penalty in connection with a criminal plea, and a payment to settle a civil forfeiture action.  *Id*. at 3.  The *Oehm* relator contended that he was entitled to a share of the criminal and civil forfeiture recoveries, in addition to a share of the *qui tam* settlement, as an alternate remedy under Section

3730(c)(5).  *Id*. at 7.  Based on the plain meaning of the statute, the *Oehm* court held that Section 3730(c)(5) did not provide a basis for an award to a relator where the United States did not obtain the criminal and civil forfeiture recovery in lieu of a recovery in the *qui tam* action.  *Id*. at 7-9 (because "[a] plain reading of § 3730(c)(5) reveals that 'alternate remedy' refers to any remedy pursued by the government in lieu of pursuing the FCA claims," "there is no support — either in the statute or the caselaw — for the construction  . . . that 'alternate remedy' includes those remedies pursued by the government *in addition* to its pursuit of FCA claims") (emphasis in original).  Instead, *Oehm* concluded that the proper inquiry was whether the settlement was "fair, adequate, and reasonable" under Section 3730(c)(2)(B).  *Id*. at 9-12.

Here, Kennedy does not claim that the amount received to resolve her *qui tam* allegations was inadequate.  To the contrary, Kennedy stipulated that the settlement of her *qui tam* action was "fair, adequate, and reasonable" in both the FCA Settlement Agreement and the joint stipulation of dismissal.[5]  Accordingly, Kennedy has no basis to seek a share of any additional non-FCA recoveries under Section 3730(c)(5) or any other provision of law.

---

[5] Paragraph 6 of the FCA Settlement Agreement provided that:

> Relators and their heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B), and that the portions of the Total Settlement Amount allocated to the Covered Conduct set forth in Paragraph K(i) ($43,970,000) and Paragraph K(ii) ($2,530,000) are also fair, adequate, and reasonable under all the circumstances.

ECF No. 116-1 at 12.  The parties' Joint Stipulation of Dismissal provided that:

> Relator stipulates that the Total Settlement Amount and allocations thereof set forth in the Settlement Agreement and the terms and conditions described therein are fair, adequate, and reasonable under all the circumstances, that she will not challenge the settlement pursuant to 31 U.S.C. § 3730(c)(2)(B), and that she expressly waives the opportunity for a hearing on any objection to the settlement under 31 U.S.C. § 3730(c)(2)(B).

ECF No. 76 at 2.

Kennedy's arguments that the Court should ignore the plain meaning of the term "alternate" in Section 3730(c)(5) and award her a share of a non-FCA recovery in addition to a share of her *qui tam* action lack merit.  Kennedy bases her argument on the assertion that the United States' election to intervene in the *qui tam* action pursuant to 31 U.S.C. § 3730(b) does not preclude a relator from seeking an alternate remedy under Section 3730(c)(5).  Specifically, Kennedy points to the phrase "[n]otwithstanding subsection (b)" in Section 3730(c)(5) that references 31 U.S.C. § 3730(b).  Section 3730(b) states that the United States may elect to intervene and take over a *qui tam* action filed by a relator or decline to intervene.

Kennedy's focus on the United States' election decision under Section 3730(b) is misplaced.  As discussed above, a relator has no rights under Section 3730(c)(5) where the United States did not choose to pursue a *remedy* in a proceeding in lieu of obtaining a recovery in the *qui tam* action because in those circumstances the United States did not choose an "alternate" remedy.  The United States agrees that whether a relator has a claim under Section 3730(c)(5) does not turn on whether the United States elected to intervene in the *qui tam* action under Section 3730(b).  Rather, 3730(c)(5) provides no rights to a relator where the United States obtained a recovery in the *qui tam* action, regardless of the United States' election decision.  Kennedy's claim to a share of the FDCA settlement under in Section 3730(c)(5) fails here because the United States settled and obtained a recovery in the *qui tam*.[6]

The Second Circuit Court's decision in *United States v. L-3 Communications Eotech, Inc.* does not support Kennedy's position that a relator can receive a share under Section 3730(c)(5) of a separate recovery when the United States has obtained a recovery in the *qui tam* action.  921

___
[6] The United States made this argument in its Response to Relator Kennedy's Motion for Immediate Award of Relator Share, filed March 23, 2018, when stating that Kennedy is not entitled to a share of the FDCA settlement under Section 3730(c)(5) because the United States had partially intervened and obtained a FCA recovery in the *qui tam* action.  ECF No. 99 at 17-18.

F.3d 11 (2d Cir. 2019).  Instead, the *L-3* court interpreted the plain meaning of the term "alternate" in Section 3730(c)(5) consistently with other Circuit courts.  *Id*. at 27 (stating that "'[A]lternate' seems clearly to have been meant in its common usage as a synonym of the more frequently used word 'alternative'" and citing the definition of alternate as meaning ''a *choice between two or among more* than two objects or courses: *alternative*'') (citing *Webster's Third New International Dictionary* 63 (2002) (emphases added)).

In *L-3,* after a relator's *qui tam* action was voluntarily dismissed, the United States obtained a FCA settlement in an action separate from the relator's original *qui tam* action.  *Id*. at 14-17.  The *L-3* court affirmed the district court's denial of a relator share under Section 3730(c)(5) of a separate settlement to a relator whose *qui tam* action had been dismissed prior to the settlement.  *Id*. at 29.  In interpreting the term "alternate" in Section 3730(c)(5), the *L-3* court found that "§ 3730(c)(5) was meant to allow the government to choose between (1) exercising subsection (b) rights [i.e. pursuing the *qui tam* action itself] accorded to it with respect to a *qui tam* action and (2) *pursuing an alternate or substitute remedy*."  *Id*. at 27 (emphasis added).

Similarly, none of the district court cases that Kennedy cites supports her contention that Section 3730(c)(5) confers a right to a share of a non-FCA recovery in addition to a share of a *qui tam* settlement.  In each of those cases, the district court determined that the relator was entitled under Section 3730(d) to a share of FCA recoveries based on the relators' pending *qui tam* complaints.  None of those cases involved "alternate remedy" awards under Section 3730(c)(5) of a separate non-FCA recovery.  *See United States ex rel. Pallares v. Itani*, Case No. 4:05-c-v-03018, ECF No. 79, at 16, 36-39 (S.D. Tex. Jul. 2, 2010) (awarding relator a 24 percent share of the entire $13.2 million FCA settlement with the defendants under 31 U.S.C. § 3730(d), including for FCA claims that relator did not allege in her complaint, but not making any award

15

to relator under 31 U.S.C. § 3730(c)(5)); *United States ex rel. Pallares v. Itani*, Case No. 4:05-c-v-03018, ECF No. 91 at 33-34 (S.D. Tex. Nov. 3, 2010) (affirming its relator share award under 31 U.S.C. § 3730(d) of the entire FCA settlement); *United States ex rel. Mustafa v. Najjar*, 120 F.Supp.3d 1322, 1324-27 (M.D. Fla. 2015) (holding that the United States' FCA recovery from an individual who relator referenced in his complaint, but had not named as a defendant, was part of the "settlement of the claim" that the relator brought for purposes of a relator share award under 31 U.S.C. § 3730(d)); *United States ex rel. Alderson v. Quorum Health Group, Inc*., 171 F.Supp.2d 1323, 1329-30 (M.D. Fla. 2001) (rejecting the United States' contention that $5 million of the FCA recovery was not part of the "proceeds of the action or settlement of the claims" of which relator was entitled to a share under 31 U.S.C. § 3730(d)).

       **2.   The FDCA Settlement Cannot Be An Alternate Remedy Because It Is Not A Substitute Recovery For The Same Fraudulent Conduct That Kennedy Alleges.**

     Kennedy's claim for an award of a share of the FDCA settlement under Section 3730(c)(5) also fails because she does not establish that the United States obtained a recovery from Novo Nordisk in the FDCA settlement for the same fraudulent conduct that she alleges in her *qui tam* complaint.  Courts have recognized that for a proceeding to constitute an "alternate remedy" under Section 3730(c)(5), the recovery from that proceeding must be a substitute for a recovery that could have been obtained in the *qui tam* action.  *See Barajas*, 258 F.3d at 1011-12; *Ervin and Assoc., Inc. v. United States*, 2003 U.S. Dist. LEXIS 25064, Civil Action No. 01-1052, at *14-20 (D.D.C. Aug. 14, 2003); *see also United States v. Kurlander*, 24 F.Supp.3d 417, 425 (D. N.J. 2014) (finding that where criminal restitution did not provide a recovery for false claims that the United States paid, the "criminal action, therefore, cannot be considered an 'alternate remedy' because it does not purport to recover anything that would be recoverable in the *qui tam* action").

Kennedy alleged that Novo Nordisk caused the submission of false claims to Federal Healthcare Programs for payments for Victoza. ECF No. 1. Kennedy's claim for an award under Section 3730(c)(5) fails because she does not establish that the United States obtained a damages remedy for false claims to Federal Healthcare Programs through settlement of the FDCA action, which was based on Novo Nordisk's profits.

In *Barajas*, relator alleged the defendant submitted false claims by providing flight data transmitters to the government with non-compliant "damping fluid." 258 F.3d at 1006. Rather than proceed with the *qui tam* action, the United States reached a settlement of a suspension and debarment action in which the defendant agreed to make cash payments and provide compliant flight data transmitters. *Id*. Because the United States' remedy to resolve the suspension and debarment action, which consisted of a recovery for the defective damping fluid, "substantially replicated the remedy that it could have obtained if it had intervened in" the *qui tam* action, the *Barajas court* found that the recovery in that specific settlement of a suspension and debarment action was an "alternate remedy" under Section 3730(c)(5). *Id*. at 1011.

In her Motion, Kennedy focuses on the "overlap" in the FCA Settlement Agreement, the FDCA complaint, and the FDCA Settlement Agreement of the factual descriptions of Novo Nordisk's alleged conduct.[7] However, as discussed above, a proceeding only qualifies as an "alternate remedy" under Section 3730(c)(5) if it seeks a remedy that could have been pursued in the *qui tam* action.

---

[7] As required by Local Civ. R. 40.5, the United States filed its "Notice of Related Case" in the FDCA action because of this factual overlap between the conduct alleged in the *qui tam* actions and that alleged in the FDCA complaint. *United States v. Novo Nordisk*, Case No. 1:17-01820, ECF No. 2 (Sept. 5, 2017). That notice did not reflect the United States' position on whether the FDCA settlement recovery qualified as an "alternate remedy" under Section 3730(c)(5) because it did not address whether the FDCA action replicated a remedy that could have been obtained in this *qui tam* action.

In the FDCA complaint, the United States sought the equitable disgorgement of $12,150,000 of Novo Nordisk's ill-gotten gains from introducing misbranded Victoza into interstate commerce. *United States v. Novo Nordisk*, Case No. 1:17-01820, ECF No. 1, ¶ 28 (Sept. 5, 2017). Rather than damages, the United States recovered from Novo Nordisk its profits, a wholly different pot of money, and a type of recovery not available under the FCA. *See* 31 U.S.C. § 3729(a)(1) (authorizing the recovery of a "civil penalty" and also "3 times the amount of damages which the Government sustains"). Accordingly, Kennedy cannot establish a claim to a share under Section 3730(c)(5) to the FDCA Settlement because that settlement did not replicate a remedy that could have been obtained in this *qui tam* action.

## II. This Court Should Not Award Kennedy A Relator Share Percentage Exceeding 18 Percent of the FCA Settlement Amount.

The Court should deny Kennedy's request for a relator share of 24 percent, nearly the maximum possible recovery, and award her no more than 18 percent of the FCA Settlement, or no more than $7,852,481.46. Kennedy met, but did not exceed, the expectations of all relators to promptly disclose reliable, credible information, respond to requests for assistance in the United States' investigation, and cooperate with the government in its resolution of the case. Based on the limited scope of Kennedy's contributions, the separate and substantial additional investigation that the United States was required to conduct, and the fact this case was resolved prior to litigation and trial, the demanded relator share award of $10.47 million would be an inappropriate windfall.[8]

---

[8] If the Court finds that Kennedy is entitled to a share of the FDCA Settlement amount, the United States contends that such award should be no more than 18 percent for the same reasons discussed below addressing the appropriate relator share percentage of the FCA Settlement amount.

### A.  Standards for Determining Relator's Share Percentage

The FCA's *qui tam* provisions are designed to motivate those with knowledge of fraud to assist in the government's efforts to fight fraud.  "The history of the FCA *qui tam* provisions demonstrates repeated congressional efforts to walk a fine line between encouraging whistleblowing and discouraging opportunistic behavior."  *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994).  The point of the statute is to induce insiders to come forward with information regarding fraud to help recover funds for defrauded programs.  Congress thus intended the statute to balance the public interest in an award that fairly reimburses relators for their efforts and entices future relators to come forward, and maximizes the return of recovered funds to the taxpayers and defrauded programs.

Congress set a minimum share percentage – 15 percent – for relators who meet the minimum expected requirements of coming forward with useful information that results in a recovery.  Courts have concluded that relator shares above this minimum amount, particularly shares in the upper reaches of the statutory range under Section 3730(d)(1), should be limited to those cases in which the relator's conduct is extraordinary and where substantial assistance of the relator continued through complex pretrial proceedings and through trial and/or appeals.  *See e.g.*, *United States ex rel. Fox. v. Northwest Nephrology Assoc.,* 87 F. Supp. 2d 1103, 1112 (E.D. Wash. 2000); *United States v. General Electric*, 808 F. Supp. 580, 584 (S.D. Ohio 1992); *United States v. Covington Technologies, Co.*, No. CV-88-5807-JMI (BX), 1991 WL 643048 *1 (C.D. Cal. Oct. 21, 1991).  Where the relator's contributions were less extensive, courts have awarded shares at the lower end of the range.  *See e.g.*, *United States ex rel. Simmons v. Samsung Elec. Am. Inc.*, 116 F.Supp.3d 575, 581 (D. Md. 2015) (noting that "[t]he case settled primarily as a result of a substantial efforts by the Government to investigate the facts and develop the claim. Thus, absent substantial and unique assistance, [r]elator is entitled to an award at the lower end

19

of the statutory range"); *United States ex rel. Coughlin v. Int'l Business Machines Corp.*, 992 F. Supp. 137, 142 (N.D.N.Y. 1998); *United States ex rel. Burr v. Blue Cross and Blue Shield of Florida, Inc.*, 882 F. Supp. 166, 169 (M.D. Fla. 1995).

Consistent with this case law, the 1986 Senate Report identified the following three factors for determining relator share percentage that focus on relator's contributions:  (1) "the "significance of the information" provided by the relator; (2) the "contribution of the [relator] to the result obtained"; and (3) "whether the information which formed the basis of the suit was known to the [g]overnment."  *See* S. Rep. No. 99-345, at 28 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5293.

### B.  This Court Should Not Consider the Contributions of the Relators Barred From A Share by the First-to-File Bar In Determining Kennedy's Share.

This Court previously found that the relators, other than Kennedy, were barred from a relator share based on the FCA's first to file rule.  ECF No. 112.  Kennedy now asks the Court to consider the contributions of these barred relators in determining the relator share to which Kennedy is entitled after successfully arguing that the other relators were not entitled to a share. The FCA provides no statutory basis for considering the contributions of relators barred from recovering under the first to file rule in determining the appropriate amount of Kennedy's share.

The Court recognized that the FCA's first to file rule bars all of the relators, but Kennedy, from a share of the United States' recovery both for the MTC Risk Conduct and Off-Label Promotion Conduct under 31 U.S.C. § 3730(d)(1).  ECF No. 112 at 27-32.  Section 3730(d)(1) provides that the Court's determination of the appropriate share percentage award to Kennedy should depend "upon the extent to which [Kennedy] substantially contributed to the prosecution of the action."  31 U.S.C. § 3730(d)(1).  Consistent with Section 3730(d)(1), the Court should only consider Kennedy's contributions in determining the appropriate amount of the relator share

and not the other relators whose claims to a relator share are barred.  *See, e.g., United States ex rel. Wittenberg v. Public Utility District No. 1 of Skamania Cnty.*, No. 3:14-CV-00213- AC, 2016 WL 6518438 *4 (D. Ore. Nov. 1, 2016) (observing the fact that a third party, and not the relator, developed the measurements that were ultimately relied upon in settlement negotiations supported a lower relator share award).

### C.  Kennedy Provided Helpful, But Limited, Contributions.

Based on an examination of her specific contributions to the investigation of the settled claims in the FCA Settlement Agreement, Kennedy's contributions do not warrant a relator share award of 24 percent - near the top of the statutory range.  The FCA Settlement resulted from an extensive government investigation that went well beyond the information that Kennedy provided and the resolution was completed prior to any litigation.

The FCA Settlement resolved claims based on conduct falling within two categories that this Court previously labeled "MTC Risk Conduct" and "Off-Label Promotion Conduct."  ECF No. 112 at 5.  Both categories of settled conduct involved nationwide allegations and Novo Nordisk personnel at different corporate levels.  In particular, with respect to the MTC Risk Conduct, the FCA settlement resolved allegations that: (1) "[a]fter Victoza was approved, Novo Nordisk provided the sales force with training to appropriately implement the REMS, but also provided them with information that had the overall effect of arming them with messages that could create a false or misleading impression with physicians that the Victoza REMS MTC risk message was erroneous, irrelevant, or unimportant" and that (2) "Following the training, certain Novo Nordisk sales representatives made false or misleading statements that were designed to avoid and circumvent the requirements of the Victoza REMS Communication Plan."  ECF No. 116-1 at 7-8, Recital K(i).

In addition, the MTC Risk Conduct included allegations about actions by the Novo Nordisk Vice President, Diabetes Marketing, and certain Novo Nordisk sales representatives, implementing a FDA-required May 5, 2011, modification to the Victoza REMS. *Id*. at 7-8, Recital K(i)(f). The FDA's May 5, 2011, modification arose from the results of surveys, which Novo Nordisk conducted as part of its REMS obligations, of the awareness and understanding of endocrinologists and primary physicians about the unknown risks of MTC associated with Victoza. *See id.* at 3-4, Recital F. As a result of the survey findings suggesting roughly half of the surveyed primary care physicians were unaware of the unknown MTC risk associated with Victoza, the FDA modified the REMS requiring Novo Nordisk to send primary care physicians a letter about the unknown MTC risk associated with Victoza. *See id*. The MTC Risk Conduct included allegations that:

> when delivering to primary care physicians a letter required by the May 5, 2011 modification to the Victoza REMS, certain Novo Nordisk sales representatives, executing instructions from Novo Nordisk's Vice President, Diabetes Marketing, told primary care physicians in June 2011 that there were no new safety concerns with Victoza and that the letter was simply the second part of the REMS requirement, which was a false or misleading message and contradicted the REMS modification that FDA deemed to be "new safety information."

*Id*. at 6-7, Recital K(i)(f).

As this Court recognized, Kennedy's complaint put the United States on notice about both the MTC Risk Conduct and the Off-Label Promotion Conduct. ECF No. 112 at 18-19, 31-32. As described in her Motion, Kennedy also made some contributions within the first two years of the investigation that support a relator share award above 15 percent. Kennedy provided some information about Novo Nordisk's management instructions about implementing the REMS, including information about Novo Nordisk's Las Vegas Victoza launch meetings and instructions that Kennedy received on how to address Victoza MTC risk questions after the HIP-D information required by the Victoza REMS communications plan was provided, and physician

reports of their interaction with Novo Nordisk sales representatives soon after Novo Nordisk's launch of Victoza.

Kennedy's contributions, however, do not warrant a relator share of 24 percent in light of the limits of her relevant knowledge and contributions and the extensive additional investigation of Novo Nordisk that the United States had to undertake to obtain this resolution. Kennedy states that Novo Nordisk terminated her on April 22, 2010, less than three months after the FDA approved the Victoza NDA and Novo Nordisk launched the drug. ECF No. 1 ¶ 4. Kennedy thus had personal knowledge of Novo Nordisk's internal operations for less than three months after Novo Nordisk's Victoza launch. In addition, Kennedy's knowledge is limited by the nature of her Novo Nordisk position. Kennedy worked for Novo Nordisk as a sales representative in the "Mobile Alabama West Territory" and called on primary care physicians. *See id*. ¶¶ 4, 80.

As a result, Kennedy lacked access to information about the alleged nationwide conduct which involved different levels of Novo Nordisk personnel and continued over a multi-year time-frame. In particular, having left Novo Nordisk on April 22, 2010, Kennedy did not have personnel knowledge of either Novo Nordisk's instructions about the FDA's May 5, 2011, modification of the Victoza REMS or Novo Nordisk's sales representatives' statements to physicians about that modification, both of which were components of the settled conduct.

The evidence Kennedy did provide demonstrates these limits to Kennedy's knowledge and contributions. For instance, Kennedy relies on her disclosure of a February 9, 2010, e-mail chain, that she received from her direct supervisor, Paul Humenansky, to support her share demand. *See* BAK 00373 – 00375 attached as Exhibit C; ECF No. 1, ¶ 80. The February 9, 2010, e-mail chain forwards a purported field report on sales calls that day on endocrinologists in

the Dallas/Plano Texas territory and discussed the endocrinologists' reaction to the MTC REMS

risk message.  Ex. C at BAK 00374-75.

While relevant to the issue of Novo Nordisk's handling of the Victoza REMS MTC risk

message, the February 9, 2010, e-mail lacked explicit directions to the Novo Nordisk's sales

force about what to say about the Victoza REMS MTC risk message to physicians and only was

received by managers and salespeople within certain geographic areas.  In its investigation, the

United States needed to develop evidence on the instructions that Novo Nordisk management

provided to salespeople on the REMS MTC risk message and what the salespeople actually said

to physicians.

Similarly, Kennedy relies on a copy of a March 2010 report prepared by third party

Impact RX titled "US Weekly Launch Tracker" that contained reports on "physician verbatims"

that reported on physician's recollections of the sales messages delivered by Novo Nordisk sales

representatives.  *See* ECF Nos. 1-4 to 1-11.  The Court previously found that the Impact RX

reports put the United States on notice of the MTC Risk Conduct but noted that the Court had

"not consider[ed] the value of the evidence . . . . which is relevant only to the Court's

determination of the amount of the settlement funds."  ECF No. 112 at 22 n.11.  As with the

February 2010 e-mail, the Impact RX reports did not identify either physicians or the Novo

Nordisk sales representative by name, covered only specific a limited time-frame, and did not

discuss the particular instructions that Novo Nordisk management provided to its sales

representatives.  All of this information had to be fleshed out by the United States' additional

investigation which required substantial time and resources as discussed further below.

The involvement of Kennedy and her counsel during the course of the investigation also

does not support the demanded share at the top end of the statutory range.  Notably, in *United*

*States ex rel. Shea v. Verizon Commc'ns, Inc.*, the Court awarded a 20 percent relator share based, in part, on the fact that the relator and his counsel "worked very closely" with the government "throughout its investigation," drafting legal memoranda and proposed subpoena requests, and the relator himself "spent hundreds of hours on the case, both pre-filing and post-filing," meeting with government counsel, investigators, and auditors "more than 10 times."  844 F. Supp. 2d 78, 86-87 (D.D.C. 2012).

Kennedy and her counsel were not as closely involved in the Novo Nordisk investigation as the *Shea* relator and his counsel, whose contributions were found to warrant a share only in the middle of the statutory range.  In her disclosure statements submitted within the first ten months of the beginning of the investigation, Kennedy primarily provided the government with relevant documents in her possession.  *See* ECF No. 116-3 ¶¶ 5-6.  The August 31, 2011, First Supplemental Disclosure Statement also included a draft subpoena, but this was months after the United States had already served subpoenas on Novo Nordisk, and a list of potential witnesses, which is the type of assistance relators commonly provide.  ECF No. 116 at 42-43; Ex. A. ¶ 10.

Kennedy's subsequent involvement in the investigation was limited.  At the United States' request, Kennedy, through her counsel, provided three written responses in 2012 to the United States' questions about her knowledge about certain areas of interest that arose in the United States' investigation.  ECF No. 116 at 43, ECF No. 116-3 ¶ 5.  After 2012, Kennedy herself did not have involvement with the investigation.  Rather, Kennedy's counsel continued to send communications to the United States, a number of which contained publicly available information.  *See* ECF No. 116-3 ¶ 6.  Such counsel contribution should be given less weight because the FCA separately provides for compensation for a relator's counsel for their fees and costs incurred in a successful *qui tam* action.  31 U.S.C. § 3730(d)(1).

**D. The Settlement was the Product of Significant Work by the United States.**

The United States undertook a substantial investigation of Relator's allegations regarding Novo Nordisk that involved agents from six different government agencies. Exhibit A ¶ 5. Both the MTC Risk Conduct and Off-Label Promotion Conduct involved nationwide allegations about the instructions that various levels of Novo Nordisk management provided and the statements that Novo Nordisk made to physicians based on those instructions.

In its investigation, the United States took numerous investigative steps to evaluate the full scope of the alleged conduct. Specifically, the United States obtained from Novo Nordisk, through subpoenas issued on February 9, 2011 and February 23, 2011, over 3.5 million pages of documents. Ex. A ¶ 10. The United States also obtained 750,000 pages of material through subpoenas to eight non-parties. *Id.* ¶ 11. Moreover, the United States interviewed at least 27 former Novo Nordisk employees, other than Relators, in the course of the investigation. *Id.* ¶ 12. The government met in-person with Novo Nordisk counsel eight times, and spoke by phone at least six times, about the substance of the allegations and/or resolution of this matter. *Id.* ¶ 13. All told, the government spent well over 1,000 hours on this matter. *Id.* ¶ 9. This is not a case where a settlement was obtained before any litigation because the relator brought a fully developed case to the government that required little additional time and effort. The United States' significant investigation required to obtain the settlement in this case supports a share at the lower end of the statutory range.

**E. The Absence of Litigation Supports a Lower Share.**

In addition to the United States' substantial investigation and the limitations in Kennedy's contributions, the fact this case was not litigated weighs against a relator share at the top end of the statutory range. There was no discovery, no depositions, no pretrial activity, and

no trial (or appeal). The absence of any need for a relator to participate in discovery and a trial is a substantial factor weighing against Kennedy's requested share.

For example, the *Coughlin* court found that "[a]s the government correctly notes, percentage awards above 15% are rare and occur when the relator goes above and beyond the norm by substantially contributing to the prosecution of the action."  992 F. Supp. at 142.  The *Coughlin* court further noted that "the argument that the maximum recovery should be reserved for those cases where substantial assistance on the part of the relator continues throughout discovery and trial rather than where settlement is achieved is compelling." *Id.* (*quoting Covington,* 1991 WL 643048, at *1).

To grant a relator 24 percent of a settlement recovery regardless of when the case settles would leave the relator who must go through a trial, with all of a trial's attendant demands, with less incentive to cooperate fully throughout and no additional benefits for suffering these additional burdens.  Here, Kennedy seeks to increase her percentage share to a level commensurate with a percentage appropriate for a relator who participates in discovery, motions practice, and through trial.  Having not endured the demands of lengthy litigation and trial, a relator share award of 24 percent is not appropriate.

### F.  Other Factors Raised by Kennedy Do Not Support a 24 Percent Relator Share Award.

Kennedy relies on additional factors identified in the DOJ Guidelines to support her demand for a 24 percent relator share.[9]  These factors, however, do not support a relator share at

---

[9] The Department of Justice has internal guidelines, created in 1996, to ensure consistency in its evaluation of relator share requests.  DOJ Guidelines identify the following factors to consider in support of a possible increase or decrease in the share percentage:

(a) Factors to consider for a possible increase in the percentage: (1) the relator reported the fraud promptly; (2) when the relator learned of the fraud, she or he tried to stop the fraud or reported it to a supervisor or the government; (3) the *qui tam* filing, or the ensuing investigation, caused the offender to halt the fraudulent practices; (4) the complaint warned the government of a significant

the high end of the statutory range.  First, contrary to Kennedy's contention, Novo Nordisk's payment to the United States of $43,624,897.03 under the FCA Settlement Agreement is not small and does not warrant a higher share percentage.  A relator share award of 18 percent of the FCA Settlement amount would total $7.85 million, hardly an insignificant amount.

As discussed above, the purpose of the *qui tam* provision of the FCA is to induce insiders to come forward with information regarding fraud to help recover funds for defrauded programs. The FCA provides a relator share that is substantial enough, but not overly so, to encourage insiders to come forward.  There is little risk that future relators would be disinclined to bring a *qui tam* action of this type if the Court does not award Kennedy close to the maximum statutory amount.  Indeed, it is difficult to imagine a situation where a future relator would decline to bring a *qui tam* complaint if the award in this case were limited to $7.85 million.

---

safety issue; (5) the complaint exposed a nationwide practice; (6) the relator provided extensive, first hand details of the fraud to the government; (7) the government had no knowledge of the fraud; (8) the relator provided substantial assistance during the investigation and/or pretrial phases of the case; (9) at his or her deposition and/or trial, the relator was an excellent, credible witness; (10) the relator's counsel provided substantial assistance to the government; (11) the relator and his counsel supported and cooperated with the government during the entire proceeding; (12) the case went to trial; (13) the FCA recovery was relatively small; and (14) the filing of the complaint had a substantial adverse impact on the relator.

(b) Factors to consider for a possible decrease in the percentage: (1) the relator participated in the fraud; (2) the relator substantially delayed in reporting the fraud or filing of the complaint; (3) the relator, or relator's counsel, violated FCA procedures:  (a) complaint served on defendant or not filed under seal; (b) the relator publicized the case while it was under seal; or (c) statement of material facts and evidence not provided; (4) the relator had little knowledge of the fraud or only suspicions; (5) the relator's knowledge was based primarily on public information; (6) the relator learned of the fraud in the course of his government employment; (7) the government already knew of the fraud; (8) the relator, or relator's counsel, did not provide any help after filing the complaint, hampered the government's efforts in developing the case, or unreasonably opposed the government's position in litigation; (9) the case required a substantial effort by the government to develop the facts to win the lawsuit; (10) the case settled shortly after the complaint was filed or with little need for discovery; and (11) the FCA recovery was relatively large.

*Alderson*, 171 F.Supp.2d at 1333.

Moreover, the allocation of the FCA Settlement Agreement between the MTC Risk Conduct and Off-Label Promotion Conduct reflects the more egregious nature in this case of the MTC Risk Conduct. Thus, it is not appropriate to compare this case to the high value recoveries in cases that primarily involved off-label marketing conduct referenced by Kennedy.

Second, the impact of Kennedy's whistleblowing on her personal and professional lives does not support a share award above 18 percent. While Kennedy identifies adverse events that she has experienced since bringing this *qui tam* action, Kennedy does not establish all of these resulted from her filing this *qui tam* action rather than other reasons. In addition, Kennedy is currently employed and has held other employment since filing her *qui tam* action. Taking her experience since filing her *qui tam* action into account, although Kennedy's hardships may support an increase above the 15 percent minimum, they do not rise to a level that supports an award at the high end of the statutory range.

## CONCLUSION

Under the FCA, Kennedy should be compensated for her assistance with this *qui tam* action. Kennedy, however, should neither be awarded any share of the FDCA Settlement Amount nor be awarded 24 percent of the FCA Settlement Amount.

As described above, Kennedy dismissed any claim under 31 U.S.C. § 3730(c)(5). Moreover, Kennedy does not have a right to a share of the FDCA Settlement amount because the United States did not pursue that settlement in lieu of a recovery in this *qui tam* action and the FDCA Settlement involved a recovery that could not have been obtained in this *qui tam* action.

Based on Kennedy's actual contributions to this investigation, and the extensive investigation the United States conducted, a relator share award of the FCA Settlement amount of 24 percent, totaling approximately $10.47 million, would be an inappropriate windfall at the expense of the taxpayers and the defrauded Federal Healthcare Programs that their monies

support.  For the reasons discussed above, the United States of America requests that deny

Relator's motion for a relator share award and award Relator up to $7,852,481.46 or 18 percent

of the federal FCA Settlement amount.



DATED:   July 26, 2019                          Respectfully submitted,

                                                JOSEPH H. HUNT
                                                Assistant Attorney General

                                                JESSIE K. LIU
                                                United States Attorney for the District of Columbia

                                                DANIEL F. VAN HORN
                                                Chief, Civil Division



                                                By:  /s/ Darrell C. Valdez_____
                                                DARRELL C. VALDEZ (D.C. Bar No. 420232)
                                                Assistant United States Attorney
                                                U.S. Attorney's Office for the District of Columbia
                                                555 4th Street, NW
                                                Washington, DC 20530
                                                Tel: 202.252.2507
                                                Fax: 202.252.2599
                                                Darrell.Valdez@usdoj.gov

                                                MICHAEL D. GRANSTON (D.C. Bar No. 44625)
                                                JAMIE ANN YAVELBERG (D.C. Bar No.
                                                445473)
                                                WILLIAM E. OLSON (D.C. Bar No. 480087)
                                                Attorneys, Civil Division
                                                Commercial Litigation Branch
                                                P.O. Box 261, Ben Franklin Station
                                                Washington, D.C. 20044
                                                Tel: 202.305.3905

                                                Counsel for the United States of America